# Exhibit A

Copy of all process, pleadings, and orders for the State Action (*Armstrong Ford, Inc., et al. v. Ford Motor Company)* in Defendant's possession, consisting of the Petition

ARMSTRONG FORD, INC. D/B/A CLONINGER )
FORD OF HICKORY; )
ASHEBORO FORD, INC.; )
BOYD BROTHERS FORD, INC.; )
CAPITAL FORD, INC.; )
CAPITAL FORD OF CHARLOTTE, INC.; )
CAPITAL FORD OF LILLINGTON, INC.; )
CAPITAL FORD OF WILMINGTON, LLC; )
CELLA FORD, INC.; )
CENTRAL FORD, INC. D/B/A FEYER FORD )
OF AHOSKIE; )
CHAMPION FORD LINCOLN, INC.; )
CLONINGER FORD, INC.; )
CLONINGER FORD OF MORGANTON, INC.; )
COUNTY MOTOR COMPANY, INC. D/B/A )
COUNTY FORD; )
CRESCENT FORD, INC.; )
CROSSROADS FORD OF )
DUNN-BENSON, INC.; )
CROSSROADS FORD LINCOLN OF )
 SOUTHERN PINES, INC.; )
CROSSROADS FORD, INC.; )
CROSSROADS FORD OF )
FUQUAY-VARINA, INC. )
CROSSROADS FORD OF HENDERSON, INC.; )
CROSSROADS FORD OF INDIAN TRAIL, INC.;)
CROSSROADS FORD OF )
KERNERSVILLE, INC.; )
CROSSROADS FORD LINCOLN OF )
SANFORD, INC. D/B/A CROSSROADS FORD )
OF SANFORD; )
CROSSROADS FORD OF LUMBERTON, INC.; )
CROSSROADS FORD OF WAKE FOREST, INC.;)
DEACON JONES FORD-LINCOLN, INC.; )
DT OF HAVELOCK, LLC D/B/A )
RIVERSIDE FORD; )
EGOLF FORD OF BREVARD, LLC; )
FAIRLANE AUTOMOTIVE LLC D/B/A )
FRIENDSHIP FORD OF LENOIR; )
FEYER FORD, INC.; )
FEYER FORD AND LINCOLN, INC.; )

**PETITION**

FILED

DATE: 03/07/2023

COMM. OF MOTOR VEHICLES
ROCKY MOUNT
NASH COUNTY

BY: April Huff

FEYER FORD OF EDENTON, INC.;                )
GREEN FORD, LLC;                            )
HASTINGS FORD, INC.;                        )
KEN WILSON FORD, INC.;                      )
LOOKOUT FORD, INC.;                         )
PILOT MOUNTAIN FORD, INC. D/B/A             )
FOOTHILL FORD;                              )
PREMIER FORD LINCOLN MERCURY, INC.;         )
D/B/A CAPITAL FORD OF ROCKY MOUNT;          )
RAY MOTOR COMPANY, INC. D/B/A               )
CAPITAL FORD OF HILLSBOROUGH;               )
SALE FORD, LLC D/B/A SALE FORD              )
OF KINSTON;                                 )
SANDERS FORD, INC.;                         )
SCENIC MOTORS, INC. D/B/A SCENIC FORD;      )
STANLEY COUNTY AUTOMOTIVE, LLC              )
D/B/A ALBEMARLE FORD;                       )
STEARNS FORD, INC.;                         )
TRI-CITY FORD, INC.;                        )
WELFORD HARRIS, INC. D/B/A                  )
WELFORD HARRIS FORD; and                    )
WYNN ODOM FORD, INC.,                       )
                                            )
              Petitioners,                  )
      v.                                    )
                                            )
FORD MOTOR COMPANY,                         )
                                            )
              Respondent.                   )

_____

NOW COME Petitioners, Armstrong Ford, Inc. d/b/a Cloninger Ford of Hickory;

Asheboro Ford, Inc.; Boyd Brothers Ford, Inc.; Capital Ford, Inc.; Capital Ford of Charlotte, Inc.;

Capital Ford of Lillington, Inc.; Capital Ford of Wilmington, LLC; Cella Ford, Inc.; Central Ford,

Inc. d/b/a Feyer Ford of Ahoskie; Champion Ford Lincoln, Inc.; Cloninger Ford, Inc.; Cloninger

Ford of Morganton, Inc.; County Motor Company, Inc. d/b/a County Ford; Crescent Ford, Inc.;

Crossroads Ford of Dunn-Benson, Inc.; Crossroads Ford Lincoln of Southern Pines, Inc.;

Crossroads Ford, Inc.; Crossroads Ford of Fuquay-Varina, Inc.; Crossroads Ford of Henderson,

-2-

Inc.; Crossroads Ford of Indian Trail, Inc.; Crossroads Ford of Kernersville, Inc.; Crossroads Ford Lincoln of Sanford, Inc. d/b/a Crossroads Ford of Sanford; Crossroads Ford of Lumberton, Inc.; Crossroads Ford of Wake Forest, Inc.; Deacon Jones Ford-Lincoln, Inc.; DT of Havelock, LLC d/b/a Riverside Ford; Egolf Ford of Brevard, LLC; Fairlane Automotive LLC d/b/a Friendship Ford of Lenoir; Feyer Ford, Inc.; Feyer Ford and Lincoln, Inc.; Feyer Ford of Edenton, Inc.; Green Ford, LLC; Hastings Ford, Inc.; Ken Wilson Ford, Inc.; Lookout Ford, Inc.; Pilot Mountain Ford, Inc. d/b/a Foothill Ford; Premier Ford Lincoln Mercury, Inc. d/b/a Capital Ford of Rocky Mount; Ray Motor Company, Inc. d/b/a Capital Ford of Hillsborough; Sale Ford, LLC d/b/a Sale Ford of Kinston; Sanders Ford, Inc.; Scenic Motors, Inc. d/b/a Scenic Ford; Stanley County Automotive d/b/a Albemarle Ford; Stearns Ford, Inc.; Tri-City Ford, Inc.; Welford Harris, Inc. d/b/a Welford Harris Ford; and Wynn Odom Ford, Inc., complaining against Respondent Ford Motor Company ("Ford"), and allege and state as follows:

1.      Petitioner Armstrong Ford, Inc. d/b/a Cloninger Ford of Hickory is a North Carolina corporation whose principal office and place of business is located in Hickory, North Carolina.

2.      Petitioner Asheboro Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Asheboro, North Carolina.

3.      Petitioner Boyd Brothers Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Oxford, North Carolina.

4.      Petitioner Capital Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Raleigh, North Carolina.

5.      Petitioner Capital Ford of Charlotte, Inc. is a North Carolina corporation whose principal office and place of business is located in Charlotte, North Carolina.

-3-

6.     Petitioner Capital Ford of Lillington, Inc. is a North Carolina corporation whose principal office and place of business is located in Lillington, North Carolina.

7.     Petitioner Capital Ford of Wilmington, LLC is a North Carolina limited liability company whose principal office and place of business is located in Wilmington, North Carolina.

8.     Petitioner Cella Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in New Bern, North Carolina.

9.     Petitioner Central Ford, Inc. d/b/a Feyer Ford of Ahoskie is a North Carolina corporation whose principal office and place of business is located in Ahoskie, North Carolina.

10.     Petitioner Champion Ford Lincoln, Inc. is a North Carolina corporation whose principal office and place of business is located in Rockingham, North Carolina.

11.     Petitioner Cloninger Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Salisbury, North Carolina.

12.     Petitioner Cloninger Ford of Morganton, Inc. is a North Carolina corporation whose principal office and place of business is located in Morganton, North Carolina.

13.     Petitioner County Motor Company, Inc. d/b/a County Ford is a North Carolina corporation whose principal office and place of business in located in Graham, North Carolina.

14.     Petitioner Crescent Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in High Point, North Carolina.

15.     Petitioner Crossroads Ford of Dunn-Benson, Inc. is a North Carolina corporation whose principal office and place of business in located in Dunn, North Carolina.

16.     Petitioner Crossroads Ford Lincoln of Southern Pines, Inc. is a North Carolina corporation whose principal office and place of business in located in Southern Pines, North Carolina.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 5 of 233

17.     Petitioner Crossroads Ford, Inc. is a North Carolina corporation whose principal office and place of business in located in Apex, North Carolina.

18.     Petitioner Crossroads Ford of Fuquay-Varina, Inc. is a North Carolina corporation whose principal office and place of business in located in Fuquay-Varina, North Carolina.

19.     Petitioner Crossroads Ford of Henderson, Inc. is a North Carolina corporation whose principal office and place of business in located in Henderson, North Carolina.

20.     Petitioner Crossroads Ford of Indian Trail, Inc. is a North Carolina corporation whose principal office and place of business in located in Monroe, North Carolina.

21.     Petitioner Crossroads Ford of Kernersville, Inc. is a North Carolina corporation whose principal office and place of business in located in Kernersville, North Carolina.

22.     Petitioner Crossroads Ford Lincoln of Sanford, Inc. d/b/a Crossroads Ford of Sanford is a North Carolina corporation whose principal office and place of business is located in Sanford, North Carolina.

23.     Petitioner Crossroads Ford of Lumberton, Inc. is a North Carolina corporation whose principal office and place of business is located in Lumberton, North Carolina.

24.     Petitioner Crossroads Ford of Wake Forest, Inc. is a North Carolina corporation whose principal office and place of business in located in Wake Forest, North Carolina.

25.     Petitioner Deacon Jones Ford-Lincoln, Inc. is a North Carolina corporation whose principal office and place of business in located in Goldsboro, North Carolina.

26.     Petitioner DT of Havelock, LLC d/b/a Riverside Ford is a North Carolina limited liability company whose principal office and place of business is located in Havelock, North Carolina.

-5-

27.     Petitioner Egolf Ford of Brevard, LLC is a North Carolina limited liability company whose principal office and place of business is located in Brevard, North Carolina.

28.     Petitioner Fairlane Automotive LLC d/b/a Friendship Ford of Lenoir is a North Carolina limited liability company whose principal office and place of business in located in Lenoir, North Carolina.

29.     Petitioner Feyer Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Plymouth, North Carolina.

30.     Petitioner Feyer Ford and Lincoln, Inc. is a North Carolina corporation whose principal office and place of business is located in Williamston, North Carolina.

31.     Petitioner Feyer Ford of Edenton, Inc. is a North Carolina corporation whose principal office and place of business is located in Edenton, North Carolina.

32.     Petitioner Green Ford, LLC is a North Carolina limited liability company whose principal office and place of business is located in Greensboro, North Carolina.

33.     Petitioner Hastings Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Greenville, North Carolina.

34.     Petitioner Ken Wilson Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Canton, North Carolina.

35.     Petitioner Lookout Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Morehead City, North Carolina.

36.     Petitioner Pilot Mountain Ford, Inc. d/b/a Foothill Ford is a North Carolina corporation whose principal office and place of business is located in Pilot Mountain, North Carolina.

37.     Petitioner Premier Ford Lincoln Mercury, Inc. d/b/a Capital Ford of Rocky Mount

-6-

is a North Carolina corporation whose principal office and place of business is located in Rocky Mount, North Carolina.

38.     Petitioner Ray Motor Company, Inc. d/b/a Capital Ford of Hillsborough is a North Carolina corporation whose principal office and place of business is located in Hillsborough, North Carolina.

39.     Petitioner Sale Ford, LLC d/b/a Sale Ford of Kinston is a North Carolina corporation whose principal office and place of business is located in Kinston, North Carolina.

40.     Petitioner Sanders Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Jacksonville, North Carolina.

41.     Petitioner Scenic Motors, Inc. d/b/a Scenic Ford is a North Carolina corporation whose principal office and place of business is located in Mount Airy, North Carolina.

42.     Petitioner Stanley County Automotive, LLC d/b/a Albemarle Ford is a North Carolina limited liability company whose principal office and place of business is located in Albemarle, North Carolina.

43.     Petitioner Stearns Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Burlington, North Carolina.

44.     Petitioner Tri-City Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in Eden, North Carolina.

45.     Petitioner Welford Harris, Inc. d/b/a Welford Harris Ford is a North Carolina corporation whose principal office and place of business is located in Siler City, North Carolina.

46.     Petitioner Wynn Odom Ford, Inc. is a North Carolina corporation whose principal office and place of business is located in La Grange, North Carolina.

47.     Petitioners are engaged in business as new motor vehicle dealers, offering for sale

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 8 of 233

to the general public motor vehicles and related parts and service. Petitioners are "new motor vehicle dealers" within the meaning of N.C. Gen. Stat. § 20-286(13). Petitioners sell and service new Ford motor vehicles.

48.     Ford is a foreign corporation organized and existing under the laws of the State of Delaware with its headquarters located at 1 American Road, Dearborn, MI 48126. Ford manufacturers and distributes Ford brand vehicles through its network of franchised dealers throughout the United States, including Petitioners. Respondent Ford is a "distributor" within the meaning of N.C. Gen. Stat. § 20-286(3) and a "manufacturer" within the meaning of N.C. Gen. Stat. § 20-286(8e).

49.     Each of the Petitioners have entered into Ford Dealer Agreements ("FDA") with Ford which purport to fix certain contractual rights and responsibilities of the Petitioners and Ford, and serves as the legal framework pursuant to which Petitioners have been purchasing and continue to purchase from Ford new Ford motor vehicles and related parts and accessories. True and complete copies of FDAs entered into between each Petitioner and Ford are attached to this Petition and are incorporated herein by reference as Exhibits A-1 to A-46.[1] Only one copy of the "Standard Provisions" to the FDAs is attached as this document is identical for all of the Petitioners. A true and complete copy of the Standard Provisions is attached hereto and is incorporated herein by reference as Exhibit A-47. Subject to superseding federal and state law, Exhibits A-1 thru A-46 are "franchises" within the meaning of N.C. Gen. Stat. § 20-286(8a).

50.     The PREAMBLE to the FDAs states that "[i]t is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through

---

[1] Where stated in Exhibits A1-A46, certain of the Petitioners are not in custody or control of a copy of their FDAs. Those Petitioners have requested a copy of their respective FDAs from Respondent Ford Motor Company.

a system of *independent* franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital." (Emphasis added).

51.    The FDAs authorize Petitioners to sell "COMPANY PRODUCTS," which are defined as new passenger cars (defined as "CARS"), new trucks and chassis, excluding all trucks and chassis of series 850 or higher designations (collectively defined as "TRUCKS"), and parts and accessories therefor.

52.    The FDAs collectively refer to CARS and TRUCKS as "VEHICLES."

53.    The PREAMBLE to the FDAs states further that "[b]ecause it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital."

54.    The FDAs purport to require Petitioners to "promote vigorously the sale at retail (and, if the Dealer elects, the leasing and retail) of CARS and TRUCKS to private and fleet customers within the DEALER's LOCALITY, and shall develop energetically and satisfactorily the potentials for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. To this end, the dealer shall develop, maintain and direct a trained, quality vehicle sales organization and shall conduct throughout each model year aggressive advertising and sales promotion activities, making use to the greatest

feasible extent of the Company's advertising and sales promotion programs relating to VEHICLES."

55.     The FDAs permit Petitioners to sell all respective Ford passenger cars and trucks regardless of the means of propulsion.

56.     North Carolina's "Licensing Law" (N.C. Gen. Stat §§ 20-285 through 20-308.2) governs these FDAs, and also provides additional protections to franchised motor vehicle dealers and consumers in North Carolina.

57.     Ford is no stranger to selling vehicles using alternative powertrains such as hybrids and electric vehicles ("EVs"). Ford has been doing so through its existing dealer networks and through the existing dealer agreements for a number of years.

58.     Indeed, Ford currently sells two EVs, the Ford Mustang Mach e, and the F150 Lightning through its existing dealer network, and under existing franchise agreements.

59.     Ford vehicles, hybrid vehicles, and EVs are "COMPANY PRODUCTS" under the FDAs.

60.     Petitioners sell and service Ford's current lineup of EVs under the FDAs.

61.     Ford has made a significant investment in EV vehicles and Ford expects 40% to 50% of its global vehicle volume to be fully electric by 2030.[2]

62.     Ford dealers such as Petitioners have demonstrated that they can sell EV and hybrid vehicles effectively. Ford's full year sales of electric vehicles for 2022 hit a new record at 61,575 vehicles, making Ford the second largest automaker of electric vehicles in America. Ford sales of

---

[2] https://media.ford.com/content/fordmedia/fna/us/en/news/2021/09/27/ford-to-lead-americas-shift-to-electric-vehicles.html (last visited December 21, 2022).

EVs were up 126 percent for the year and up 223 percent for December.[3]

63. These Ford EVs were sold through Ford's existing dealer network.

64. Ford dealers like Petitioners collectively sold 39,458 Mustang Mach-Es in 2022, with a 45.4% increase from the prior year. *Id.*

65. While discussing Ford's success with EVs thus far, Andrew Frick, Vice President of Ford, stated "our all-new EVs [are] growing at twice the rate of the overall EV segment." *Id.*

66. Ford sold 6,500 E-Transit vans, making it America's best-selling electric van with 73 percent share of the segment. *Id.*

67. The F-150 Lightning was the No. 1 electric truck in America in December, 2022 and the best-selling electric truck in the U.S. since its launch in May, 2022 with 15,617 electric trucks sold. *Id.*

68. Despite the strong performance by dealers, on or around September 22, 2022, Ford informed its dealers that it intends to fundamentally modify their franchises by requiring dealers to comply with unlawful requirements in order to continue selling EVs.

69. Ford has fallen short by failing to keep up with demand and thus has restricted EV sales that fall below consumer demand.

70. The new requirements are included in what Ford calls the "Model e Electric Vehicle Program" (the "EV Program").

71. These new requirements come at a time when the industry is shifting its focus from selling motor vehicles with internal combustion engine ("ICE") powertrains to EVs.

72. For dealers like Petitioners, the continued ability to sell and service new EVs will

---

3

https://media.ford.com/content/dam/fordmedia/North%20America/US/2023/01/05/December%202022%20Sales%20Release%20Final.pdf. (Last Visited 01/09/2023).

be critical to survival.

73.     Through the EV Program, Ford seeks to coerce dealers into expending huge sums of money unnecessarily in order to continue selling vehicles they are already authorized to sell under their current FDAs, and agree to limitations, the improper ceding of control of dealer operational control of aspects of vehicle sales, and to acquiesce to additional unlawful and unilaterally devised requirements.

74.     Ford provided each of the Petitioners with a Model e proforma for the individual dealerships prior to the commencement of the EV Program enrollment period. Upon information and belief, those proformas indicate that Ford does not believe that any of the Petitioners will be able to generate an overall profit selling and servicing EVs over the following three years.

75.     In order to continue selling and servicing Ford EVs, a Ford dealer must either be a Ford "Model e Certified" dealer or a "Model e Certified Elite" dealer.

76.     Dealers that do not agree to go along with Ford's demands as set out in the Ford EV Program will not be allowed to continue ordering, selling, or servicing Ford EVs.

77.     Ford will not allow Model e Certified dealers to maintain an inventory of EVs at the dealership, nor will Ford permit Model e Certified dealers to keep any vehicles on hand for customers to test drive as demonstrators.

78.     Ford's EV Program, as released, would restrict sales by Model e Certified dealers to "Build to Order," with a cap of only 25 retail orders annually. Ford has since told dealers via written notification, a true a complete copy of which is attached hereto and is incorporated herein by reference as Exhibit F, that Model e Certified dealers will be allowed to take orders above 25, but only if, upon information and belief, those orders come from either employees or "loyal customers" who have purchased at least two new Ford vehicles from the dealer over the previous

-12-

seven years.

79.     Model e Certified dealers will be denied access to any vehicle stock inventory and they will only be allowed to take a build to order reservation from a very limited pool of customers.

80.     Only Model e Certified Elite dealers will be allowed to order EVs from a limited number of ground stock. No other dealers will be able to order EVs from Ford directly.

81.     Dealers that refuse to go along with Ford's new demands will be denied access to new Ford EVs.

82.     Ford has failed to disclose any manner or mode of allocation among dealers participating in the EV Program other than to state that only Certified Elite dealers will be allocated any EVs.

83.     Under the EV Program, the sole entry and exit point for consumer purchases will be the Ford.com E-Commerce platform other than to state that only Certified Elite dealers will be allocated any EVs.

84.     Only Model e Certified Elite dealers will be highly visible in the Ford.com purchase flow, meaning that consumers will only be able to readily select online from Model e Certified Elite dealers. Ford told dealers at the NADA Convention on January 28, 2023 that Model e Certified dealers will also appear on the Ford.com website with less prominence than Model e Certified Elite dealers. Dealers that do not enroll in the EV Program will not appear on the Ford.com website at all, and will no longer be allowed to sell Ford electric vehicles.

85.     This means that 100% of the EV sales transactions must be initiated and completed directly through Ford, whether they occur at a franchised Ford dealership or not.

86.     Additionally Model e Certified Elite and Model E Certified Dealers are required to purchase at least one Level 3 charger to be dedicated to public use.

-13-

87.    Ford estimates that the cost to purchase and install the requisite chargers will run between $770,000-$1,120,000 for a Model e Certified Elite dealer and approximately $450,000 for a Model e Certified dealer.

88.    North Carolina law includes an express prohibition against Ford requiring a dealer to provide public-facing chargers.

89.    Upon information and belief, a number of Ford dealers have been informed that there is currently inadequate power infrastructure to support Ford's charger demands.

90.    There are additional costs and requirements for a dealer to continue selling EVs, including the Mach e and Lightning vehicle models the dealers are currently selling today:

| Requirement | Cost |
|---|---|
| Annual Training | $40,000/Certified Elite Model e $25,000/Certified Model e |
| Retail Environment | $25,000-$50,000/Certified Elite Model e |
| Technology Tools | $6,000 + $800/EV Specialist |
| Displays | $5,000 |

91.    Dealers must meet a 95% completion standard for the Ford dictated annual training, which is not limited to information required to sell or service EVs, but also includes impermissible training topics such as travel, "ownership experiences" and "building diverse teams."

92.    Training requirements that go beyond specific instruction necessary to sell or service motor vehicles are not permitted by North Carolina law.

93.    Ford's CEO, Jim Farley, told analysts in July that Ford needs to cut $2,000 per

vehicle out of selling and distribution costs to be competitive with Tesla and other electric vehicle startups that sell directly to consumers without franchised dealers.[4]

94.     True to Mr. Farley's words, Ford is shifting the burden of building out an EV charging and repair infrastructure (the "Blue Oval Charging Network") to its dealers to maximize Ford's own margins and profits.

95.     Rather than incurring the cost to establish its own EV charging network, Ford is impermissibly shifting the cost of Ford's Blue Oval Charging Network onto its dealers by requiring them to buy expensive chargers regardless of whether they need them to sell and service EVs.

96.     The cost to install the chargers does not include ongoing maintenance and security dealers like Petitioners will be required to provide so they can satisfy the requirement to have chargers available to the public.

97.     Besides requiring dealers to spend significant sums on infrastructure to become Model e Certified or Model e Certified Elite, Ford also sets requirements regarding sales practices a dealer must follow.

98.     Dealers are required to have a single e-commerce platform with non-negotiable prices. This means a dealer must exclusively use Ford's website for marketing and selling Ford EVs and must sell those vehicles at non-negotiable prices notwithstanding specific statutory provisions prohibiting such requirements.

99.     Dealers are also required to honor non-negotiable trade-in prices generated by Ford, despite a North Carolina statute prohibiting such a requirement.

100.    Dealers must also participate in Ford's Model e Allowable Advertised Price

---

[4] Ford will challenge dealers to match Tesla's lower selling costs | Reuters (last visited November 21, 2022).

("MAAP") program.

101. Under MAAP, dealers may not advertise or promote EVs at a price payment or offer that is outside the allowable advertised price standards to be unilaterally controlled by Ford.

102. Ford EV Program dealers must also offer home delivery of vehicles to 100% of customers, utilize a specific tablet for all vehicle deliveries to a customer, and complete a digital readiness checklist that Ford has yet to finish.

103. Ford EV Program dealers must exclusively use "Guest XP," a Ford digital platform, which allows customers to request service appointments, a loaner vehicle, or remote or in-service consultation.

104. Dealers must use Guest XP even if the dealers are already paying for a competing product that offers the same or similar services that they would prefer to use.

105. Ford is also requiring dealers to offer pickup & delivery with a loaner vehicle for all Model e service events. Ford has not disclosed any plan to provide an adequate number of loaner vehicles, or any commitment to reimburse dealers for these costs, despite a state law requirement for Ford to do so.

106. None of these new Model e requirements are included in the FDAs, and Ford has not guaranteed that it will reimburse dealers for these services.

107. On October 26, 2022, December 6, 2022 and January 4, 2023, the North Carolina Automobile Dealers Association ("NCADA"), sent letters to Ford documenting various ways the Model e Programs conflicts with North Carolina law. The letters are attached hereto and are incorporated herein by reference as Exhibits B-D.

108. On November 22, 2022, Ford responded to NCADA with a letter denying it was violating any laws. Ford's response letter is attached herein and is incorporated herein by reference

-16-

as Exhibit E.

109.    Ford's letter acknowledges that the Model e Program is tied to the FDA and states: "Ford also has the right under its dealer agreement to develop programs, and dealers have a corresponding obligation to cooperate with such programs...." Ex. E, p.1.

110.    Despite this acknowledgement that the Program is an "obligation," later on in the letter Ford disingenuously claims "the Program is voluntary and allows each dealer to make an individual assessment of the potential for EV sales and servicing in its market, and to determine what level of investment and commitment, if any, is warranted based on their assessment." Ex. E p. 2.

111.    Ford's claim of voluntariness ignores not only the unlawful provisions of the Model e Program, but also ongoing regulatory efforts to limit or eliminate the sales of ICE vehicles. For instance, on January 22, 2022 Governor Roy Cooper issued Executive Order 246, which provides that the State will strive to "increase the sale of ZEVs so that 50 percent of in-state sales of new vehicles are zero-emission by 2030."[5]

112.    Petitioners cannot afford to lose 50% of their sales over the next few years, so the contention that "the Program is voluntary" is untenable. Either Petitioners sign up for the program, or they lose the ability to sell EVs, the only zero-emission vehicles Ford currently offers, which in turn would likely put them out of business.

113.    Ford's EV Program will serve to reduce the number of Ford dealers in North Carolina and further restrict consumer access to electric vehicles, particularly those citizens residing in parts of North Carolina outside of the largest cities.

---

[5] https://governor.nc.gov/media/2907/open (last visited December 21, 2022).

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 18 of 233

114.    Upon information and belief, the persons within Ford Motor Company responsible for developing the Model e Program and its requirements never bothered to review applicable statutes and regulations in North Carolina to determine whether certain provisions were illegal.

115.    Upon information and belief, Ford certifies that it will fully comply with North Carolina law in all of its activities that impact this State as a part of its annual manufacturer license renewal.

116.    The fundamental changes to the franchise relationship between each Petitioner and Ford that are brought about by the Ford EV Program not only violate North Carolina law, but also amount to modifications of Ford franchise-related form agreements, as Ford is seeking to alter the existing written terms of the FDAs, including the existing language that permits dealers to sell all "COMPANY PRODUCTS".

117.    Pursuant to N.C. Gen. Stat. § 20-297.1, a specific process must be followed for modifications of franchise-related form agreements, which requires, *inter alia*, written notice to the dealers, written notice to the North Carolina Automobile Dealers Association, Inc., and the Commissioner, the inclusion of specific statutory language, and an opportunity for dealer to protest the proposed changes.

118.    Ford has not complied with these statutory notice requirements.

119.    Ford's EV Program violates numerous provisions of North Carolina law.

120.    N.C. Gen. Stat. § 20-301.1 provides that "[a]ny franchised new motor vehicle dealer who believes that a manufacturer, factory branch, distributor or distributor branch with whom the dealer holds a currently valid franchise has violated or is currently violating any provision of [Article12 of Chapter 20] may file a petition before the Commissioner setting forth the factual and legal basis for such violations."

-18-

The Petitioners believe, and therefore allege that Ford is violating provisions of the Franchise Law.

## FIRST CAUSE OF ACTION
## PROTEST OF PROPOSED MODIFICATION UNDER N.C. GEN. STAT. § 20-297.1

121. The preceding paragraphs of the Petition are incorporated herein by reference.

122. N.C. Gen. Stat. § 20-308.2 states that the Licensing Law applies to all agreements between a motor vehicle dealer and a manufacturer, wholesaler, or distributor, and that provisions of any such agreement which violate North Carolina's franchise laws "shall be deemed null and void and without force and effect."

123. N.C. Gen. Stat. § 20-297.1 governs franchise-related form agreements, including the FDA, and imposes limitations on the ability of manufacturers, including Ford, to change a franchise-related form agreement if such modification(s) "may adversely affect or alter rights, obligations, or liability of a motor vehicle dealer, or may adversely impair the sales, service obligations, investment, or profitability of any motor vehicle dealer located in this State..." Specifically, N.C. Gen. Stat. § 20-297.1(b) provides:

> (b) Notwithstanding the terms of any franchise or agreement, it shall be unlawful for any manufacturer, factory branch, distributor, or distributor branch to offer to a dealer, revise, modify, or replace a franchise-related form agreement, as defined above in this section, which agreement, modification, or replacement may adversely affect or alter the rights, obligations, or liability of a motor vehicle dealer or may adversely impair the sales, service obligations, investment, or profitability of any motor vehicle dealer located in this State, unless:

> (1) The manufacturer, factory branch, distributor, or distributor branch provides prior written notice by registered or certified mail to each affected dealer, the Commissioner, and the North Carolina Automobile Dealers Association, Inc., of the modification or replacement in the

-19-

form and within the time frame set forth within this section and in subsection (c) of this section; and

(2) If a protest is filed under this section, the Commissioner approves the modification or replacement.

124.    Petitioners are already authorized by Ford to sell EVs under the terms of the existing FDAs.

125.    Internal combustion engine vehicles, EVs, and Hybrids are all "COMPANY PRODUCTS" under the terms of the FDAs.

126.    The existing FDAs acknowledge that Petitioners: (a) are independent from Ford; (b) are the parties tasked with interacting with the public for the sale of vehicles; and (c) have latitude to achieve these goals. *See* Preamble: "[i]t is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships…[b]ecause it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital."

127.    Petitioners, as well as other Ford dealers, are not only authorized to sell EVs under the FDAs, but also have been very successful doing so in recent years notwithstanding extremely limited inventory, and without the EV Program.

128.    In fact, Ford's share of the EV market has been increasing, and its market share is

-20-

second only to Tesla.

129.    Despite strong dealer performance in relation to EVs, Ford now wants to dictate the minutiae of Petitioners' businesses, down to how such things as the number of EV chargers they must have to charge EV vehicles, how they interact with customers, what software programs to use to schedule service appointments, creation of new dealership personnel positions and titles, unnecessary training, and at what price they can sell EVs and purchase trade-in vehicles.

130.    Ford's EV Program also imposes significant investment costs, which cannot be justified by petitioners' expected return on those forced investments.

131.    These requirements are unreasonable and contrary to the plain language of the FDAs which acknowledge the Petitioners' roles as independent retailers of new motor vehicles, and the independence Petitioners maintain over their day-to-day operations and capital investments.

132.    Ford is attempting to force these unreasonable requirements upon the dealers through the "EV Program" in an unlawful attempt to circumvent franchise laws which prevent such unreasonable modifications to franchise agreements.

133.    The various new requirements for continuing to sell electric vehicles, as introduced as a part of the EV Program, are "modifications", as they effectively alter the language of franchise-related form agreements and they substantially alter the rights and obligations of Ford dealers in North Carolina, and will also serve to adversely impact sales, service obligations, investment, and profitability.

134.    To the extent that these modifications may purport to be voluntary, North Carolina dealers are faced with a Hobson's choice where there is no real alternative. Dealers can either accept the modifications and be forced to buy-in to Ford's onerous EV Program so that they may

-21-

continue to sell Ford EVs (which they are already legally entitled to do), or decline to agree to Ford's illegal conditions and be suddenly deprived of new EV motor vehicles altogether. This Hobson's choice mandates action by the Commissioner to prevent Ford's unlawful actions.

135. Petitioners cannot simply opt-out and choose not to sell EVs without negatively impacting their future viability as franchised Ford dealers.

136. Participation in the "voluntary" EV Program also requires dealers to comply with a host of illegal conditions.

137. If a Ford dealer does not sign up for the EV Program, Ford will strip the dealer of the continued right to sell Ford EV vehicles, including the Mach e and Lightning, which the dealers are already authorized to sell today.

138. N.C. Gen. Stat. § 20-297.1(c) sets forth stringent notice requirements which Ford must follow for any proposed modifications:

> (c) The notice required by subdivision (b)(1) of this section shall:
> (1) Be given not later than the 60th day before the effective date of the modification or replacement;
> (2) Contain on its first page a conspicuous statement that reads: "NOTICE TO DEALER: YOU MAY BE ENTITLED TO FILE A PROTEST WITH THE COMMISSIONER OF THE NORTH CAROLINA DIVISION OF MOTOR VEHICLES AND HAVE A HEARING IN WHICH YOU MAY PROTEST THE PROPOSED INITIAL OFFERING, MODIFICATION, OR REPLACEMENT OF CERTAIN FRANCHISE-RELATED FORM AGREEMENTS UNDER THE TERMS OF THE MOTOR VEHICLE DEALERS AND MANUFACTURERS LICENSING LAW, IF YOU OPPOSE THIS ACTION"; and
> (3) Contain a separate letter or statement that identifies all substantive modifications or revisions and the principal reasons for each such modification or revision.

139. Ford has violated N.C. Gen. Stat. § 20-297.1(c) by not providing the requisite written notice.

140. Under N.C. Gen. Stat. § 20-297.1(e), Ford has the burden of proving good cause for the proposed modifications.

-22-

141.    Under N.C. Gen. Stat. § 20-297.1(e), the Petitioners are entitled to an automatic stay of the proposed modifications until the Commissioner resolves the protest.

142.    Based upon the foregoing, and pursuant to N.C. Gen. Stat. §§ 20-301(b), N.C. Gen. Stat. § 20-297.1, and other applicable law, Petitioners respectfully request that the Commissioner hold a hearing to determine whether Respondent Ford complied with the notice requirements for its proposed modifications, and if so, whether Ford can satisfy its burden of proving that good cause exists for the proposed modifications, and that the modifications are otherwise fully-complaint with applicable law.

WHEREFORE, Petitioners respectfully requests that the Commissioner: (i) hold a hearing, pursuant to N.C. Gen. Stat. §§ 20-301(b), N.C. Gen. Stat. § 20-297.1, and other applicable law, to determine whether Ford met the required statutory notice requirements for modifications of a franchise related form agreement pursuant to N.C. Gen. Stat. § 20-297.1; (ii) hold a hearing, pursuant to N.C. Gen. Stat. §§ 20-301(b), N.C. Gen. Stat. § 20-297.1, and other applicable law, to determine whether the proposed changes amount to modifications of a franchise-related form agreement that adversely affects or alters the rights, obligations, or liability of a motor vehicle dealer or may adversely impair the sales, service obligations, investment, or profitability of any motor vehicle dealer located in this State; and if so, determine whether Ford can satisfy its burden of proving good cause for the proposed modifications; (iii) notify Ford that it may not put into effect any proposed changes or modifications to the FDAs pending a final determination by the Commissioner; (iv) tax the costs of this matter, together with the Petitioners' reasonable litigation expenses against Respondent Ford to the extent allowed by law; and (v) grant Petitioners such other and further relief as the Commissioner may deem just and proper.

## SECOND CAUSE OF ACTION
## PROTEST OF VIOLATIONS UNDER
## N.C. GEN. STAT. § 20-305 (1, 2, 3, 9, 11, 12, 14, 15, 22, 32, 33, 34, 48, 49 and 53)

143. The preceding paragraphs of the Petition are incorporated herein by reference.

144. N.C. Gen. Stat. § 20-308.2 provides that the Licensing Law applies to all agreements between a motor vehicle dealer and a manufacturer, wholesaler, or distributor, and that any provisions of such agreements which violate the Licensing Law "shall be deemed null and void and without force and effect."

145. N.C. Gen. Stat. § 20-305 provides protection to franchised new motor vehicle dealers by prohibiting a wide array of conduct by Ford.

146. Ford's EV Program is so egregious that its provisions violate numerous subsections of N.C. Gen. Stat. § 20-305, including subsections (1), (2), (3), (9), (11), (12), (14), (15), (22), (32), (33), (34), (48), (49) and (53).

147. N.C. Gen. Stat. § 20-305(1) prohibits manufacturers, such as Ford, from requiring dealers to accept delivery of any vehicles, parts or accessories which were not ordered by the dealer.

148. The Ford EV Program contemplates customers ordering vehicles online, directly from Ford, and then selecting a dealership to which the EV is delivered for pickup and to complete some of the sale paperwork.

149. This scheme results in vehicles being delivered to dealers regardless of whether the vehicles were ordered *by the dealers.* The EV Program violates N.C. Gen. Stat. § 20-305(1).

150. N.C. Gen. Stat. § 20-305(2) prohibits manufacturers, such as Ford, from requiring or coercing dealers to enter into agreements by threatening to cancel an existing franchise.

-24-

151. As Ford expects 40% to 50% of its global vehicle volume to be fully electric by 2030, dealers which do not have access to Ford's EV's will be effectively terminated as they will be unable to compete with other Ford dealerships that sell EVs.

152. Ford's existing FDA authorizes all dealers to sell new Ford EVs.

153. Ford has told its dealers that they must either sign up for the EV Program or have their access to EVs terminated.

154. The importance of all Ford dealers having continued access to new EVs on reasonable conditions that are fully-complaint with North Carolina law is magnified by the governmental efforts by many states, including North Carolina, to transition away from ICE vehicles in favor of EVs.

155. By "offering" dealers a Hobson's choice of either participating in the onerous EV Program or losing access to EV inventory entirely, Ford is in violation of N.C. Gen. Stat. § 20-305(2) by effectively terminating the franchise of any dealer that does not "choose" to comply with the untenable provisions of the EV Program.

156. N.C. Gen. Stat. § 20-305(3) prohibits manufacturers, such as Ford, from cancelling the franchise of a dealer unfairly and without due regard to the equities of said dealer, and without provocation.

157. As set forth herein, Ford dealers are clearly capable of selling EVs without the EV Program, as presented to the dealers, and the onerous program requirements which come with significant and needless expenses, are unprovoked and fail to consider the equities of individual dealers.

158. The effective termination of dealers that refuse to comply with Ford's EV Program also violates N.C. Gen. Stat. § 20-305(3).

-25-

159.    N.C. Gen. Stat. § 20-305(9) prohibits manufacturers, such as Ford, from, among other things, requiring dealers to purchase specific dealer management computer systems or any other computer hardware or software used for any purpose other than maintenance and repair of motor vehicles.

160.    As discussed herein, and in direct violation of N.C. Gen. Stat. § 20-305(9), Ford's EV Program requires dealers to purchase a minimum number of Level 3 charging stations (regardless of the dealerships' levels of EV sales), and also requires that dealers offer "public-facing" charging.

161.    Ford's EV Program also violates N.C. Gen. Stat. §20-305(9) because it requires (a) more than the number of electric vehicle charging stations for use by service technicians and customer education than would reasonably be necessary for the dealer to perform these functions based on the dealer's estimated sales and service volume during the following three-year period and (b) requires the dealers to make electric vehicle charging stations located at the dealership available for use by the general public.

162.    The Ford EV Program also requires dealers to pay for, and exclusively use, software called Guest XP. Upon information and belief, Guest XP is designed to set and process all customer service appointments and repair transactions. Dealers already possess the capability to handle such functions without Guest XP. The requirement to pay and exclusively use Guest XP is also in violation of N.C. Gen. Stat. § 20-305(9).

163.    N.C. Gen. Stat. § 20-305(11) prohibits manufacturers, such as Ford, from requiring, coercing or attempting to coerce dealers to refrain from investing in or acquiring other line-makes of vehicles.

164.    To the extent Ford contends that Ford EVs will be considered a separate brand,

-26-

division or other designation other than products offered pursuant to the existing FDAs, Ford shall be in violation of N.C. Gen. Stat. §20-305(11) as its onerous and unlawful requirements for offering EVs amount to an attempt to coerce dealers, particularly smaller, rural dealers, to refrain from investing in or acquiring Ford EVs due to the excessive cost and unlawful terms of the EV Program.

165. N.C. Gen. Stat. § 20-305(12) prohibits manufacturers, such as Ford, from requiring or coercing dealers to make substantial alterations to the dealership premises or facilities when to do so would be unreasonable, or without providing written assurance of a sufficient supply of new vehicles to justify the expenses to be incurred in light of market and economic conditions.

166. The Ford EV Program requires substantial facility alterations, including the installation of mandatory charging stations and associated infrastructure.

167. The facility alteration requirements included in the EV Program are unreasonable in light of current and projected future EV sales. Further, Ford has also failed to provide any assurances that dealers that acquiesce to the terms of the EV Program will receive a sufficient supply of EVs in order to justify the significant cost of participating in the EV Program. In fact, Ford has admitted that it cannot provide its dealers an adequate supply of EVs to meet expected consumer demand for the foreseeable future.

168. Ford's EV Program also violates N.C. Gen. Stat. § 20-305(12).

169. N.C. Gen. Stat. § 20-305(14) prohibits manufacturers, such as Ford, from: (i) delaying, refusing, or failing to deliver motor vehicles to dealers in quantities relative to their facilities and sales potential in their respective markets or within a reasonable time following receipt of an order.

170. N.C. Gen. Stat. § 20-305(14) further requires that: (i) manufacturers provide its

-27-

franchised dealers with an adequate supply of vehicles by series, line, and model in a fair, equitable and reasonable manner; (ii) that allocation be fair and equitable to all of the manufacturer's franchised dealers in the State; (iii) provide at least one of each vehicle series, model, or product line be made available to each franchised dealer; and (iv) the allocation process may not unfairly discriminate among its franchised dealers.

171.    Ford's EV Program seeks to completely deprive dealers who do not enroll in the EV Program from receiving at least one of each Ford vehicle series, model, or product line.

172.    All of Ford's dealers are entitled to Ford EVs, as they are "COMPANY PRODUCTS" under the FDAs.

173.    Ford will not provide adequate EV inventory to its dealers at levels to justify the required investments for at least a period of years.

174.    Ford's EV Program violates N.C. Gen. Stat. § 20-305(14) by failing to provide a method of allocation for EVs that is equitable, fair, reasonable, and not discriminatory; and by refusing to provide all of its franchised dealers with at least one of each vehicle series, model, or product line that is made available to other franchised dealers.

175.    N.C. Gen. Stat. § 20-305(15) prohibits manufacturers, such as Ford, from refusing to disclose the manner and mode of distribution of vehicles to its franchised dealers.

176.    Ford's EV Program violates N.C. Gen. Stat. § 20-305(15) by failing to disclose the manner and mode of distribution of its EVs to its franchised dealers.

177.    Ford has, in fact, failed and refused to disclose how it will allocate its EV product to dealers in North Carolina, other than to admit that a number of its dealers will soon be blocked from ordering EVs and, upon information and belief, roughly one-third of Ford dealers nationally will soon be banned from selling EVs altogether.

178.    N.C. Gen. Stat. § 20-305(22) prohibits manufacturers, such as Ford, from unfairly discriminating among its franchised dealers with respect to warranty reimbursement or granting authority to dealers to make warranty adjustments with retail customers.

179.    Ford's EV Program violates N.C. Gen. Stat. § 20-305(22) by not only attempting to restrict the ability of dealers to sell EV vehicles, but also by restricting their ability to perform warranty service on vehicles, unless they agree to go along with the terms of the new EV Program.

180.    Only dealers that participate in the EV Program will be allowed to perform warranty work on Ford EVs.

181.    N.C. Gen. Stat. § 20-305(32) prohibits manufacturers, such as Ford, from conditioning the receipt of particular vehicles on the payment of additional fees, the purchase of unreasonable or unnecessary materials, or renovations or remodeling.

182.    Ford's EV Program violates N.C. Gen. Stat. § 20-305(32) by conditioning dealers' receipt of EVs on, among other things, the purchase and installation of charging stations, including public facing charging stations, and the payment of significant fees for training, which are not currently necessary to sell or service EVs.

183.    N.C. Gen. Stat. § 20-305(33) prohibits manufacturers, such as Ford, from failing to reimburse dealers for the full cost required loaner vehicles.

184.    Ford's EV Program requires that dealers participating in the EV Program offer loaners to all EV customers, but does not offer reimbursement for such loaners, in violation of N.C. Gen. Stat. § 20-305(33).

185.    N.C. Gen. Stat. § 20-305(34) prohibits manufacturers, such as Ford, from requiring dealers to participate monetarily in training programs unless such programs are expressly limited to specific information necessary to sell or service vehicles which the dealers are authorized to

-29-

sell.

186. The annual training costs alone for these programs, at the expense of the dealers, range from $25,000 to $40,000 or more. These costs are in addition to existing training requirements.

187. In violation of N.C. Gen. Stat. § 20-305(34), the EV Program expressly states that the required training will not be limited to training actually required in order to be able to sell and service EVs, but will also include other unrelated topics such as "building diverse terms."

188. N.C. Gen. Stat. § 20-305(48) allows dealers to maintain independence in staffing, and prohibits manufacturers, such as Ford, from requiring the employment or designations of full-time or exclusive staff in any specific capacity, with the exception of a general manager.

189. In violation of N.C. Gen. Stat. § 20-305(48), the EV Program requires, among other things, that dealers designate employees to serve in a role other than the general manager, and that the dealers establish and train specialized teams relating to the "Ford Guest Experience", and that they have a predetermined minimum number of certified technicians, regardless of the dealership's size, service capacity, units in operation, or sales numbers.

190. N.C. Gen. Stat. § 20-305(49) prohibits manufacturers, such as Ford, from charging more than the reasonable cost for any essential or special tool, and requires the disclosure of the actual cost of said tools by the manufacturer if it is sold to dealers for more than $250.00.

191. In violation of N.C. Gen. Stat. § 20-305(49), the EV Program requires specific tools and other service equipment, but fails to disclose the price or cost of any of these items.

192. N.C. Gen. Stat. § 20-305(53) prohibits manufacturers, such as Ford, from taking a variety of actions relating to vehicle reservations, including: (i) failing to assign vehicle reservations to the dealer selected by the customer, or if none selected, the nearest dealer; (ii)

-30-

prohibiting customers with a reservation from negotiating the final vehicle purchase price with the dealer; (iii) prohibiting customers with reservations from utilizing financing or leasing sources available from the dealer; (iii) prohibiting customers with reservations from purchasing, on terms negotiated or agreed directly with the dealer, service contracts, extended warranties, maintenance contracts, GAP agreements, or other vehicle related products; (iv) prohibiting customers with reservations from negotiating trade-in prices with the dealer; and (v) using a third party to accomplish what would otherwise be prohibited.

193.    In violation of N.C. Gen. Stat. § 20-305(53), the EV Program, among other prohibited practices, (i) will only permit customers to choose dealers that have enrolled in the EV Program, as opposed to letting customers choose their desired or nearest dealer; (ii) prohibits customers from negotiating the purchase pricing directly with the dealer; and (iii) prohibits customers from negotiating trade-in vehicle pricing directly with the dealer.

WHEREFORE, Petitioners respectfully request that the Commissioner: (i) hold a hearing, pursuant to N.C. Gen. Stat. §§ 20-301(b), N.C. Gen. Stat. § 20-297.1, and other applicable law, to determine whether the Ford EV Program violates N.C. Gen. Stat. § 20-305, including subsections (1), (2),(3), (9), (11), (12), (14), (15), (22), (32), (33), (34), (48), (49) and (53); (iii) tax the costs of this matter, together with the Petitioners' reasonable litigation expenses against Respondent Ford to the extent allowed by law; and (iv) Grant Petitioners such other and further relief as the Commissioner may deem just and proper.

### THIRD CAUSE OF ACTION
### PROTEST OF VIOLATIONS UNDER N.C. GEN. STAT. § 20-305.6

194.    Plaintiffs incorporate by reference each of the allegations set forth above as if fully written here.

-31-

195. N.C. Gen. Stat. § 20-308.2 provides that the Licensing Law regulates all agreements between a motor vehicle dealer and a manufacturer, wholesaler, or distributor, and that provisions of any such agreements which violate the Licensing Law "shall be deemed null and void and without force and effect."

196. N.C. Gen. Stat. § 20-305.6 provides protection to new motor vehicle dealers, including Petitioners, by prohibiting manufacturers from discriminating against similarly situated dealers, unfairly discriminating against its franchised dealers with dualled facilities, and unfairly discriminating against any one of their franchised dealers in North Carolina.

197. Even though Ford is requiring the Petitioners to spend significant sums of money to participate in the EV Program, there is no guarantee they will receive adequate inventory or that the limited supply of EVs will be allocated fairly.

198. Ford is also discriminating against Ford dealers that are dualled with Lincoln by requiring duplication of EV chargers when such duplication is totally unnecessary.

199. Ford has stated that if a dealer attains the highest level of certification under the Ford EV Program, at best it will receive "limited" amounts of inventory.

200. Rather than allocate vehicles based on sales to customers as Ford has done in the past, the amount of Ford's allocation of EVs will be strictly at its whim, and if, and only if, the Petitioners meet all of the onerous requirements to be Model e Certified Elite under the EV Program.

201. All other Ford dealers, including even those that are Model e Certified, will not receive any EV inventory from Ford.

202. Ford's EV Program also inherently fails to take into account the individual circumstances and locations of its various dealers, as there are only two versions of these EV

-32-

Programs—"Model e Certified" and "Model e Certified Elite."

203.	The EV Program, as introduced, has rigid, and onerous, requirements that inherently discriminate against rural and smaller dealerships.

204.	Through the requirements implemented in its EV Program, Ford is violating N.C. Gen. Stat. § 20-305.6 by discriminating against similarly situated dealers, by discriminating against dealers with dualled facilities, and by implementing a discriminatory vehicle allocation scheme.

205.	Based on the foregoing and pursuant to N.C. Gen. Stat. §§ 20-301(b) and other applicable law, Petitioners respectfully request that the Commissioner conduct a hearing to determine whether Respondent Ford's EV Program violated N.C. Gen. Stat. §20-305.6. WHEREFORE, Petitioners respectfully request that the Commissioner:  (i) hold a hearing, pursuant to N.C. Gen. Stat. §§ 20-301(b), N.C. Gen. Stat. § 20-305.6, and other applicable law, to determine whether the Ford EV Programs violate N.C. Gen. Stat. § 20-305.6  by discriminating against similarly situated dealers; by unfairly discriminating against franchise dealers with dualled facilities;  by unfairly discriminating against any one of  their franchised dealers; or (iii) by other acts or omissions to be demonstrated at hearing; and (iv) tax the costs of this matter, together with the Petitioners' reasonable litigation expenses against Respondent Ford to the extent allowed by law; and (iv) Grant Petitioners such other and further relief as the Commissioner may deem just and proper.

## **RESERVATION OF RIGHTS**

Petitioners expressly reserve all rights to allege amended and additional claims as may become evident as this subject action proceeds.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 34 of 233

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully pray that the Commissioner:

1) Conduct a hearing for the purpose of determining whether Respondent Ford and its Model e Program are in violation of the various provisions of North Carolina law as alleged in the subject Petition;

2) Enter an order determining that Respondent Ford and its Model e Program are in violation of the various provisions of North Carolina law as alleged in the subject Petition;

3) Enter an Order prohibiting all violations of North Carolina law on the part of Respondent Ford and its Model e Program;

4) Grant Petitioners the relief requested;

5) Award Petitioners their costs and reasonable attorney fees to the extent allowed by law; and

6) Grant Petitioners such other and further relief that the Commissioner deems just and proper.

Respectfully submitted this the 7th day of March, 2023.

BASS SOX MERCER

By:

Shawn D. Mercer (NCSB 19182)
Mark W. Ishman (NCSB 27908)
4208 Six Forks Road, Suite 1000
Raleigh, North Carolina 27609
Telephone: (919) 847-8632
Facsimile: (919) 847-8633
smercer@bsm-law.com
mishman@bsm-law.com

-and-

Jeremiah M. Hawkes (*pro hac vice pending*)
Andrew G. Thomas (*pro hac vice pending*)
2822 Remington Green Circle
Tallahassee, Florida 32308
Phone: 850-878-6404
Fax: 850-942-4869
jhawkes@bsm-law.com
athomas@bsm-law.com

*Attorneys for Petitioners*

-35-

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the foregoing Petition on Respondent

Ford Motor Company by depositing a copy of the same in the United States certified mail, return

receipt requested, addressed to said Respondent's registered agent for the service of process in

North Carolina as follows:

> CT Corporation System
> Reg. Agent for Ford Motor Company
> 160 Mine Lake Ct Ste 200
> Raleigh, NC 27615-6417
>
> Ford Motor Company
> 1 American Rd
> Dearborn, MI 48126

This the 7th day of March, 2023.

Shawn D. Mercer

_____
Shawn D. Mercer

-36-



# Ford Motor Company

CONFIDENTIAL

(Original)

COPY OF ORIGINAL



EXHIBIT

A-1

_____**CHARLOTTE**_____ Region

# Superseding
# Ford Sales and Service Agreement

AGREEMENT made as of the _____**2nd**_____ day of _____**November**_____, **2011**,

by and between _____**Armstrong Ford, Inc.**_____
<br>(Name of Entity)

_____**Corporation**_____           _____**North Carolina**_____
<br>(State whether an individual, partnership or corporation)      (Show name of the State in which incorporated or registered)

doing business as _____**Cloninger Ford of Hickory**_____
<br>(Trade Name)

and with a principal place of business at _____**1241 Highway 70 East**_____      **1328**
<br>(Street Address)           (P.O. Box)

| **Hickory** | **Catawba** | **North Carolina** | **28602** | **28603** |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
<br>GEN. SALE 9/98
<br>Macro #5002 (1/02)

 CONFIDENTIAL

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii



Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Madison Miles Holdings, Inc. | 1241 Highway 70 East, Hickory NC 28602 | 100.00% |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Larry T. Cloninger, Jr. | ▮▮▮▮▮▮▮▮▮▮ | President |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G. (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring October 31, 2014 unless sooner terminated under the provisions of paragraph 17 hereof.

H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

Cloninger Ford of Hickory
(Dealer's Trade Name)

General Sales Manager

Countersigned _Martin E Collins_

_Donna Buss_     DOH

By _Larry A. Cloninger_

(Title) _Pres._

iv



EXHIBIT

A-2

Asheboro Ford, Inc. is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.

DocuSign Envelope ID: 9D618B10-FE01-4466-AB01-642CB21FD7C4



# Ford Motor Company

Charlotte Region



EXHIBIT

A-3

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | 10/26/1999 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the _____ day of _____ , _____

,

by and between _____ Boyd Brothers Ford, Inc. _____

_____ Corporation _____ North Carolina _____

doing business as _____ Boyd Brothers Ford, Inc. _____

and with a principal place of business at _____ 1021 Martin Luther King Jr. Avenue _____ 396
<div align="center">(Street Address)       (P.O. Box)</div>

| Oxford | Granville | NC | 27565-3657 | 27565-0396 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Glenn A. Boyd | ▉▉▉▉▉▉▉▉<br>27537 | 25 | |
| Maurice A. Boyd | ▉▉▉▉▉▉▉▉<br>27536 | 75 | |
| | | | |
| | | | |
| | | | |

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 43 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | ██████████, 27537 | President |
| Maurice A. Boyd | ██████████, 27536 | President |
| Anna Boyd May | ██████████, 27537 | Temporary General Manager |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST Equity | Voting |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Boyd Brothers Ford, Inc.
(Dealer's Trade Name)

By _____
   Assistant Secretary

By _____
   Maurice A. Boyd
   President

*Donna Buss*
_____
   Donna Buss - Regional Manager

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 44 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

EXHIBIT

A-4

 **Ford Motor Company**

**Charlotte** District

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ **1** day of _April_____, 19 **85**,

by and between _____ **Capital Ford, Inc.**_____

**Corporation** — (Name of Entity) **North Carolina**

(State whether an individual, partnership or corporation) **Capital Ford, Inc.** — (If the latter, show name of the state in which incorporated)

doing business as _____

(Trade Name) **4900 North Boulevard**

and with a principal place of business at _____

**Raleigh** (City)    **Wake** (County)    **North Carolina** (State)    **27604** (Zip Code)

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through a system of independent franchised dealers, with each dealer fulfilling his responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representa-

tion in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within his locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops monthly production schedules from basic orders submitted by its franchised dealers for the following month and its and their best estimates of the market for subsequent months.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories for vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each month each dealer must forecast and give the Company a basic order for the products needed to serve his market. During the month each dealer should submit specific orders for products covered by his basic order. If dealers' specific orders for any product are greater than or different from their basic orders, the Company seeks to revise production schedules to the extent feasible, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only through cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Since it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to, the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and curent conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of dealership operations and, through other agreements and the activities of its affiliates, assistance in financing, new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, his intention to carry out his responsibilities set forth in this agreement, and his desire

to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon his representations as to the persons who will participate in the ownership and management of the dealership.

The Dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize that the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law.

The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A GEN. SALE 1-76"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Manager, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional or District Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Manager, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and

(iii)

agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Hubert B. Parks | Kernersville, North Carolina | 50 |
| Chester A. Michael, III | Winston-Salem, North Carolina | 50 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Timothy W. Michael | Raleigh, North Carolina | President |
| Hubert B. Parks | Kernersville, North Carolina | Vice President |
| Chester A. Michael, III | Winston-Salem, North Carolina | Secretary |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| | | |
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

    G. (Strike out either subparagraph (1) or (2) whichever is not applicable.)

    (1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

    (2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.

    H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

    IN WITNESS WHEREOF the parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

*(Ford)* **Ford Motor Company**

*RC Kurvey*

General Manager, Ford Division

Countersigned by

_____

Capitol Ford, Inc.

_____
(Dealer's Trade Name)

By *Timothy W. Michael*

**President**
(Title)

By *Hubert B. Parks*, Vice President

By *Chester A. Michael, III*, Secretary


EXHIBIT

A-5



# Ford Motor Company

### Charlotte Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 10ᵗʰ _____ day of __ MARCH __ , __ 2014 __ ,

by and between _____ Capital Ford of Charlotte, Inc. _____

_____ Corporation _____ North Carolina .

doing business as _____ Capital Ford of Charlotte, Inc. _____

and with a principal place of business at _____ 5411 North Tryon St. _____

| | | | | (P.O. Box) |
| (Street Address) | | | | |

| Charlotte | Mecklenburg | NC | 28213 | 28213 |
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

**Ford Sales Service Agreement**
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 1/2012
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 51 of 233

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Timothy W. Michael | ▓▓▓▓▓▓▓▓▓ | 33.34 | |
| Chester A. Michael, III | ▓▓▓▓▓▓▓▓▓ | 33.33 | |
| Hubert B. Parks Marital Trust UAD 4/23/2009 | ▓▓▓▓▓▓▓▓▓ | 33.33 | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Timothy W. Michael | ▓▓▓▓▓▓▓ ..... | President |
| | | |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G.  (2)  This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _March 31, 2016__ unless sooner terminated under the provisions of paragraph 17 hereof.

**H.**  Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

*D Mondragon*

General Sales Manager

Countersigned by

*Donna Buss*

Donna Buss - Regional Manager

_____  _____  _βPH_

Capital Ford of Charlotte, Inc.
(Dealer's Trade Name)

By _____
Timothy W. Michael

(Title) _____ President _____



**EXHIBIT**

A-6



# Ford Motor Company

### Charlotte Region
### Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ **29th** _____ day of __**October**__, __**2020**__ ,

by and between _____ **Capital of Lillington, Inc.** _____

_____ **Corporation** _____        **North Carolina**

doing business as _____ **Capital Ford of Lillington** _____

and with a principal place of business at _____ **945 North Main Street** _____  **1937**
<br>(Street Address)                (P.O. Box)

| **Lillington** | **Harnett** | **NC** | **27546-9412** | **27546** |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

### PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 53 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

DocuSign Envelope ID: 069589FB-57F7-4EB2-BA00-EF20871C2001

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 54 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 55 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Timothy W. Michael | ▓▓▓▓▓▓▓▓▓▓▓▓▓ | 34.0% | |
| Chester A. Michael III | ▓▓▓▓▓▓▓▓▓▓▓▓▓ | 33.0% | |
| Hubert B. Parks Martial Trust, UAD 04/23/2009 | ▓▓▓▓▓▓▓▓▓▓▓▓▓ | 33.0% | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Timothy W. Michael | 1937 Torrey Pines Place, Raleigh, NC 27615 | President |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring October 31, 2022 unless sooner terminated under the provisions of paragraph 17 hereof.

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.



**Ford Motor Company**

Director, U.S. Sales

Countersigned by _Donna Buss_

Donna Buss - Regional Manager

Assistant Secretary

Capital Ford of Lillington
(Dealer's Trade Name)

By _____

Timothy W. Michael

(Title) _____President_____

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM  Document 1-1  Filed 03/31/23  Page 56 of 233
Date Revised: 5/2015
Retention Requirement: C + 12



# Ford Motor Company

(Copy of Original)

EXHIBIT

A-7

_____ **Atlanta** _____ Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ _1st_ day of _July_ , _2003_

by and between _____ **Capital Ford of Wilmington LLC** _____
(Name of Entity)

__**Limited Liability Company**__                                    __**North Carolina**__
(State whether an individual, partnership or corporation)          (Show name of the State in which incorporated or registered)

doing business as _____ **Capital Ford of Wilmington LLC** _____
(Trade Name)

and with a principal place of business at _____ **4222 Oleander Drive** _____ **4069**
(Street Address)                                  (P.O. Box)

| **Wilmington** | **New Hanover** | **North Carolina** | **28403-6822** | **28406-1069** |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | EQUITY | VOTING |
| Timothy W. Michael | ████████████████████ | 33.34 | 33-1/3 |
| Chester A. Michael, III | ████████████████████ | 33.33 | 33-1/3 |
| Hubert B. Parks | ████████████████████ | 33.33 | 33-1/3 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Timothy W. Michael | ████████████████████ | Member |
| James D. Barbour, Jr. | ████████████████████ | General Manager |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | EQUITY | VOTING |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

    **G.** (Strike out either subparagraph (1) or (2) whichever in not applicable.)

    (1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

    (2) ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.~~

    **H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

President, Ford Division

Countersigned by

Capital Ford of Wilmington LLC
(Dealer's Trade Name)

By

(Title)    Member

iv

 

# FORD MOTOR COMPANY

**EXHIBIT**
**A-8**

_File_

CHARLOTTE _____ District

## AMENDMENT TO

| | |
|---|---|
| FORD SALES AND SERVICE AGREEMENT | dated **June 1, 1972** |
| FOREIGN VEHICLE SALES AGREEMENT (COURIER) | dated **December 20, 1974** |
| FOREIGN VEHICLE SALES AGREEMENT (FIESTA) | dated **May 2, 1977** |
| ~~FORD TRUCK SALES AND SERVICE AGREEMENT~~ | ~~dated~~ _____ |
| ~~FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT~~ | ~~dated~~ _____ |

SUPPLEMENTAL AGREEMENT, made at Dearborn, Michigan as of this **30** day of **July**, 19 **84**,

by and between **Cella Ford, Inc.**
(Name of Entity)

**Corporation**            **North Carolina**
(State whether an individual, partnership or corporation)   (If the latter, show name of the state in which incorporated)

doing business as **Cella Ford, Inc.**
(Trade Name)

and with a principal place of business at **Highway 17 South**
(Street Address)

| New Bern | Craven | North Carolina | 28560 |
|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) |

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Sales and Service or Sales Agreements (hereinafter "Agreements") and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F. In view of the personal nature of these Agreements and their objectives and purposes, the Company expressly reserves to itself the right to execute said Agreements with individuals or other entities specifically selected and approved by the Company. Accordingly, these Agreements and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under these Agreements. These Agreements have been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| E. J. Cella | New Bern, North Carolina | 95 |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of these Agreements:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| E. J. Cella | New Bern, North Carolina | President |
| | | |
| | | |

FD-925-J
REV 4/83

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Stephen F. Cella | New Bern, North Carolina | 5 |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effectve on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

FORD MOTOR COMPANY

By _____
Assistant Secretary

Cella Ford, Inc.
(Dealer Trade Name)

By X _____
(Signature and Title)

E. J. Cella, President

EXHIBIT

A-9

tabbies



Central Ford, Inc. d/b/a Feyer Ford of Ahoskie is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.

DocuSign Envelope ID: 802C416C-E20D-4B8B-B2BA-7B3E015CCD43

 **Ford Motor Company**

Southeast Market Area-Charlotte Region


EXHIBIT
A-10

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | July 17, 2007 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | July 17, 2007 |

SUPPLEMENTAL AGREEMENT made as of the _____ 2nd _____ day of _____ March _____, _____ 2021 _____

,

by and between _____ Champion Ford Lincoln, Inc. _____

_____ Corporation _____ _____ Delaware _____

doing business as _____ Champion Ford/Champion Lincoln _____

and with a principal place of business at _____ 706 Highway 74 East _____ ____ 607 ____
<br>(Street Address) (P.O. Box)

| Rockingham | Richmond | NC | 28379-7524 | 28380 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F.    In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| **NAME** | **HOME ADDRESS** | **Equity** | **Voting** |
| Reginald Robinson | ▬▬▬▬▬▬▬▬▬▬ | 100% | N/A |
| | | | |
| | | | |
| | | | |
| | | | |

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 64 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Reginald Robinson | ████████████████ | President |
| Charles A. Morgan Jr. | ████████████████ | General Manager |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| NAME | HOME ADDRESS | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Champion Ford/Champion Lincoln
(Dealer's Trade Name)

By _____
DocuSigned by:
*Eric Lukas*
06EDCF1C7A2F4F7...    Assistant Secretary

By _____
*Reginald Robinson*
Reginald Robinson
President

*Donna Buss*
Donna Buss - Regional Manager

*Steve Hammond*
Steve Hammond - Lincoln Regional Manager

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 65 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

 **Ford Motor Company**

EXHIBIT
A-11


Charlotte District

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 2 day of March _____, 19 85

by and between _____ Cloninger Ford, Inc. _____
(Name of Entity)

Corporation North Carolina
(State whether an individual, partnership or corporation) (if the latter, show name of the state in which incorporated)

doing business as _____ Cloninger Ford, Inc. _____
(Trade Name)

and with a principal place of business at _____ 419 South Main Street _____
(Street Address)

| Salisbury | Rowan | North Carolina | 28144 |
|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through a system of independent franchised dealers, with each dealer fulfilling his responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representa-

tion in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within his locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops monthly production schedules from basic orders submitted by its franchised dealers for the following month and its and their best estimates of the market for subsequent months.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories for vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each month each dealer must forecast and give the Company a basic order for the products needed to serve his market. During the month each dealer should submit specific orders for products covered by his basic order. If dealers' specific orders for any product are greater than or different from their basic orders, the Company seeks to revise production schedules to the extent feasible, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only through cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Since it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to, the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and curent conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of dealership operations and, through other agreements and the activities of its affiliates, assistance in financing, new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, his intention to carry out his responsibilities set forth in this agreement, and his desire

to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon his representations as to the persons who will participate in the ownership and management of the dealership.

The Dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize that the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law.

The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

A. The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

B. Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

C. The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A GEN. SALE 1-76"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

D. This agreement shall bind the Company when it bears the facsimile signature of the General Manager, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional or District Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

E. The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof; (ii) no one except the General Manager, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing; and (iii) no one except the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

F. In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and

agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Billy H. Armstrong | Hickory, North Carolina | 69 |
| Larry T. Cloninger, Jr. | Salisbury, North Carolina | 31 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Billy H. Armstrong | Hickory, North Carolina | Secretary-Treasurer |
| Larry T. Cloninger, Jr. | Salisbury, North Carolina | President |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
|      |              |                        |
|      |              |                        |
|      |              |                        |
|      |              |                        |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever is not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring ——————————————— unless sooner terminated under the provisions of paragraph 17 hereof.

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

IN WITNESS WHEREOF the parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

Cloninger Ford, Inc.

Ford Motor Company

General Manager, Ford Division

Countersigned by

By

(Dealer's Trade Name)

President

(Title)


EXHIBIT
tabbies
A-12



# Ford Motor Company

Charlotte Region
Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ *3rd* _____ day of *may* , *2017* ,

by and between _____ Cloninger Ford of Morganton, Inc. _____

_____ Corporation _____ North Carolina _____

doing business as _____ *Cloninger Ford of Morganton* _____

and with a principal place of business at _____ 1001 Jamestown Road _____ 100

<div align="center">(Street Address)      (P.O. Box)</div>

| Morganton | Burke | NC | 28655-9277 | 28680-0100 |
|-----------|-------|----|-----------|-----------| 
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 70 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 72 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Larry T. Cloninger, Jr. | ███████████████ | 100% | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Larry T. Cloninger, Jr. | ███████████████ | President |
| John D. Abee | ███████████████ | General Manager |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G.   (2)  This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring __May 31, 2020__ unless sooner terminated under the provisions of paragraph 17 hereof.

H.   Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

*Dianne C. Craig*

Director, U.S. Sales

Cloninger Ford of Morganton
(Dealer's Trade Name)

By *Larry T. Cloninger*
Larry T. Cloninger, Jr.

(Title) _____ President _____

Countersigned by

*Donna Buss*

Donna Buss - Regional Manager

_____  _____  _____

Assistant Secretary

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 5/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 73 of 233

DocuSign Envelope ID: B860276C-EA62-44EC-9325-8B0DD21527AB



EXHIBIT

tabbies

A-13



# Ford Motor Company

### Charlotte Region

# EXTENSION OF

## TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

_____ day of _____ , _____

by and between _____ County Motor Company, Inc. _____

Corporation _____ North Carolina _____

doing business as _____ County Motor Company, Inc. _____

and with a principal place of business at _____ 105 Auto Park Drive _____ 597

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  |  | (Street Address) | (P.O. Box) |

| Graham | Alamance | NC | 27253-3598 | 27253 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| FORD SALES AND SERVICE AGREEMENT | Dated | May 9, 2016 |
|---|---|---|
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **April 30, 2021** unless sooner terminated under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 3/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 74 of 233

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

## FORD MOTOR COMPANY

County Motor Company, Inc.
(Dealer's Trade Name)

By _____
　　　　Assistant Secretary

By _____ *Dale Stearns*
　　　　Dale A. Stearns
　　　　President

_____ *Donna Buss*
Donna Buss - Regional Manager

DocuSign Envelope ID: AE2ECB38-47E3-43CD-88C3-970FC292E421



EXHIBIT

A-14



# Ford Motor Company

Charlotte Region
<u>Interim</u>

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ day of _____ , _____ ,

by and between _____ Crescent Ford, Inc. _____

_____ <u>Corporation</u> _____ <u>North Carolina</u> _____

doing business as _____ Crescent Ford, Inc. _____

and with a principal place of business at _____ 100 Old Winston Rd _____ 5628
<div align="center">(Street Address)</div> <div align="right">(P.O. Box)</div>

| High Point | Guilford | NC | 27265-2829 | 27262-5628 |
|:---:|:---:|:---:|:---:|:---:|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the *Dealer and of the Dealer in reselling and providing service for them and* (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 76 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

DocuSign Envelope ID: AE2ECB38-47E3-43CD-88C3-970FC292E421

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 77 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 78 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

DocuSign Envelope ID: AE2ECB38-47E3-43CD-88C3-970FC292E421

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Anthony Bertschi | ~~[redacted]~~ | 33.5% | |
| April Bertschi Gibson | ~~[redacted]~~ | 33.25% | |
| Jeremy Bertschi | ~~[redacted]~~ | 33.25% | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Anthony Bertschi | ~~[redacted]~~ | Dealer Principal |
| | | |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | In Process | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G.

      This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **November 30, 2024** unless sooner terminated under the provisions of paragraph 17 hereof.

H.   Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

Crescent Ford, Inc.
**(Dealer's Trade Name)**

Director, U.S. Sales

By _____
          Anthony Bertschi
          Dealer Principal

Countersigned by

_____
    William Krill- Regional Manager

_____
Assistant Secretary

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 79 of 233
Date Revised: 5/2015
Retention Requirement: C + 12



EXHIBIT

A-15



# Ford Motor Company

### Charlotte Region
### Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ day of _____ , _____ ,

by and between _____ **Crossroads Ford of Dunn-Benson, Inc.** _____

_____ Corporation _____ North Carolina _____

doing business as _____ **Crossroads Ford of Dunn-Benson** _____

and with a principal place of business at _____ **1700 West Cumberland St** _____ **2069, Wake F…**

<div align="center">(Street Address)       (P.O. Box)</div>

| Dunn | Harnett | NC | 28334-4510 | 27588 |
|------|---------|-----|-----------|-------|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 80 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 81 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Glenn A. Boyd | ▓▓▓▓▓▓▓▓▓▓ | 75% | |
| Glenn A. Boyd, Jr. | ▓▓▓▓▓▓▓▓▓▓ | 25% | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | ▓▓▓▓▓▓▓▓▓▓ | President |
| Glenn A. Boyd, Jr. | ▓▓▓▓▓▓▓▓▓▓ | Vice President |
| Gregory E. Vandeloo | ▓▓▓▓▓▓▓▓▓▓ | Temporary General Manager |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

**G.**     This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **September 30, 2021** unless sooner terminated under the provisions of paragraph 17 hereof.

**H.**     Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

Crossroads Ford of Dunn-Benson
(Dealer's Trade Name)

By _____ *Glenn Allen Boyd, Sr.*

Director, U.S. Sales

Glenn A. Boyd

Countersigned by

(Title) _____ President

_____ *Donna Buss*

Donna Buss - Charlotte Regional Manager

_____  _____  _____

Assistant Secretary

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 83 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

EXHIBIT

A-16



# Ford Motor Company

Southeast Market Area-Charlotte Region

# EXTENSION OF

## TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

_____30th_____ day of _____September_____ , _____2018_____

by and between _____Crossroads Ford Lincoln of Southern Pines, Inc._____

Corporation _____North Carolina_____

doing business as _____Crossroads Ford of Southern Pines/ Crossroads Lincoln of Southern Pines_____

and with a principal place of business at

| 1590 U.S. Highway 1 South | 2069 |
|---|---|
| (Street Address) | (P.O. Box) |

| Southern Pines | Moore | NC | 28387-5914 | 27588 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| FORD SALES AND SERVICE AGREEMENT | Dated | August 27, 2013 |
|---|---|---|
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | August 27, 2013 |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

G.     (1)  This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**FORD MOTOR COMPANY**

By _____
          Assistant Secretary

_____
Donna Buss - Regional Manager

Crossroads Ford of Southern Pines/ Crossroads Lincoln of ...
(Dealer's Trade Name)

By _____
          Glenn A. Boyd
          President

_____
Steve Hammond - Lincoln Regional Manager

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 3/2015
Retention Requirement: C + 12
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 85 of 233



## NOTICE OF CHANGE OF TRADE NAME
## AND/OR CORPORATE ENTITY NAME

### BEFORE

The name of <u>CAC III, Inc.</u> (Entity Name)

d/b/a <u>Crossroads Ford Lincoln of Southern Pines</u> (Trade Name)

located at <u>1590 U.S. Highway 1 South</u> , <u>Southern Pines</u>, <u>NC</u> <u>28387-5914</u>
(Address, City, State, Zip Code)

has been changed to:

### AFTER

The name of <u>Crossroads Ford Lincoln of Southern Pines</u> (Entity Name)*

d/b/a <u>Crossroads Ford of Southern Pines/Crossroads Lincoln of Southern Pines</u> (Trade Name)

* Note: If there is a Trade Name only change, the Corporate Entity name before and after should be the same.

Please change your records to show this change in name.

| | Crossroads Ford Lincoln of Southern Pines |
|---|---|
| | (Dealer's Trade Name on Sales Agreement) |
| By: | Glenn A. Boyd |
| Title: | President |
| Date: | 2-6-19 |

_Earl Lutes_
Assistant Secretary     3.20.2019
Date

_Donna Buss_
Regional Manager     Mar-12-2019
Date

_Steve Hammond_
Lincoln Regional Manager     Mar-13-2019
Date

Notice of Trade and/or Entity Name
GIS1: 7.06
GIS2 Classification : CONFIDENTIAL

Date Revised: 3/2015
Retention Requirement: C+12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 86 of 233

 **FORD MOTOR COMPANY**

EXHIBIT
A-17
tabbies

_____ Atlanta _____ Region

# EXTENSION OF

## TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT, made at Dearborn, Michigan as of this **4th** day of _____ June _____, 19 **08**,

by and between _____ Crossroads Ford, Inc. _____
<div align="center">(Name of Entity)</div>

__Corporation__ _____ __North Carolina__ _____
(State whether an Individual, Partnership or Corporation)   (If the Latter, show name of the state in which incorporated)

doing business as _____ Crossroads Ford, Inc. _____
<div align="center">(Trade Name)</div>

and with a principal place of business at _____ 1101 Buck Jones Road _____
<div align="center">(Street Address)</div>

__Raleigh__ _____ __Wake__ _____ __NC__ _____ __27606__ ✓
(City)            (County)            (State)            (Zip Code)

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware Corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| Ford Sales and Service Agreement | dated | November 22, 1996 ✓ |
| ~~Foreign Vehicle Sales Agreement (Courier)~~ | ~~dated~~ | |
| ~~Foreign Vehicle Sales Agreement (Fiesta)~~ | ~~dated~~ | |
| ~~Ford Truck Sales and Service Agreement~~ | ~~dated~~ | |
| ~~Ford Heavy Duty Truck Sales and Service Agreement~~ | ~~dated~~ | |

Therefore, Paragraph "G" of the Ford, Ford Truck and Ford Heavy Duty Truck Sales and Service Agreements and Paragraph "H" of the Foreign Vehicle Sales Agreements are deemed amended to read as follows:

G. (Strike out either subparagraph (1) or (2) whichever is not applicable)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

~~(2) This agreement shall continue in force and effect for term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.~~

~~H. DURATION. This Agreement shall be effective from the date it bears until _____ upon which date this Agreement shall automatically expire without notice, unless sooner terminated under the provisions of paragraph 14 of the Standard Provisions.~~

4/83 **FD-925-E** **(Macro 5010 5/95)**

The remaining subparagraphs and other terms of the said agreements remain unchanged.

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this extension will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreements identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

FORD MOTOR COMPANY                                      Crossroads Ford, Inc.
                                                        (Dealer's Trade Name)

By _____        By _____  President
          Assistant Secretary                          (Signature and Title)

_____Regional Sales Manager_____

_____

_____

_____



# Ford Motor Company

## Charlotte Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 11ᵗʰ _____ day of __ June __ , __2014__ ,

by and between _____ Crossroads Ford of Fuquay-Varina, Inc. _____

| Corporation | North Carolina |
|---|---|

doing business as _____ Crossroads Ford of Fuquay-Varina _____

and with a principal place of business at _____ 3217 North Main Street _____ .597 2069
(Street Address)                                              (P.O. Box)  WAKE FOREST, NC
                                                                                    27588

| Fuquay-Varina | Wake | NC | 27526-8570 | 27526-0597  CR |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip)  6-16-14 |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 1/2012
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 89 of 233

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

**Ford Sales Service Agreement**
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 90 of 233
Date Revised: 1/2012
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. *The Dealer hereby accepts such appointment.*

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 91 of 233

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Glenn A Boyd | | 75 | |
| Glenn Allen Boyd, Jr. | | 25 | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | | President |
| Glenn Allen Boyd, Jr. | | Vice President/Secretary |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G.          (1)  This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

H.   Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.
The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford** **Ford Motor Company**

*TD Mondragon*

General Sales Manager

Countersigned by

*Donna Buss*
Donna Buss - Regional Manager

Crossroads Ford of Fuquay-Varina
(Dealer's Trade Name)

By _____
Glenn A. Boyd

(Title) _____President_____

DOH

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 1/2012
Retention Requirement: C + 12
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 92 of 233

EXHIBIT
A-19
tabbies*



# Ford Motor Company

Charlotte Region

Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____1st_____ day of __October__ , __2018__ ,

by and between _____Crossroads Ford of Henderson, Inc._____

_____Corporation_____  _____North Carolina_____

doing business as _____Crossroads Ford of Henderson_____

and with a principal place of business at _____1675 Dabney Drive_____ **2069 Wake Forest**

<span>(Street Address)</span>                                  (P.O. Box)

| Henderson | Vance | NC | 27536-3493 | 27588 |
|:---:|:---:|:---:|:---:|:---:|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 5/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 93 of 233

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Glenn A. Boyd | ███████████████ | 75% | |
| Glenn Allen Boyd, Jr. | ███████████████ | 25% | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | ███████████████ | President |
| Glenn Allen Boyd, Jr. | ███████████████ | Vice President |
| Terry A. Wooten | ███████████████ | TGM |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G.    This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring __September 30, 2023_ unless sooner terminated under the provisions of paragraph 17 hereof.

H.    Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

Crossroads Ford of Henderson
(Dealer's Trade Name)

Director, U.S. Sales

By _____
Glenn A. Boyd

Countersigned by

(Title) _____ President

Donna Buss - Regional Manager

Assistant Secretary

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 5/2015
Retention Requirement: C + 12
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 95 of 233



# Ford Motor Company

Charlotte Region

EXHIBIT

A-20

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | September 10, 2012 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the ___19th___ day of _October_ , _2017_ ,

by and between _____ Crossroads Ford of Indian Trail, Inc. _____

_____ Corporation _____ North Carolina _____

doing business as _____ Crossroads Ford of Indian Trail _____

and with a principal place of business at _____ 88 Dale Jarrett Blvd _____ 2069-11120

| Indian Trail | Union | NC | 28079 | 27588 |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F.    In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST Equity |
|---|---|---|
| Glenn A. Boyd | ████████████████████ | 80 |
| Glenn Allen Boyd, Jr. | ████████████████████ | 20 |
| | | |
| | | |
| | | |

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 96 of 233

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | ███████████████████ | President |
| Glenn Allen Boyd, Jr. | ███████████████████ | Vice President |
| John Timothy May | ███████████████████ | Treasurer |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

By _____
Assistant Secretary

Donna Buss - Regional Manager

Crossroads Ford of Indian Trail
(Dealer's Trade Name)

By _____
Glenn A. Boyd
President



# Ford Motor Company

### Charlotte Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 10th _____ day of ___ September, 2018 ___,

by and between _____ Crossroads Ford of Indian Trail, Inc. _____

Corporation                                    North Carolina

doing business as _____ Crossroads Ford of Indian Trail _____

and with a principal place of business at _____ 88 Dale Jarrett Boulevard _____ 2069 – 11120 Capital Blvd.

| Indian Trail | Union | NC | 28079 | 27588 (Wake Forest) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

### PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 99 of 233

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
| --- | --- | --- |
| | | Equity |
| Glenn A. Boyd | ███████████████ | 80 |
| Glenn Allen Boyd, Jr. | ███████████████ | 20 |
| | | |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
| --- | --- | --- |
| Glenn A. Boyd | ████████████ | President |
| Glenn Allen Boyd, Jr. | ████████████ | Vice President |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
| --- | --- | --- | --- |
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G.    This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

H.    Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

Crossroads Ford of Indian Trail
(Dealer's Trade Name)

General Sales Manager _(signature)_

By _(signature)_
Glenn A. Boyd

Countersigned by
_Donna Buss_
Donna Buss - Regional Manager

(Title) _____ President _____



# Ford Motor Company

_____ *Atlanta* _____ Region

**EXHIBIT A-21**

# Ford Sales and Service Agreement



AGREEMENT made as of the _____ 11ᵗʰ _____ day of __ October __, 2007,

by and between _____ **Crossroads Ford of Kernersville, Inc.** _____
(Name of Entity)

_____ **Corporation** _____      **North Carolina**
(State whether an individual, partnership or corporation)     (Show name of the State in which incorporated or registered)

doing business as _____ **Crossroads Ford of Kernersville, Inc.** _____
(Trade Name)

and with a principal place of business at ____ **1330 Highway 66 South** ____    **1069**
(Street Address)        (P.O. Box)

| **Kernersville** | **Forsyth** | **North Carolina** | **27284** | **27285** |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |



(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Glenn A. Boyd | ▉▉▉▉▉▉▉▉▉▉▉ | 100.00 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | ▉▉▉▉▉▉▉▉▉▉▉ | President |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

~~(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring unless sooner terminated under the provisions of paragraph 17 hereof.~~

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford** **Ford Motor Company**

_____
President, Ford Division

Countersigned by
_____

**Crossroads Ford of Kernersville, Inc.**
(Dealer's Trade Name)

By _____

(Title) _____President_____

iv

(Original)

 **FORD MOTOR COMPANY**

EXHIBIT
A-22
tabbles

_CHARLOTTE_ Region

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | **March 31, 2010** |
| ~~FORD TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ | _MB_ |
| ~~FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ | _RN DB_ |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | **March 31, 2010** |

SUPPLEMENTAL AGREEMENT, made as of this ___4ᵗʰ___ day of ___October___ , ___2011___

by and between ___~~Crossroads~~ ~~Sanford~~ Ford Lincoln-~~Mercury~~, Inc.___   _of ~~JANFORD~~, DR 12-2-11_
(Name of Entity)

___Corporation___                                    ___Delaware___
(State whether an Individual, Partnership or Corporation)        (If the latter, show name of State in which Incorporated)

doing business as ___Crossroads Ford Lincoln ~~Mercury~~ of Sanford , _Ink_.___   _CR 12-2-11_
(Trade Name)

and with a principal place of business at ___3251 Highway 87 South___                    ___2069___
(Street Address)                                        (P.O. Box)

| ___Sanford___ | ___Lee___ | ___North Carolina___ | ___27332___ | ___27588___ |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip Code) |

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F. In view of the personal nature of these Agreements and their objectives and purposes, the Company expressly reserves to itself the right to execute said Agreements with individuals or other entities specifically selected and approved by the Company. Accordingly, these Agreements and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under these Agreements. These Agreements have been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Sanford Automotive, Inc. | 3251 Highway 87 South, Sanford, NC 27332 | 100.00 |
| | | |
| | | |
| | | |

(ii) upon the representation and agreeme... ...hat the following person(s), and only the follow... _person(s), shall have full managerial authority for the operating management of the Dealer in the performance of these agreements:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | | President |
| Glenn A. Boyd, Jr. | | VP/Secretary |
| John Timothy May | | Treasurer/Asst. Secretary |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**FORD MOTOR COMPANY**

By _____
Assistant Secretary

_Donna Buss_

(Dealer's Trade Name)

By _____ _President_
(Signature and Title)




CONFIDENTIAL

## NOTICE OF CHANGE OF TRADE NAME
## AND/OR CORPORATE ENTITY NAME
### Charlotte Region

**Dealer Code: F21777/L26288**
**P&A: 01267**

__BEFORE__

The name of       Sanford Ford Lincoln Mercury of Sanford
                                (Entity Name)

d/b/a                Crossroads Ford Lincoln Mercury of Sanford
                                 (Trade Name)

located at           3251 Highway 87 South, Sanford, NC  27332
                        (Address, City, State, Zip Code)

has been changed to:

__AFTER__

Crossroads Ford Lincoln of Sanford, Inc.
                            (Entity Name)*

d/b/a               Crossroads Ford Lincoln of Sanford, Inc.
                                (Trade Name)

\*  **Note: If this is a Trade Name only change, the Corporate Entity name before
and after should be the same.**

Please change your records to show this change in name.

             Crossroads Ford Lincoln Mercury of Sanford
             (Dealer's Trade Name on Sales Agreement)

By:_____

Title:_____

**General Sales Manager,
Ford and Lincoln**

Date: _____

_____
Regional Manager                 Date

_____
Assistant Secretary              Date

Macro #5051c - (1/02)



# Ford Motor Company



(Copy to be Original)
CONFIDENTIAL

_____ **Charlotte** _____ Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ *31ST* _____ day of *MARCH* _____, *2010* ,

by and between _____ **Sanford Ford Lincoln Mercury, Inc.** _____
<div align="center">(Name of Entity)</div>

_____ **Corporation** _____          **Delaware** _____
(State whether an individual, partnership or corporation)      (Show name of the State in which incorporated or registered)

doing business as _____ ***Crossroads Ford Lincoln Mercury of Sanford*** _____
<div align="center">(Trade Name)</div>

and with a principal place of business at ____ **3251 Hwy 87 South** ____      **P.O.Box 2638** ____
<div align="center">(Street Address)        (P.O. Box)</div>

| **Sanford** | **Lee** | **North Carolina** | **27331** | **27331** |
|:---:|:---:|:---:|:---:|:---:|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii



Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Sanford Automotive, Inc. | | 100 |
| | | |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Mr. Glenn A. Boyd | | President |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| | | |
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G. (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring unless sooner terminated under the provisions of paragraph 17 hereof.

H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

President, Ford Division

Countersigned by

_____

**Crossroads Ford Lincoln Mercury, Inc.**
(Dealer's Trade Name)

By _____

(Title) _President_

iv



# Ford Motor Company



EXHIBIT

**A-23**

### Charlotte Region

# EXTENSION OF

## TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

_____ day of _____ , _____

by and between _____ Crossroads Ford Lincoln of Lumberton, Inc. _____

Corporation _____ North Carolina _____

doing business as _____ Crossroads Ford Lincoln of Lumberton _____

and with a principal place of business at _____ 5045 Dawn Drive _____    2069

                                                              (Street Address)              (P.O. Box)

| Lumberton | Robeson | NC | 28360 | 27588 |
|-----------|---------|-----|-------|-------|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | 08/18/2016 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | 08/18/2016 |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring 08/31/2022 unless sooner terminated under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 113 of 233
Date Revised: 3/2015
Retention Requirement: C + 12

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

## FORD MOTOR COMPANY

Crossroads Ford Lincoln of Lumberton
**(Dealer's Trade Name)**

By _____       By _____*Glenn Boyd*_____
　　　　Assistant Secretary　　　　　　　　　　　　　Glenn A. Boyd
　　　　　　　　　　　　　　　　　　　　　　　　　　　President

　　*Donna Buss*　　　　　　　　　　　　　　　*Steve Hammond*
_____       _____
Donna Buss - Regional Manager　　　　　　Steve Hammond - Regional Manager

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 114 of 233
Date Revised: 3/2015
Retention Requirement: C + 12



EXHIBIT

A-24

Crossroads Ford of Wake Forest, Inc. is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.



# Ford Motor Company



_____Atlanta_____ Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ *1st* day of *October* , *2003*,

by and between _____ **Deacon Jones Ford, L.L.C.** _____
(Name of Entity)

**Limited Liability Company** _____ **North Carolina** _____
(State whether an individual, partnership or corporation) (Show name of the State in which incorporated or registered)

doing business as _____ **Deacon Jones Ford** _____
(Trade Name)

and with a principal place of business at _____ **321 East Ash Street** _____
(Street Address) (P.O. Box)

| **Goldsboro** | **Wayne** | **North Carolina** | **27530-3707** | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (11/02)

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 118 of 233

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Bobby Kenneth Jones | ▒▒▒▒▒▒▒▒▒▒ | 52.00 |
| Bobby Kenneth Jones, II | ▒▒▒▒▒▒▒▒▒▒ | 16.00 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Bobby Kenneth Jones | ▒▒▒▒▒▒▒▒▒▒ | Manager, Member |
| Bobby Kenneth Jones, II | ▒▒▒▒▒▒▒▒▒▒ | Member |
| T. Scott Johnson | ▒▒▒▒▒▒▒▒▒▒ | General Manager |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Anthony Dale Jones | ▒▒▒▒▒▒▒▒▒▒ | 16.00 |
| Tina Jones Winborne | ▒▒▒▒▒▒▒▒▒▒ | 16.00 |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

    G. (Strike out either subparagraph (1) or (2) whichever in not applicable.)

    (1) ~~This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.~~

    (2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring September 30, 2004 _____ unless sooner terminated under the provisions of paragraph 17 hereof.

    H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

President, Ford Division

Countersigned by

_____

**Deacon Jones Ford**
(Dealer's Trade Name)

By _____

(Title) _____

iv



DT of Havelock, LLC d/b/a Riverside Ford is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.



Egolf Ford of Brevard, LLC is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.

DocuSign Envelope ID: 13B3EF07-1CF8-4B81-A6B2-632099610B4A



**EXHIBIT**

tabbies

A-28



# Ford Motor Company

## Charlotte Region

# EXTENSION OF
### TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

_____ 31st _____ day of _____ December _____ , _____ 2022 _____

by and between _____ Fairlane Automotive, LLC _____

Limited Liability Company _____ North Carolina _____

doing business as _____ Friendship Ford of Lenoir _____

and with a principal place of business at _____ 515 Wilkesboro Blvd. NE _____ _____
                                                        (Street Address)                    (P.O. Box)

| Lenoir | Caldwell | NC | 28645-4636 | |
|--------|----------|------|-------------|--|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | January 3, 2019 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring December 31, 2024 unless sooner terminated under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

DocuSign Envelope ID: 13B3EF07-1CF8-4B81-A6B2-632099610B4A

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

## FORD MOTOR COMPANY

Friendship Ford of Lenoir
(Dealer's Trade Name)

By _____
AE6521DEBFD5413 Assistant Secretary

By _____
Steven M. Walters
President

By _____
AFF5F890A008451 William Krill - Regional Manager



# Ford Motor Company

Charlotte Region / South East Market Area



**Confidential**

**EXHIBIT**

tabbies A-29

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | January 31, 2001 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | |

SUPPLEMENTAL AGREEMENT made as of the ____22nd____ day of ____December____ , ____2021____

by and between _____ Feyer Ford, Inc. _____

_____ Corporation _____      North Carolina

doing business as _____ Feyer Ford, Inc. _____

and with a principal place of business at _____ 454 Highway 64 West _____ 2160

(Street Address)     (P.O. Box)

| Plymouth | Washington | NC | 27962 | 2160 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F. In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Feyer Auto Group Inc. | 454 Highway 64 West, Plymouth, NC 27962-2160 | 100% | |
| | | | |
| | | | |
| | | | |
| | | | |

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM  Document 1-1  Filed 03/31/23  Page 124 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Mr. Chad M. Feyer | ███████████████████ | President |
| Mr. Eric C. Feyer | ███████████████████ | Vice President |
| Mr. Dick A. Feyer | ███████████████████ | Secretary |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|------|--------------|-----------|--------|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Feyer Ford, Inc.
(Dealer's Trade Name)

By *Robert Wolfhauer*
0149B2F8FDD1440 Assistant Secretary

By *Chad Feyer*
388C5C7895C84CD... Chad Feyer
President

*Donna Buss*
672730FE4D2D4... Donna Buss - Regional Manager

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 125 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

DocuSign Envelope ID: 0C5D3A8A-4109-43F3-974E-EC74A44F12D8

 # Ford Motor Company

Charlotte Region / South East Market Area


EXHIBIT
A-30

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | March 30, 2006 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | March 30, 2006 |

SUPPLEMENTAL AGREEMENT made as of the ___22nd___ day of ___December___, ___2021___

by and between _____ Feyer Ford and Lincoln, Inc. _____

_____ Corporation _____                    North Carolina

doing business as _____ Feyer Ford and Lincoln, Inc. _____

and with a principal place of business at _____ 1677 US Highway 17 South, _____
_(Street Address)_                    _(P.O. Box)_

| Williamston | Martin | NC | 27892 | 9641 |
|---|---|---|---|---|
| _(City)_ | _(County)_ | _(State)_ | _(Zip Code)_ | _(P.O. Box Zip)_ |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| **NAME** | **HOME ADDRESS** | **Equity** | **Voting** |
| Feyer Auto Group Inc. | 454 Highway 64 West, Plymouth, NC 27962-2160 | 100% | |
| | | | |
| | | | |
| | | | |
| | | | |

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 3/2015
Retention Requirement: C + 12

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Mr. Chad M. Feyer | | President |
| Mr. Eric C. Feyer | | Vice President |
| Mr. Dick A. Feyer | | Secretary |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|------|--------------|------------------------|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

Feyer Ford and Lincoln, Inc.
(Dealer's Trade Name)

By *Robert Wolfbauer*
0149B2F8FDD1440... Assistant Secretary

By *Chad Feyer*
388C5C7895C84CDC... Chad Feyer
President

*Donna Buss*
672730FE4D... Donna Buss - Regional Manager

*Steve Hammond*
0985CC0D7DBF4... Steve Hammond - Lincoln Regional Manager

Amendment
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 127 of 233

Date Revised: 3/2015
Retention Requirement: C + 12



Feyer Ford of Edenton, Inc. is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.

CONFIDENTIAL

 LINCOLN 

**Market Representation Office**
**Ford and Lincoln**
**Marketing and Sales**

**Ford Motor Company**
**16800 Executive Plaza Dr.**
**8SWC Dearborn, MI 48126**

March 23, 2011

Mr. Dean Green
Green Ford
3800 West Wendover Avenue
Greensboro, NC 27407

Subject: **Letter of Understanding – Dual Dealership – Term Agreement**

Dear Mr. Dean Green:

This letter effective_____(Date filled in by GSO) is to confirm our understanding and agreement that Ford Motor Company ("Company") has reviewed your proposal to operate a Company Dual dealership at the premises located at 3800 West Wendover Avenue Greensboro, NC 27407 ("Dealership Facilities") on behalf of a corporation formed or to be formed and known as Green Ford Lincoln, LLC dba Green Ford Lincoln ("Dealer") under a Ford and Lincoln Sales and Service Agreement(s) ("Agreement(s)").

This also is to confirm your understanding and acknowledgment regarding the Company's concerns and requirements related to your proposal, which we have previously reviewed with you. Specifically,

- Your proposed Dealership Facilities do not meet the Company's minimum qualifying standards and can only be used by the Dealer on a temporary basis.

Notwithstanding, the Company is willing to approve your request and issue a Lincoln Sales and Service Agreement for a term of two years ("Term Agreement"). The Dealer understands and agrees that granting the Agreement(s) for an indefinite period ("Continuing Agreement") will be contingent upon compliance by the Dealer with the conditions and terms set forth below in this letter.

Accordingly, the undersigned agree as follows:

1. **Dealership Facilities Improvements**: On or before March 31, 2013 except for reasons beyond the Dealer's control, the current Dealership Facilities at 3800 West Wendover Avenue Greensboro, NC 27407 will be modified and renovated to accommodate the combined Ford and Lincoln franchises. Furthermore, the Dealership Facilities will meet the following terms and conditions:

    a. The Dealership Facilities will be designed and constructed utilizing Ford's Dual Facility Standards, meeting the approval of Ford's Dealership Facilities Manager before construction begins.
    b. On or before September 30, 2011, the Dealer will order all required Brand signage related to the addition of Lincoln franchises from AGI, the Company's approved vendor.
    c. Dealer understands that all standard interior elements of the approved facility must be ordered from Moda 360, the approved vendor, four months prior to the completion of the facility. Dealer is required to submit a 50% deposit when the interior elements are ordered.

LOU – Term Agreement (Template)
GIS1: Template 25.06; Dealer Data 7.06
GIS2 Classification: Confidential

Date Revised: 1-6-2011
Retention Requirements: 7.06/C+12; 25.06/R+20

    d. On or before November 30, 2011, site and elevation plans shall be submitted to the Company for review and approval.

    e. On or before January 31, 2012, Dealer will obtain and secure required approval of site plans and construction documents from all relevant government entities and notify the Company of such approval(s).

    f. On or before March 31, 2012, Dealership Facility modifications and improvements will commence.

    g. On or before March 31, 2013, the Dealership Facilities will be completed and occupied.

2. **Other:** Compliance with all provisions of the Term Agreement.

3. **Financial Assistance Payment:** The Company will provide Financial Assistance in the amount of 50% of the Dealerships expenditures up to a maximum payment of $250,000 ("Full Payment") to the Dealer at such time as the Dealer provides evidence that sales and service operations have begun at the Dealership Facility and all facility improvements and/or construction detailed in this Letter have been completed.

4. **Capitalization:** Based on a Sales and Profit Forecast developed by you with input from the Charlotte Region, the Dealer will increase the Ford and Lincoln dealership's total investment, working capital and net cash to the levels necessary to support the combined Ford and Lincoln operations.

5. **Vehicle Re-distribution:** Dealer agrees to purchase and/or re-distribute Gate City Motor Company new model Lincoln inventory.

6. **Dealership Operational and Entity Structure:** The Dealer agrees to maintain one single entity for the combined Ford and Lincoln Dealership throughout the life of the Dealership agreements.

7. **Ford and Lincoln Performance:** The Dealer agrees that the dualing of Lincoln with Ford will not detract from Dealer's requirements, as expressed in Paragraph 2(a) of the Ford Sales and Service Agreement, to vigorously and aggressively promote the sales of Ford vehicles in the Greensboro Locality and agrees to take necessary actions, as determined by the Dealer, to improve Ford and Lincoln customer satisfaction handling rating and retail market share performance

8. **Company's Right Of First Refusal:** The Dealer agrees to establish Superseding agreements with Ford Motor Company allowing the Company the Right of First Refusal as outlined in Paragraph 24 (b) of the Sales and Service Agreements.

9. **Competitive Dualing:** The Dealer agrees that the Dealership Facilities established in accordance with provisions of Paragraph 5 of the Sales & Service Agreement(s) or any future facilities to which the Dealer might relocate, will be used exclusively for the sales and service of Ford and Lincoln products. Any default under these terms will be considered a violation of the Sales & Service Agreement(s) and we may, at our discretion, elect to terminate the Agreement(s) under subparagraph 17(b)(2).

10. **Right of re-establishment:** The Dealer and Company understand and agree that nothing herein will impact the rights of the parties under Paragraph 9 of the Sales and Service Agreement or state law regarding future dealer representation.

LOU – Term Agreement (Template)
GIS1: Template 25.06; Dealer Data 7.06
GIS2 Classification: Confidential

Date Revised: 1-6-2011
Retention Requirements: 7.06/C+12; 25.06/R+20

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 130 of 233

11. **Personal Nature of Letter of Understanding:** This Letter of Understanding is personal in nature and may not be assigned by you to any other person or legal entity without the express written consent of the Company. Please signify in the space provided below your understanding and acceptance of the conditions under which this Letter of Understanding is being issued.

12. **Applicable State Laws and Protests:** North Carolina law as well as the Agreements, dictate that in certain situations, certain surrounding Dealers must receive notification and have the right to protest the establishment of an additional Dealer. Depending on the location and timing of your proposal, the proposed dealership may be considered an additional Dealer and certain surrounding Dealers may have the right to notice and protest. In the event a protest is filed contesting the proposed add point, the Company, in its sole discretion, will determine whether to defend the protest or forego representation. The Company will also determine, in its sole discretion, whether to appeal adverse decisions or judgments.

In addition, North Carolina may have certain laws concerning requirements for licensing Dealers. In this connection, we suggest that you assure yourself in advance of entering into any irrevocable commitments and that you can obtain the necessary licenses for your proposed new operation.

13. **Non-Renewal:** The undersigned recognize that the conditions of this Letter are consistent with the Dealer's responsibilities under Paragraphs 2 (Vehicles), 4 (Service), 5 (Location and Facilities), 6h (Customer Handling) and 7 (Hours of Business) of the Agreement(s).

    a. If the conditions for granting of any Continuing Agreement under the terms and conditions of this Letter are not met, the Company has no obligation to give any notice or grace period referred to in Paragraph 17 of the Agreement(s) or to give any notice or grace period under applicable law with respect to the failure to extend any such Term Agreement.

    b. Notwithstanding Paragraph 13(a) hereof, the Company will give written notice thereof to the Dealer as soon as practicable after the Company determines that the Dealer's Term Agreement will not be replaced with any Continuing Agreement or the Term Agreement will be terminated or not renewed. In giving such notice, the Company agrees that such Term Agreement will be extended for a period not to exceed six (6) months to permit the Dealer, acting in good faith, to enter into a binding agreement for the sale of its assets or stock and business ("Buy-Sell Agreement") with a qualified buyer ("Dealer's Buyer") as contemplated by Paragraph 24 of the Agreement(s) and Paragraph 13(c) hereof, and subject to the Company's Right of First Refusal pursuant to Paragraph 24(b) of the Agreement(s).

        i. The Company further agrees that it will provide Dealer written notice of its approval or rejection of a proposed replacement Dealer candidate and/or notice that the Company will exercise its Right of First Refusal under Paragraph 24 of the Agreement(s) within thirty (30) days after the effective date of delivery of the Buy-Sell Agreement and complete application package by overnight express mail. If the Company rejects any Buy-Sell Agreement, Dealer may submit additional Buy-Sell Agreements during the six (6) month period after notice of termination/non-renewal. The Company also will allow a

LOU – Term Agreement (Template)
GIS1: Template 25.06; Dealer Data 7.06
GIS2 Classification: Confidential

Date Revised: 1-6-2011
Retention Requirements: 7.08/C+12; 25.06/R+20

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 131 of 233

reasonable period of time thereafter, not to exceed six (6) months after execution of an agreement of sale, for review and acceptance or rejection by the Company and settlement of closing thereunder.

c. The Dealer's Buyer must meet the Company's standard appointment criteria. To allow the Company to make this evaluation, the Dealer's Buyer is required to complete the Company's standard application forms for new dealers, including supplying information and documents that the Company reasonably requires to evaluate the qualifications of the Dealer's Buyer.

d. In the event that the Dealer does not present an executed Buy-Sell Agreement and completed application package by the end of an applicable six (6) month period, Dealer will and does hereby resign its Term Agreement and related Agreement(s) effective on the 181st day after notice. In the event Dealer does present an executed Buy-Sell Agreement and completed application package by the end of the six (6) month period, and (a) the Company disapproves the Dealer candidate or (b) the Company approves the Dealer candidate but Dealer and the Dealer candidate fail to complete the Terms of the Buy-Sell Agreement within ninety (90) days after the Company's approval of the replacement Dealer, Dealer will and does hereby resign its Term Agreement and related Agreement(s), effective the following day.

14. **Additional Provisions:** We/I also agree as follows:

a. Notwithstanding Paragraph 26 of Agreement(s) to be issued to the undersigned, the provisions of this Letter are not intended to be superseded by any such Agreement(s), will continue in full force and effect after the execution of any such Agreement(s) by the undersigned, and are hereby ratified and confirmed by both the Dealer and the undersigned individually.

b. The Dealer and Company also understand that this letter of understanding is contingent upon the Company receiving Gate City Motor Company Resignation and General Release in exchange for certain considerations. Additionally, the Dealer agrees to a debit to their dealership's parts statement in the amount of $600,000 toward their contribution in those considerations.

c. Failure to meet the terms of this Letter by the end of the Term Agreement will constitute good cause to terminate or not renew the Term Agreement, subject to the provisions of Paragraph "Non-Renewal" above. However, any disagreement by Dealer that it has or has not met the conditions set forth in this Letter will be referred in writing to the Ford Motor Company Dealer Policy Board by Dealer within fifteen (15) days after receipt of notice from the Company of its failure to achieve / satisfy the conditions.

d. The contents of this Letter will be handled on a confidential basis by the parties hereto and, unless authorized by them or required by law or offered in evidence in judicial or administrative proceedings, will not be furnished to any other person or legal entity.

e. There is attached a certified copy of a resolution of the Board of Directors of the Dealer certifying that the signatory, on behalf of the Dealer, has full power and authority to execute and deliver this Letter and the Agreement(s).

LOU – Term Agreement (Template)
GIS1: Template 25.06; Dealer Data 7.06
GIS2 Classification: Confidential

Date Revised: 1-6-2011
Retention Requirements: 7:08/C+12; 25.08/R+20

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 132 of 233

f.  In executing this Letter, each of the undersigned signatories acknowledges reading the entire Letter, having the opportunity to and consulting with counsel, understanding its terms, and agreeing not to be relying on any statement or representation made by any party, but to be relying upon his own judgment and advice of counsel.

g.  This Letter will not be modified or amended in any fashion except by written agreement signed by both parties.

h.  This Letter of Understanding Agreement has been signed by the Dealer and sent to the Company in Michigan for final approval and execution and has there been signed and delivered on behalf of the Company. The parties intend this Letter of Understanding Agreement to be executed as a Michigan Letter of Understanding Agreement and to be construed in accordance with the laws of the State of Michigan.

This Letter of Understanding will become null and void if not signed and returned to the Charlotte Region, 4201 Taggart Creek Road, Suite 101, Charlotte, NC 28202 attention Donna Buss, Regional Manager, by April 15, 2011.

This Letter will become effective when it has been signed/executed by and on behalf of the Dealer and Ford Motor Company by its Secretary or Assistant Secretary.

Very truly yours,

FORD MOTOR COMPANY


Dan Heffernan    Date: _____
Assistant Secretary


**AGREED AND ACCEPTED:**

Green Ford, LLC dba Green Ford

By: _____    Date: 4-1-11
    Mr. Dean Green, Managing Member

By: _____    Date: 4-1-11
    Mr. Dean Green, Individually


**COUNTERSIGNED:**

By: _____    Date: _____
    Donna Buss
    Regional Manager

LOU – Term Agreement (Template)
GIS1: Template 25.06; Dealer Data 7.06
GIS2 Classification: Confidential

Date Revised: 1-6-2011
Retention Requirements: 7.06/C+12; 25.06/R+20

 **Ford Motor Company**

Charlotte Region

EXHIBIT

A-33

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | December 15, 1998 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

SUPPLEMENTAL AGREEMENT made as of the ___11th___ day of _October_ , _2016_ ,

by and between _____ Hastings Ford, Inc. _____

Corporation                          North Carolina

doing business as _____ *Hastings Ford, Inc.* _____

and with a principal place of business at _____ 3013 E 10th St _____ 1886

(Street Address)                                                                 (P.O. Box)

| Greenville | Pitt | NC | 27858 | 27835-1886 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F.   In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| | | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| NAME | HOME ADDRESS | Equity | Voting |
| Sherelyn M. Woolard | ███████████████ | 55.6% | |
| William A. McClung | ███████████████ | 14.4% | |
| William M. Wilson | ███████████████ | 30% | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Sherelyn M. Woolard | ▮▮▮▮▮▮▮▮▮▮ | President |
| William M. McClung | ▮▮▮▮▮▮▮▮▮▮ | VP |
| William M. Wilson | ▮▮▮▮▮▮▮▮▮▮ | VP-GM |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**Ford Motor Company**

By _____
Assistant Secretary

_____
Donna Buss -Regional Manager

Hastings Ford, Inc.
(Dealer's Trade Name)

By _____
Sherelyn M. Woolard
President

Amendment
GIS1: 7.06

Date Revised: 3/2015





# Ford Motor Company

## Charlotte Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ day of _____ , _____ ,

by and between _____ Ken Wilson Ford, Inc. _____

_____ Corporation _____ North Carolina _____

doing business as _____ Ken Wilson Ford _____

and with a principal place of business at _____ 769 Champion Drive _____ 869

_____(Street Address)_____ (P.O. Box)

| Canton | Haywood | NC | 28716-3027 | 28716 |
|--------|---------|-----|------------|-------|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 136 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

DocuSign Envelope ID: 4ABFD1F6-EECC-4F33-84E8-03BE3FF196AB

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 137 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 138 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Glenn A. Boyd | | 75% | |
| Glenn A. Boyd, Jr. | | 25% | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Glenn A. Boyd | | President |
| Glenn A. Boyd, Jr. | | Vice President |
| Kenneth Wilson | | General Manager |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

**G.** This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **March 15, 2022** unless sooner terminated under the provisions of paragraph 17 hereof.

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.
The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

Ken Wilson Ford
(Dealer's Trade Name)

By _____ *Glenn Allen Boyd, Sr.*
Glenn A. Boyd

Director, U.S. Sales

(Title) _____ President

Countersigned by
*Donna Buss*
Donna Buss - Regional Manager

_____ _____
Assistant Secretary

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 139 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

(Copy of Original)

EXHIBIT

A-35

# Ford Motor Company

_____ **CHARLOTTE** _____ Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 2nd _____ day of ___ August ___, _2010_,

by and between _____ **Lookout Ford, Inc.** _____
(Name of Entity)

_____ **Corporation** _____     **North Carolina**
(State whether an individual, partnership or corporation)     (Show name of the State in which incorporated or registered)

doing business as _____ **Lookout Ford, Inc.** _____
(Trade Name)

and with a principal place of business at _____ **5557 Highway 70 West** _____
(Street Address)       (P.O. Box)

| **Morehead City** | **Carteret** | **North Carolina** | **28557** | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN SALE WWb
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN SALE 6/98
Macro #3602 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Kurtis Dean Wagaman | ~~████████████████~~ | 51.00 |
| John W. Gainey, III | ~~████████████████~~ | 49.00 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Kurtis Dean Wagaman | ~~████████████████~~ | President |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

    G.  (Strike out either subparagraph (1) or (2) whichever in not applicable.)

    (1)  This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.    *Kew* ◯❶❷

    (2)  ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring~~ ~~unless sooner terminated under the provisions of paragraph 17 hereof.~~

    H.  Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ⓕ Ford Motor Company**

President, Ford Division

Countersigned by

Lookout Ford, Inc.
(Dealer's Trade Name)

By *Kurtis Dean Wagaman*

(Title) *Pres.*

iv



EXHIBIT
A-36



# Ford Motor Company

Charlotte Region / South East Market Area
Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 11th _____ day of ___ January ___ , __ 2022 __ ,

by and between _____ Pilot Mountain Ford, Inc. _____

_____ Corporation _____                    _____ North Carolina _____

doing business as _____ Foothill Ford _____

and with a principal place of business at _____ 3220 Cook School Rd. _____    1468
                                                          (Street Address)                          (P.O. Box)

| Pilot Mountain | Surry | NC | 27041 | 7280 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 144 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 145 of 233
Date Revised: 5/2015
Retention Requirement: C + 12

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 146 of 233

Date Revised: 5/2015
Retention Requirement: C + 12

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Kevin B. Powell | ▬▬▬▬▬▬ | 100% | |
| | | | |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Kevin B. Powell | ▬▬▬▬▬▬ | President |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **September 30, 2023** unless sooner terminated under the provisions of paragraph 17 hereof.

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

 **Ford Motor Company**

*Andra M. Firat*

Director, U.S. Sales

Countersigned by

*Donna Buss*
─672730FE4D2963... Donna Buss - Regional Manager

─DocuSign by:
*Robert Wolfbauer*
─5188B8CB3DA44EB... Assistant Secretary

Foothill Ford
(Dealer's Trade Name)

By ─DocuSigned by: *Kevin Powell*
   ─43501C7A0F2849A... Kevin Powell

(Title) _____ President _____

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 147 of 233
Date Revised: 5/2015
Retention Requirement: C + 12



EXHIBIT

A-37

Premier Ford Lincoln Mercury, Inc. d/b/a Capital Ford of Rocky Mount is a new motor vehicle dealer with a Ford Sales and Service Agreement ("SSA").

Despite efforts to do so, this Petitioner has been unable to locate its SSA.

Petitioner has requested a copy of its SSA from Ford Motor Company.

Petitioner will tender a copy of its SSA to the Commissioner when received from Ford Motor Company.


EXHIBIT

A-38

 **Ford Motor Company**

Charlotte Region
Superseding

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 11 +h _____ day of December, 2012,

by and between _____ Ray Motor Company, Inc. _____

_____ Corporation _____ North Carolina _____

doing business as _____ Capital Ford of Hillsborough _____

and with a principal place of business at _____ 350 South Churton Street _____ _____

Hillsborough ____ Orange ____ NC ____ 27278 ____ _____

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

### PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 1/2012
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 149 of 233

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 151 of 233
Date Revised: 1/2012
Retention Requirement: C + 12

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | Equity |
| Capital Ford of Hillsborough, LLC | ███████████ | 100 |
| | | |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Timothy W. Michael | ███████████ | President |
| Tony William Fisher | ███████████ | Vice President |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| | | | |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring December 31, 2014 unless sooner terminated under the provisions of paragraph 17 hereof.

H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

General Sales Manager

Countersigned by

Donna Buss - Regional Manager

Capital Ford of Hillsborough
(Dealer's Trade Name)

By

Timothy W. Michael

(Title) President

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 1/2012
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 152 of 233



# Ford Motor Company

### Charlotte Region

# Addendum To

| | |
|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated _____ |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated ____N/A____ |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated ____N/A____ |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated ____N/A____ |

The "Agreements" by and between _____Ray Motor Company, Inc._____

Corporation in the state of North Carolina doing business as

_____Capital Ford of Hillsborough_____

(the "Dealer") and Ford Motor Company, a Delaware Corporation (the "Company").

THE PARTIES AGREE that the following addendum to Paragraph (F) containing clause (i)(a) is annexed and made part of the Agreements:

F(i)(a) upon the representation and agreement that the following person(s) and/or entity(ies), and only the following person(s) and/or entity(ies), shall have ownership interests in the principal owner(s) referred to in clause (i) of this Paragraph F:

| NAME OF PRINCIPAL OWNER(S) WHICH ARE PARTNERSHIPS OR CORPORATIONS (STATE OF INCORPORATION) | NAME AND ADDRESS OF PERSON(S) OR ENTITY (IES) HAVING OWNERSHIP INTEREST(S) IN PRINCIPAL OWNER(S) (INDICATE TITLE) | Equity |
|---|---|---|
| Capital Ford of Hillsborough, LLC | Timothy W. Michael (Member) | 25 |
| a North Carolina limited liability Company | | |
| | Tony William Fisher (Member) | 25 |
| | | |
| | Chester A. Michael, III (Member) | 25 |
| | | |
| | Hubert B. Parks Marital Trust UAD 4/23/09, | 25 |
| | | |

The provisions of this paragraph F requiring notice to and consent by the Company to any changes in ownership shall apply to any change in the person(s) or entity(ies) having an ownership interest in the principal owner(s) set forth in this clause F(i)(a).

IN WITNESS WHEREOF, the Company and the Dealer duly executed this addendum in triplicate as of the ____11th____ day of ____December____, ____2012____.

FORD MOTOR COMPANY

By _____
Assistant Secretary

Capital Ford of Hillsborough
(Dealer's Trade Name)

By _____
Timothy W. Michael
President

Addendum
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 1/2012
Retention Requirement: C + 12

 # Ford Motor Company



EXHIBIT

**A-39**

_____Atlanta_____ Region

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 1ˢᵗ _____ day of _____ Dec. _____, 2003,

by and between _____ **Sale Ford, LLC** _____
(Name of Entity)

_____ **Limited Liability Company** _____    **North Carolina** _____
(State whether an individual, partnership or corporation)    (Show name of the State in which incorporated or registered)

doing business as _____ **Sale Ford of Kinston** _____
(Trade Name)

and with a principal place of business at _____ **1145 Highway 258 North** _____    **3423** _____
(Street Address)    (P.O. Box)

| _____ **Kinston** _____ | **Lenoir** | **North Carolina** | **28504-9197** | **28502-3423** |
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes or periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, testing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits from its dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out the responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

# TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/98
Macro #5002 (1/02)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| David K. Sale | ~~[REDACTED]~~ | ~~90.00~~ |
| Daniel K. Sale | ~~[REDACTED]~~ | ~~10.00~~ 0/100 Now |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| David K. Sale | ~~[REDACTED]~~ | Member / Manager |
| Daniel K. Sale | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

    G.  (Strike out either subparagraph (1) or (2) whichever in not applicable.)

    (1)  This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

    (2)  ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring unless sooner terminated under the provisions of paragraph 17 hereof.~~

    H.  Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

Sale Ford of Kinston
(Dealer's Trade Name)

President, Ford Division

By _____

Countersigned by

(Title) _____

_____

iv

 **Ford Motor Company**

(Copy of Original) WHITE


EXHIBIT
A-40

_____ Atlanta _____ Region

## SUPERSEDING

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 11th _____ day of _____ Jan _____, 19 99 ,

by and between _____ Sanders Ford, Inc. _____
<div style="text-align:center">(Name of Entity)</div>

_____ Corporation, _____ North Carolina _____
(State whether an individual, partnership or corporation)     (Show name of the State in which incorporated or registered)

doing business as _____ Sanders Ford, Inc. _____
<div style="text-align:center">(Trade Name)</div>

and with a principal place of business at _____ 1135 LeJeune Boulevard _____
<div style="text-align:center">(Street Address)</div>

_____ Jacksonville _____ Onslow _____ NC _____ 28540 _____
(City)     (County)     (State)     (Zip Code)

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

### - PREAMBLE -

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/94
Macro #5002 (9/96)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## - TERMS OF THE AGREEMENT -

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Manager, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Manager, The General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/94
Macro #5002 (9/96)                    iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
| Elizabeth G. Downey | ▓▓▓▓▓▓▓▓▓▓ | 50 |
| Stagg N. Sanders | ▓▓▓▓▓▓▓▓▓▓ | 25 |
| Molly C. Sanders | ▓▓▓▓▓▓▓▓▓▓ | 25 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|--------------|-------|
| Mat C. Raymond | ▓▓▓▓▓▓▓▓▓▓ | Pres/Treas |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|--------------|------------------------|
|  |  |  |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.~~

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

_____
General Manager, Ford Division

Countersigned by _____

_____  _____  _____

_____
**Sanders Ford, Inc.**
(Dealer's Trade Name)

By _Mat C. Raymond, Jr_

(Title) _President_

Nov- 11, 1998

iv

(Copy of Original)



# FORD MOTOR COMPANY

_Charlotte_
~~Atlanta~~ Region



EXHIBIT
A-41

## EXTENSION OF

### TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT, made at Dearborn, Michigan as of this ___8th___ day of ___November___, ___2010___

by and between _____ Scenic Motors, Inc. _____
<div align="center">(Name of Entity)</div>

__Corporation__                                                     __North Carolina__
(State whether an Individual, Partnership or Corporation)          (If the Latter, show name of the state in which incorporated)

doing business as _____ Scenic Motors, Inc. _____
<div align="center">(Trade Name)</div>

and with a principal place of business at ___1992 Rockford Street___
(Street Address)                                                   (P.O. Box)

| __Mount Airy__ | __Surry__ | __North Carolina__ | __27030__ | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box/Zip) |

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware Corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| Ford Sales and Service Agreement | dated | November 30, 2007 |
| ~~Ford Truck Sales and Service Agreement~~ | ~~dated~~ | ~~XXX XX~~ |
| ~~Ford Heavy Duty Truck Sales and Service Agreement~~ | ~~dated~~ | ~~XXX XX~~ |
| Mercury Sales and Service Agreement | dated | November 30, 2007 |
| Lincoln Sales and Service Agreement | dated | November 30, 2007 |

Therefore, Paragraph "G" of the Ford, Ford Truck, Ford Heavy Duty Truck, Mercury and Lincoln Sales and Service Agreements are deemed amended to read as follows:

G.   (Strike out either subparagraph (1) or (2) whichever is not applicable)

(1)   This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2)   ~~This agreement shall continue in force and effect for term commencing on the date of its execution and expiring XXX XX unless sooner terminated under the provisions of paragraph 17 hereof.~~

LM-8141/FD-925-E  9/00                                              Macro #7021 (1/02)

(Copy of Original)

 **FORD MOTOR COMPANY** CONFIDENTIAL

~~Atlanta~~ Charlotte Region

# AMENDMENT TO

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | November 30, 2007 |
| ~~FORD TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ | Agmt Sales |
| ~~FORD HEAVY DUTY TRUCK SALES AND SERVICE AGREEMENT~~ | ~~Dated~~ | Agmt Sales |
| MERCURY SALES AND SERVICE AGREEMENT | Dated | November 30, 2007 |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | November 30, 2007 |

SUPPLEMENTAL AGREEMENT made as of this **8th** day of **November**, **2010**

by and between **Scenic Motors, Inc.**
(Name of Entity)

**Corporation**                     **North Carolina**
(State whether an Individual, Partnership or Corporation)          (If the latter, show name of State in which Incorporated)

doing business as **Scenic Motors, Inc.**
(Trade Name)

and with a principal place of business at **1992 Rockford Street**
(Street Address)                     (P.O. Box)

| **Mount Airy** | **Surry** | **North Carolina** | **27030** | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip Code) |

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Agreements and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F. In view of the personal nature of these Agreements and their objectives and purposes, the Company expressly reserves to itself the right to execute said Agreements with individuals or other entities specifically selected and approved by the Company. Accordingly, these Agreements and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under these Agreements. These Agreements have been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Sheree Gough | | 40.00 |
| Justin Dean Gough | | 60.00 |
| | | |
| | | |
| | | |


EXHIBIT
tabbies®
A-42



# Ford Motor Company

Charlotte Region

Term

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ *1st* _____ day of *August*, *2019*,

by and between _____ Stanly County Automotive, LLC _____

| Limited Liability Company | North Carolina |

doing business as _____ Joe Maus Ford _____

and with a principal place of business at _____ 738 Highway 27 East _____ _____

(Street Address)          (P.O. Box)

| Albemarle | Stanly | NC | 28001-5348 | |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 5/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 164 of 233

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

**Ford Sales Service Agreement**
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 5/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM    Document 1-1    Filed 03/31/23    Page 165 of 233

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Sales Manager and the manual countersignature of the Market Representation Manager, or a Regional Sales Manager, and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Sales Manager, the Regional Sales Manager, or Market Representation Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Sales Manager, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Date Revised: 5/2015
Retention Requirement: C + 12
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 166 of 233

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| James L. Keffer | ██████████████████ | 55% | 100% |
| R. Scott McCorkle | ██████████████████ | 25% | - |
| Joseph Maus | ██████████████████ | 10% | - |
| | | | |
| | | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| | | |
| Joseph Maus | ██████████████████ | Dealer Principal |
| Kevin A. Nelson | ██████████████████ | Temporary General Manager |
| | | |
| | | |
| | | |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST | |
|---|---|---|---|
| | | Equity | Voting |
| Bonnie M. Hunter | ██████████████████ | 10% | - |
| | | | |
| | | | |
| | | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G.  This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **August 15, 2021** unless sooner terminated under the provisions of paragraph 17 hereof.

**H.**  Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford Motor Company**

Director, U.S. Sales

Countersigned by

Donna Buss - Regional Manager

Assistant Secretary

Joe Maus Ford
(Dealer's Trade Name)

By _____
James L. Keffer

(Title) _____ Manager _____

Ford Sales Service Agreement
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Date Revised: 5/2015
Retention Requirement: C + 12

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 167 of 233

 # Ford Motor Company

Charlotte Region / South East Market Area

# EXTENSION OF

## TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

__15th__ day of ___August___ , ___2021___

by and between ___Stanly County Automotive, LLC___

__Limited Liability Company__          ___North Carolina___

doing business as ___Joe Maus Ford___

and with a principal place of business at ___738 Highway 27 East___          _____
                                                          (Street Address)                              (P.O. Box)

| __Albemarle__ | __Stanly__ | __NC__ | __28001-5348__ | _____ |
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | August 1, 2019 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | _____ |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | _____ |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | _____ |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **August 31, 2023**, unless sooner terminated under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 168 of 233

Date Revised: 3/2015
Retention Requirement: C + 12

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

## FORD MOTOR COMPANY

By _Robert Wolfbauer_
DocuSigned by:
Assistant Secretary

Joe Maus Ford
(Dealer's Trade Name)

By _____ James L. Keffer
DocuSigned by:
Manager

_Donna Buss_
DocuSigned by:
Donna Buss - Regional Manager

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 169 of 233

Date Revised: 3/2015
Retention Requirement: C + 12


EXHIBIT
A-43



# Ford Motor Company

### Charlotte Region

# EXTENSION OF

### TERM SALES AND SERVICE AGREEMENTS AND TERM SALES AGREEMENTS

SUPPLEMENTAL AGREEMENT made at Dearborn, Michigan as of this

__30th__ day of __April__ , __2017__

by and between _____ Stearns Ford, Inc. _____

Corporation _____ North Carolina _____

doing business as _____ Stearns Ford, Inc. _____

and with a principal place of business at _____ 602 Alamance Road _____ 2480
                                                    (Street Address)        (P.O. Box)

| Burlington | Alamance | NC | 27215-6232 | 27216 |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the following Agreements and now desire to make certain changes therein extending the term expiration date of the:

| | | |
|---|---|---|
| FORD SALES AND SERVICE AGREEMENT | Dated | May 9, 2016 |
| FORD TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| FORD HEAVY TRUCK SALES AND SERVICE AGREEMENT | Dated | N/A |
| LINCOLN SALES AND SERVICE AGREEMENT | Dated | N/A |

THEREFORE, Paragraph "G" of the above Sales and Service Agreement (s) are deemed amended to read as follows:

G. This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring **April 30, 2021** unless sooner terminated under the provisions of paragraph 17 hereof.

The remaining subparagraphs and other terms of the said agreements remain unchanged.

The Dealer shall give the Company prior notice of any proposed change in the ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effective on the date of execution of these Agreements.

This Extension is subject to all the terms and conditions contained in said Sales and Service Agreements and Sales Agreement (s) identified herein except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

**FORD MOTOR COMPANY**

By _____
          Assistant Secretary


_____
Donna Buss - Regional Manager

Stearns Ford, Inc.
(Dealer's Trade Name)

By _____
          Dale A. Stearns
          President

Extension
GIS1: 7.06
GIS2 Classification: CONFIDENTIAL
Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 171 of 233
Date Revised: 3/2015
Retention Requirement: C + 12



# FORD MOTOR COMPANY

COPY OF ORIGINAL

EXHIBIT

A-44

_Atlanta_ District

# AMENDMENT TO

## FORD SALES AND SERVICE AGREEMENT   dated _June 4, 1986_

~~XFOREIGN VEHICLE SALES AGREEMENT (FOR 1948)~~
~~XFORD TRUCK SALES (SUPPLEMENT (FIRST 1948)~~
~~XFORD XMEDIUM SALES AND DXSERVICE AGREEMENT 1948~~
~~XFORD XXMEDIUM DUTY XX TRUCK SALES AND SERVICE 1948~~
~~XXAGREEMENT~~

SUPPLEMENTAL AGREEMENT, made at Dearborn, Michigan as of this _24th_ day of _Oct_, 19 _94_.

by and between _____ _Tri-City Ford, Inc._

(Name of Entity)

_Corporation_                                     _North Carolina_

(State whether an individual, partnership or corporation)       (If the latter, show name of the state in which incorporated)

doing business as _____ _Tri-City Ford, Inc._

(Trade Name)

and with a principal place of business at _____ _N. C. Highway 14 South_

(Street Address)

| _Eden_ | _Rockingham_ | _NC_ | _27288_ |
|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) |

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

The parties hereto have previously entered into the above designated Sales and Service or Sales Agreements (hereinafter "Agreements") and now desire to make certain changes therein.

NOW, THEREFORE, in consideration of these premises, the parties hereto mutually agree that said Agreements be amended by changing Paragraph F to read as follows:

F. In view of the personal nature of these Agreements and their objectives and purposes, the Company expressly reserves to itself the right to execute said Agreements with individuals or other entities specifically selected and approved by the Company. Accordingly, these Agreements and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under these Agreements. These Agreements have been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Samuel F. Coates | Eden, North Carolina | 100% |
| | | |
| | | |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of these Agreements:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Samuel F. Coates | Eden, North Carolina | President |
| | | |
| | | |

REV 4/83 **FD-925-J** (WPA 6/89)

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority of said Dealer, and immediate notice of the death or incapacity of any such person. No such change or notice, and no amendment or assignment of these Agreements or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of these Agreements as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change. If the Company's restriction regarding amendment or assignment of these Agreements is illegal under a valid law of any jurisdiction where such change is to take place, this amendment will be modified to the minimum extent necessary to comply with such law if it was effectve on the date of execution of these Agreements.

This Supplemental Agreement is subject to all the terms and conditions contained in said Agreements, except insofar as such terms and conditions may be inconsistent with the express terms hereof.

IN WITNESS WHEREOF the parties hereto have executed this Agreement as of the day and year first above written and the Company is authorized to deliver the same to the Dealer by placing the Dealer's copy thereof in the United States Mail, duly stamped and addressed to the Dealer at his principal place of business, or by delivery to such place of business or to the Dealer in person.

FORD MOTOR COMPANY

By _____
        Assistant Secretary

Tri-City Ford, Inc.
_____
(Dealer's Trade Name)

By _____
        (Signature and Title)



# Ford Motor Company

Charlotte
_____ District

# Ford Sales and Service Agreement

AGREEMENT made as of the _____4_____ day of _____June_____, 1986,

by and between _____ Tri-City Ford, Inc. _____

Corporation
(State whether an individual, partnership or corporation)          (Name of Entity)          North Carolina          (If the latter, show name of the state in which incorporated)

doing business as _____ Tri-City Ford, Inc. _____
(Trade Name)

and with a principal place of business at ___ N.C. Highway 14 South ___
(Street Address)

| Eden | Rockingham | North Carolina | 27288 |
|------|-----------|----------------|-------|
| (City) | (County) | (State) | (Zip Code) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through a system of independent franchised dealers, with each dealer fulfilling his responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representa-

tion in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within his locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops monthly production schedules from basic orders submitted by its franchised dealers for the following month and its and their best estimates of the market for subsequent months.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories for vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each month each dealer must forecast and give the Company a basic order for the products needed to serve his market. During the month each dealer should submit specific orders for products covered by his basic order. If dealers' specific orders for any product are greater than or different from their basic orders, the Company seeks to revise production schedules to the extent feasible, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only through cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Since it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to, the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of dealership operations and, through other agreements and the activities of its affiliates, assistance in financing, new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has selected Dealer to enter into this agreement in reliance on Dealer's confidence in the Dealer's integrity and ability, his intention to carry out his responsibilities set forth in this agreement, and his desire

to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon his representations as to the persons who will participate in the ownership and management of the dealership.

The Dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize that the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law.

The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A GEN. SALE 1-76"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Manager, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional or District Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Manager, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 176 of 233

agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|------|------|
| Charles W. Maness | Eden, North Carolina | 51 |
| Martin J. Lester | Bassett, Virginia | 49 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|------|------|
| Charles W. Maness | Eden, North Carolina | President |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|------|------|
|  |  |  |
|  |  |  |
|  |  |  |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever is not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

IN WITNESS WHEREOF the parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

Ford **Ford Motor Company**

_General Manager, Ford Division_

Countersigned by

**Tri-City Ford, Inc.**
(Dealer's Trade Name)

By _Charles W. Maness_

(Title) _President_



# Ford Motor Company

EXHIBIT
tabbies
A-45

_____Atlanta_____ Region

### SUPERSEDING

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ **20th** day of **May** _____, **2002**,

by and between _____ **Welford Harris, Inc.** _____
<br>(Name of Entity)

**Corporation**              **North Carolina**
<br>(State whether an individual, partnership or corporation)          (Show name of the State in which incorporated or registered)

doing business as _____ **Welford Harris, Inc.** _____
<br>(Trade Name)

and with a principal place of business at _____ **1701 East 11th Street - Highway 64 East**     **669**
<br>(Street Address)              (P.O. Box)

| **Siler City** | **Chatham** | **North Carolina** | **27344** | **27344** |
|---|---|---|---|---|
| (City) | (County) | (State) | (Zip Code) | (P.O. Box Zip) |

(hereafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal place of business at Dearborn, Michigan (hereinafter called the "Company").

### PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public though a system of independent franchised dealers, with each dealer fulfilling its responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representation in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within its locality.

FD 925
GEN. SALE 9/98
Macro #5002 (9/00)

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops production schedules from orders submitted by its franchised dealers and its and their best estimates of the market demand for COMPANY PRODUCTS.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories of vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each dealer must give the Company orders for the products needed to serve its market. The Company seeks to adjust production schedules, to the extent feasible, to fill dealer orders, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only though cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Because it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, its intention to carry out its responsibilities set forth in this agreement, and its desire to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon its representations as to the persons who will participate in the ownership and management of the dealership.

The dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

ii

Both parties recognize the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law. The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

## TERMS OF THE AGREEMENT

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the President, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the President, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the President of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This Agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

FD 925
GEN. SALE 9/68
Macro #5002 (9/00)

iii

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|-------------|------------------------|
| Welford David Harris | ████████████████████ | 100.00 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|------|-------------|-------|
| Welford David Harris | ████████████████ | President |
| Welford Dalton Harris | ████████████████████ | Vice-President |

and (iii) upon representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|------|-------------|------------------------|
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold it consent to any such change.

**G.** (Strike out either subparagraph (1) or (2) whichever in not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) ~~This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.~~

**H.** Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

The parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

**Ford** **Ford Motor Company**

President, Ford Division

Countersigned by

Welford Harris, Inc.
(Dealer's Trade Name)

By: _Welford D. Harris_

(Title): _President_

iv



# Ford Motor Company

District _____ _____

# Ford Sales and Service Agreement

AGREEMENT made as of the _____ 31 _____ day of ____~~~~~~~~~~~~~~~~~~_____ 19 8 5 .

by and between

_____ **Corporation** _____ **South Carolina** _____
(Name of Entity)

(State whether an individual, partnership or corporation or (if the latter) show name of the state in which incorporated)

doing business as

_____ **Open Road Ford, Inc.** _____
(Trade Name)

and with a principal place of business at

_____ **Highway 76 East** _____
(Street Address)

_____ **Chicago** _____ · **Lands** _____ _____ **South Carolina** _____ · **29611** _____
(City)      (County)      (State)      (Zip Code)

(hereinafter called the "Dealer") and Ford Motor Company, a Delaware corporation with its principal of business at Dearborn, Michigan (hereinafter called the "Company").

## PREAMBLE

The purpose of this agreement is to (i) establish the Dealer as an authorized dealer in COMPANY PRODUCTS including VEHICLES (as herein defined), (ii) set forth the respective responsibilities of the Company in producing and selling those products to the Dealer and of the Dealer in reselling and providing service for them and (iii) recognize the interdependence of both parties in achieving their mutual objectives of satisfactory sales, service and profits by continuing to develop and retain a broad base of satisfied owners of COMPANY PRODUCTS.

In entering into this agreement, the Company and the Dealer recognize that the success of the Company and of each of its authorized dealers depends largely on the reputation and competitiveness of COMPANY PRODUCTS and dealers' services, and on how well each fulfills its responsibilities under this agreement.

It is the opinion of the Company that sales and service of COMPANY PRODUCTS usually can best be provided to the public through a system of independent franchised dealers, with each dealer fulfilling his responsibilities in a given locality from properly located, adequate, well-equipped and attractive dealerships, which are staffed by competent personnel and provided with the necessary working capital. The Dealer recognizes that, in such a franchise system, the Company must plan for the establishment and maintenance of the numbers, locations and sizes of dealers necessary for satisfactory and proper sales and service representa-

EXHIBIT
A-46

FD 925
GEN. SALE 1-76

tion in each market area as it exists and as it develops and changes. At the same time, the Company endeavors to provide each of its dealers with a reasonable profit opportunity based on the potential for sales and service of COMPANY PRODUCTS within his locality.

The Company endeavors to make available to its dealers a variety of quality products, responsive to broad wants and needs of the buying public, which are attractively styled, of sound engineering design and produced on a timely basis at competitive prices. The development, production and sale of such products require that the Company and its manufacturing sources make large continuing investments in plants, equipment, tools and other facilities, engineering and styling research and development, quality control procedures, trained personnel and marketing programs. Heavy commitments must also be made in advance for raw materials and finished parts. For purposes of making these investments and commitments, planning production and estimating costs for setting prices, the Company assumes in advance an estimated volume of sales for each of its products. Within each year, it develops monthly production schedules from basic orders submitted by its franchised dealers for the following month and its and their best estimates of the market for subsequent months.

In turn, each of the Company's franchised dealers makes important investments or commitments in retail sales and service facilities and equipment, in working capital, in inventories for vehicles, parts and accessories, and trained sales and service personnel based on annual planning volumes for their markets.

If satisfactory volumes for either the Company or a dealer are not realized, each may suffer because of commitments already made and the cost of manufacturing and of selling each product may be increased. Each month each dealer must forecast and give the Company a basic order for the products needed to serve his market. During the month each dealer should submit specific orders for products covered by his basic order. If dealers' specific orders for any product are greater than or different from their basic orders, the Company seeks to revise production schedules to the extent feasible, and to allocate fairly any product in short supply, but inevitably both the Company and its dealers suffer loss of profits to the extent they cannot meet market demands. Thus, the automotive business is a high risk business in which the Company, its manufacturing sources and its dealers can succeed only through cooperative and competitive effort in their respective areas of manufacturing, sales, service and customer satisfaction.

Since it is the dealer who deals directly with, and develops the sale of COMPANY PRODUCTS to, the consuming public, the Company substantially relies on its dealers to provide successful sales and merchandising programs, competent service operations and effective owner relations programs. To do this, dealers must carry out their responsibilities of establishing and maintaining adequate wholesale and retail finance plans, new and used vehicle sales programs, parts and service sales programs, personnel training and supportive capitalization and working capital. To assist its dealers in these responsibilities, the Company establishes and periodically updates standards of operation and planning guides based on its experience and current conditions. It also offers sales and service training courses, advice as to facilities, counseling in the various phases of dealership operations and, through other agreements and the activities of its affiliates, assistance in financing, new and used vehicle merchandising, parts and service merchandising, leasing, daily rentals and facilities development. It also conducts national advertising, promotional and other marketing programs and assists dealers in developing complementary group and individual programs.

To enable the Company to provide such assistance, it requires dealers to submit uniform and accurate sales, operating and financial reports from which it can derive and disseminate analytical and comparative operating data and advice to dealers. The Company also solicits dealers to bring to its attention through their National Dealer Council organization any mutual dealer problems or complaints as they arise.

Because the Company relies heavily on its dealers for success, it reserves the right to cease doing business with any dealer who is not contributing sufficiently to such success. Similarly, the Company recognizes that its dealers look to it to provide competitive products and programs and that, if it does not do so, any dealer may elect to cease doing business with the Company.

The Company has elected to enter into this agreement with the Dealer with confidence in the Dealer's integrity and ability, his intention to carry out his responsibilities set forth in this agreement, and his desire

to provide courteous, competent and satisfying sales and service representation to consumers for COMPANY PRODUCTS, and in reliance upon his representations as to the persons who will participate in the ownership and management of the dealership.

The Dealer has elected to enter into this agreement with the Company with confidence in its integrity and ability, its intention to provide competitive products and assist the Dealer to market them successfully, and its desire to maintain high quality dealers.

Both parties recognize that the rights of the Dealer and the Company under this agreement are defined and limited by the terms of this agreement and applicable law.

The Company and the Dealer further acknowledge that their methods of operation and business practices have an important effect on the reputation of the Dealer, the Company, COMPANY PRODUCTS and other franchised dealers of the Company. The Company and the Dealer also acknowledge that certain practices are detrimental to their interests, such as deceptive, misleading or confusing advertising, pricing, merchandising or business practices, or misrepresenting the characteristics, quality, condition or origin of any item of sale.

It is the expectation of each of the parties that by entering into this agreement, and by the full and faithful observance and performance of its duties, a mutually satisfactory relationship will be established and maintained.

IN CONSIDERATION of the mutual agreements and acknowledgements hereinafter made, the parties hereto agree as follows:

**A.** The Company hereby appoints the Dealer as an authorized dealer at retail in VEHICLES and at retail and wholesale in other COMPANY PRODUCTS and grants the Dealer the privilege of buying COMPANY PRODUCTS from the Company for sale in its DEALERSHIP OPERATIONS (as herein defined). The Company also grants to the Dealer the privilege of displaying, at approved location(s), the Company's trademarks and trade names applicable to COMPANY PRODUCTS. The Dealer hereby accepts such appointment.

**B.** Subject to and in accordance with the terms and conditions of this agreement, the Company shall sell COMPANY PRODUCTS to the Dealer and the Dealer shall purchase COMPANY PRODUCTS from the Company.

**C.** The Ford Motor Company Ford Sales and Service Agreement Standard Provisions (Form "FD925-A GEN. SALE 1-76"), a duplicate original of which is attached to the Dealer's duplicate original of this agreement, have been read and agreed to by the Company and by the Dealer, and such Standard Provisions and any duly executed and delivered supplement or amendment thereto, are hereby made a part of this agreement with the same force and effect as if set forth herein in full.

**D.** This agreement shall bind the Company when it bears the facsimile signature of the General Manager, and the manual countersignature of the General Sales Manager, Market Representation Manager, or a Regional or District Sales Manager, of the Ford Division of the Company and a duplicate original thereof is delivered personally or by mail to the Dealer or the Dealer's principal place of business.

**E.** The Dealer acknowledges that (i) this agreement may be executed only in the manner provided in paragraph D hereof, (ii) no one except the General Manager, the General Sales Manager, or Market Representation Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to make or execute any other agreement relating to the subject matter hereof on behalf of the Company, or in any manner to enlarge, vary or modify the terms of this agreement, and then only by an instrument in writing, and (iii) no one except the General Manager of the Ford Division of the Company, or the Secretary or an Assistant Secretary of the Company, is authorized to terminate this agreement on behalf of the Company, and then only by an instrument in writing.

**F.** In view of the personal nature of this agreement and its objectives and purposes, the Company expressly reserves to itself the right to execute a Ford Sales and Service Agreement with individuals or other entities specifically selected and approved by the Company. Accordingly, this agreement and the rights and privileges conferred on the Dealer hereunder are not transferable, assignable or salable by the Dealer and no property right or interest, direct or indirect, is sold, conveyed or transferred to the Dealer under this agreement. This agreement has been entered into by the Company with the Dealer in reliance (i) upon the representation and

agreement that the following person(s), and only the following person(s), shall be the principal owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| Ryan E. Eden | LaGrange, North Carolina | 6 |
| John Ettinger | Eustis, Florida | 4 |

(ii) upon the representation and agreement that the following person(s), and only the following person(s), shall have full managerial authority for the operating management of the Dealer in the performance of this agreement:

| NAME | HOME ADDRESS | TITLE |
|---|---|---|
| Ryan E. Eden | LaGrange, North Carolina | President |
| John Ettinger | Eustis, Florida | Secretary |

and (iii) upon the representation and agreement that the following person(s), and only the following person(s), shall be the remaining owners of the Dealer:

| NAME | HOME ADDRESS | PERCENTAGE OF INTEREST |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

The Dealer shall give the Company prior notice of any proposed change in the said ownership or managerial authority, and immediate notice of the death or incapacity of any such person. No such change or notice, and no such assignment of this agreement or of any right or interest herein, shall be effective against the Company unless and until embodied in an appropriate amendment to or assignment of this agreement, as the case may be, duly executed and delivered by the Company and by the Dealer. The Company shall not unreasonably withhold its consent to any such change.

G. (Strike out either subparagraph (1) or (2) whichever is not applicable.)

(1) This agreement shall continue in force and effect from the date of its execution until terminated by either party under the provisions of paragraph 17 hereof.

(2) This agreement shall continue in force and effect for a term commencing on the date of its execution and expiring _____ unless sooner terminated under the provisions of paragraph 17 hereof.

H. Both the Company and the Dealer assume and agree to carry out and perform their respective responsibilities under this agreement.

IN WITNESS WHEREOF the parties hereto have duly executed this agreement in duplicate as of the day and year first above written.

Ford Motor Company

_Louis C. Latif_

General Manager, Ford Division

Countersigned by

Ryan Eden Ford, Inc.
(Dealer's Trade Name)

By _Ryan E. Eden_

(Title) President


EXHIBIT
A-47

# FORD SALES & SERVICE AGREEMENT



**Ford Motor Company**
**Ford Division**

# TABLE OF CONTENTS FOR STANDARD PROVISIONS

| Paragraph | Page |
|---|---|
| **1. DEFINITIONS** | 1 |
| **2. RESPONSIBILITIES WITH RESPECT TO VEHICLES** | |
| (a) Sales | 3 |
| (b) Orders | 4 |
| (c) Consideration of Orders | 4 |
| (d) Stocks | 5 |
| (e) Demonstrators | 5 |
| (f) Factory Suggested Price Labels | 5 |
| (g) Owner Literature | 5 |
| (h) Rebates and Allowances | 5 |
| (i) Warranty | 5 |
| **3. RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS** | |
| (a) Sales | 6 |
| (b) Orders | 6 |
| (c) Consideration of Orders | 6 |
| (d) Stocks | 6 |
| (e) Returns and Allowances | 6 |
| (f) Warranty | 7 |
| **4. RESPONSIBILITIES WITH RESPECT TO SERVICE** | |
| (a) Predelivery Service | 7 |
| (b) Warranty and Policy and Campaign Service | 7 |
| (c) Maintenance and Repair Service | 8 |
| (d) Service Tools and Equipment | 8 |
| **5. RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES** | |
| (a) Locations and Facilities | 8 |
| (b) Dealership Facilities Supplement | 8 |
| (c) Changes and Additions | 8 |
| (d) Company Assistance | 9 |
| (e) Fulfillment of Responsibility | 9 |
| **6. OTHER DEALER AND COMPANY RESPONSIBILITIES** | |
| (a) Signs | 9 |
| (b) Personnel | 9 |
| (c) Dealer Residence | 9 |
| (d) Capital | 9 |
| (e) Accounting System | 9 |
| (f) Financial Reports | 10 |
| (g) Delivery and Sales Reports | 10 |
| (h) Customer Handling | 10 |
| (i) Business Practices, Advertising and Programs | 10 |
| (j) Compliance with Laws, Rules and Regulations | 11 |
| (k) Indemnification by the Company | 11 |
| **7. DEALER'S RESPONSIBILITIES WITH RESPECT TO HOURS OF BUSINESS** | 12 |
| **8. PURCHASES FROM OTHERS AND SALES TO OTHERS** | 12 |
| **9. DETERMINATION OF DEALER REPRESENTATION** | |
| (a) Representation Planning | 12 |
| (b) Information to Dealer | 12 |
| (c) Additional Dealers | 13 |
| (d) Established Dealer Points | 13 |
| **10. PRICES AND CHARGES** | 13 |
| **11. TERMS AND TITLE** | |
| (a) Payment | 13 |
| (b) Title | 13 |
| (c) Risk of Loss and Claims | 14 |
| (d) Demurrage and Diversion Liability | 14 |
| (e) State and Local Taxes | 14 |
| **12. RECORDS, INSPECTIONS AND TESTS** | |
| (a) Record Retention | 14 |
| (b) Inspections and Tests | 14 |
| **13. CHANGES IN COMPANY PRODUCTS** | 15 |
| **14. DEALER NOT AN AGENT OF COMPANY** | 15 |
| **15. TRADEMARKS AND TRADE NAMES** | |
| (a) Use in Firm Name | 15 |
| (b) Limitations on Use | 15 |

| Paragraph | Page |
|---|---|
| **16. REPORTS TO DEALER POLICY BOARD** | 15 |
| **17. TERMINATION OR NONRENEWAL OF AGREEMENT** | |
| (a) By Dealer | 16 |
| (b) By Company Due to Events Controlled By Dealer | 16 |
| (c) By Company For Nonperformance by Dealer of Sales, Service, Facilities or Other Responsibilities | 17 |
| (d) By Company or Dealer Because of Death or Physical or Mental Incapacity of any Principal Owner | 17 |
| (e) By Company or Dealer for Failure to be Licensed | 17 |
| (f) By Company at Will | 17 |
| (g) By Company Upon the Offer of New Agreements | 17 |
| (h) Acts In Good Faith | 18 |
| **18. REQUIRED APPEAL TO POLICY BOARD — TERMINATIONS OR NONRENEWALS — OPTIONAL ARBITRATION PLAN** | |
| (a) Arbitration Plan | 18 |
| (b) Appeal to Policy Board | 18 |
| (c) Optional Arbitration | 18 |
| (d) Limitation of Actions | 19 |
| (e) Expenses of Arbitration | 19 |
| **19. OBLIGATIONS UPON TERMINATION OR NONRENEWAL** | |
| (a) Sums Owing Company | 20 |
| (b) Discontinuance of Use of Trademarks and Trade Names | 20 |
| (c) Warranty Work | 20 |
| (d) Service Records | 20 |
| (e) Orders and Customer Deposits | 20 |
| (f) Deliveries After Termination or Nonrenewal | 21 |
| **20. SUCCESSOR TO DEALER IN EVENT OF DEATH** | |
| (a) Interim Agreement | 21 |
| (b) Buy-Out | 22 |
| (c) Term/Continuation | 23 |
| (d) Limitation of Offer | 23 |
| (e) Limitation of Acceptance | 23 |
| **21. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF OTHER DEALER ASSETS** | |
| (a) Vehicles | 23 |
| (b) Genuine Parts | 24 |
| (c) Dealer's Signs | 24 |
| (d) Special Tools and Equipment | 24 |
| (e) Procedures, Delivery and Title | 25 |
| (f) Payment | 25 |
| (g) Assignment of Benefits | 25 |
| **22. FACILITIES ASSISTANCE UPON NONRENEWAL OR CERTAIN TERMINATIONS BY THE COMPANY** | |
| (a) Dealer Eligibility | 25 |
| (b) Eligible Facilities | 26 |
| (c) Company's Obligation | 26 |
| (d) Limitation on Company's Obligation | 26 |
| (e) Satisfaction of Company's Obligation | 27 |
| **23. TERMINATION BENEFITS FULL COMPENSATION; GENERAL RELEASE** | 27 |
| **24. DISPOSITION OF DEALER'S ASSETS** | 28 |
| (a) Company Right to Approve Change in Ownership | 28 |
| (b) Company Right of First Refusal to Purchase | 28 |
| **25. NEW AGREEMENT** | 29 |
| **26. ACKNOWLEDGEMENTS** | 29 |
| **27. NO IMPLIED WAIVERS** | 29 |
| **28. RELATIONS AFTER TERMINATION NOT A RENEWAL** | 30 |
| **29. LIMITATION OF COMPANY'S LIABILITY** | 30 |
| **30. NOTICES** | 30 |
| **31. AMENDMENT** | 30 |
| **32. MICHIGAN AGREEMENT** | 30 |
| **33. CONFLICT WITH STATUTE** | 30 |



# **Ford Motor Company**

# FORD SALES AND SERVICE AGREEMENT
# STANDARD PROVISIONS

### *DEFINITIONS*

**1.** As used herein, the following terms shall have the following meanings, respectively:

**1. (a)** "COMPANY PRODUCTS" shall mean such

> **(1)** new passenger cars,
>
> **(2)** new trucks and chassis, excluding all trucks and chassis of series 850 or higher designations, and
>
> **(3)** parts and accessories therefor,

as from time to time are offered for sale by the Company to all authorized Ford dealers as such for resale, plus such other products as may be offered for sale by the Company to the Dealer from time to time. The Company reserves the right to offer any new, different and differently designated passenger car, truck or chassis, and any other product, bearing any trademarks or brand names used or claimed by the Company or any of its subsidiaries, including the name "Ford", to selected authorized Ford dealers or others under existing or separate new agreements; provided, however, that the Company shall not franchise any such new passenger car bearing the name "Ford" (other than the Ford script-in-oval corporate form of trademark) to anyone who is not an authorized Ford dealer.

**1. (b)** "CAR" shall mean any passenger car, and "TRUCK" shall mean any truck or chassis, included in this agreement pursuant to paragraph 1(a) above. "VEHICLE" shall mean any CAR or TRUCK and "VEHICLES" shall mean CARS and TRUCKS.

**1. (c)** "COMPETITIVE CARS" and "COMPETITIVE TRUCKS" shall mean those new cars and new trucks, respectively, not marketed by the Company which are selected by the Company as generally comparable with CARS and TRUCKS, respectively, in price and product characteristics.

**1. (d)** "INDUSTRY CARS" and "INDUSTRY TRUCKS" shall mean all new cars and all new trucks, respectively, of all manufacturers to the extent data therefor are reasonably available.

**1. (e)** "GENUINE PARTS" shall mean such parts, accessories and equipment for VEHICLES as are offered for sale by the Company from time to time to the Dealer.

**1. (f)** "DEALER PRICE" shall mean, with respect to each COMPANY PRODUCT to which it refers, the price to the Dealer for such product, as from time to time established by the Company, before deduction of any cash or other discount applicable thereto. It shall not include any amount in the nature of a predelivery or other holdback deposit or charge, any dealer association collection, any charge by the Company for distribution, delivery or taxes, or any other charge for special items or services.

FD 925A ᴳᴱᴺ ˢᴬᴸᴱˢ                    1

### 1. DEFINITIONS (Continued)

**1. (g)** "VEHICLE TERMS OF SALE BULLETIN" shall mean the latest VEHICLE TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of VEHICLES to authorized Ford dealers.

**1. (h)** "PARTS AND ACCESSORIES TERMS OF SALE BULLETIN" shall mean the latest PARTS AND ACCESSORIES TERMS OF SALE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company setting forth the terms of sale and ordering procedures applicable to sales of GENUINE PARTS to authorized Ford dealers.

**1. (i)** "CUSTOMER SERVICE BULLETIN" shall mean the latest CUSTOMER SERVICE BULLETIN and amendments thereto furnished to the Dealer from time to time by the Company establishing standards for authorized Ford dealers with respect to service personnel, training, tools and equipment, for customer handling procedures and for evaluating the Dealer's service performance.

**1. (j)** "DEALER'S LOCALITY" shall mean the locality designated in writing to the Dealer by the Company from time to time as the area of the Dealer's sales and service responsibility for COMPANY PRODUCTS.

**1. (k)** "DEALERSHIP LOCATION" shall mean the place or places of business of the Dealer for carrying out this agreement which are approved by the Company as provided in paragraph 5 of this agreement.

**1. (l)** "DEALERSHIP FACILITIES" shall mean the land areas, buildings and improvements established at the DEALERSHIP LOCATION in accordance with the provisions of paragraph 5 of this agreement.

**1. (m)** "DEALERSHIP OPERATIONS" shall mean the sale of COMPANY PRODUCTS and used vehicles, service operations and (if the Dealer so elects) rental or leasing of VEHICLES, conducted by the Dealer at or from the DEALERSHIP FACILITIES.

**1. (n)** "CAR PLANNING VOLUME" and "TRUCK PLANNING VOLUME" shall mean the average annual estimated sales base for CARS and TRUCKS, respectively, established by the Company for the Dealer from time to time for planning purposes under its standard procedures for authorized Ford dealers in single or multiple DEALERS' LOCALITIES, as the case may be, based on historical sales and registrations, and current trends, in CARS, TRUCKS, COMPETITIVE CARS and TRUCKS and INDUSTRY CARS and TRUCKS in the DEALER'S LOCALITY. Consideration shall also be given to the environs of the DEALERSHIP LOCATION and market trends therein, consumer shopping habits, demographic factors and other appropriate data to the extent available and pertinent. Such terms shall not represent the actual sales volumes to be achieved by the Dealer to meet his responsibilities under paragraph 2 of this agreement.

**1. (o)** "PERCENT RESPONSIBILITY" shall mean the ratio of the Dealer's CAR PLANNING VOLUME, and of the Dealer's TRUCK PLANNING VOLUME, to the total CAR PLANNING VOLUMES and to the total TRUCK PLANNING VOLUMES, respectively, for all authorized Ford dealers in the DEALER'S LOCALITY.

**1. (p)** "UIO" (units in operation) shall mean the CARS and TRUCKS of the next preceding three or more model years (as determined by the Company from time to time) licensed within the DEALER'S LOCALITY at a given time multiplied by the Dealer's PERCENT RESPONSIBILITY therefor.

2

## 1. DEFINITIONS (Continued)

**1. (q)** "GUIDES" shall mean such reasonable standards as may be established by the Company for the Dealer from time to time under its standard procedures for authorized Ford dealers (i) for DEALERSHIP FACILITIES and equipment, capitalization and net working capital based on such factors as CAR and TRUCK PLANNING VOLUMES, UIO, the DEALER'S LOCALITY and (ii) for inventories, personnel, demonstrators and other elements of DEALERSHIP OPERATIONS based on such factors as sales and service volumes.

## RESPONSIBILITIES WITH RESPECT TO VEHICLES

**2. (a) Sales.** The Dealer shall promote vigorously and aggressively the sale at retail (and, if the Dealer elects, the leasing and rental) of CARS and TRUCKS to private and fleet customers within the DEALER'S LOCALITY, and shall develop energetically and satisfactorily the potentials for such sales and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. To this end, the Dealer shall develop, maintain and direct a trained, quality vehicle sales organization and shall conduct throughout each model year aggressive advertising and sales promotion activities, making use to the greatest feasible extent of the Company's advertising and sales promotion programs relating to VEHICLES.

The Dealer's performance of his sales responsibility for CARS shall be measured by such reasonable criteria as the Company may develop from time to time, including:

(1) Dealer's sales of CARS to private and fleet users located in the DEALER'S LOCALITY as a percentage of:

    (i) all private and all fleet registrations of CARS in the DEALER'S LOCALITY,

    (ii) all private and all fleet registrations of COMPETITIVE CARS in the DEALER'S LOCALITY,

    (iii) all private and all fleet registrations of INDUSTRY CARS in the DEALER'S LOCALITY, and

    (iv) the private and fleet sales objectives for CARS established by the Company for the Dealer from time to time.

(2) If the Dealer is not the only authorized dealer in CARS in the DEALER'S LOCALITY, the following factors shall be used in computing percentages pursuant to 2(a) (1) above:

    (i) The Dealer's sales of CARS to users located in the DEALER'S LOCALITY shall be deemed to be the total registrations thereof in the DEALER'S LOCALITY multiplied by the Dealer's percent of sales of all CARS made by all authorized Ford dealers located in the DEALER'S LOCALITY unless the Dealer or the Company shows that the Dealer actually has made a different number of such sales,

    (ii) The registrations of CARS and COMPETITIVE and INDUSTRY CARS in the DEALER'S LOCALITY against which the Dealer shall be measured shall be the total thereof multiplied by the Dealer's PERCENT RESPONSIBILITY, and

    (iii) The Dealer's objectives for CARS shall be the total objectives therefor of all authorized Ford dealers in the DEALER'S LOCALITY multiplied by the Dealer's PERCENT RESPONSIBILITY.

(3) A comparison of each such percentage with percentages similarly obtained for all other authorized Ford dealers combined in the Company's sales zone and district in which the Dealer is located, and where subparagraph 2(a) (2) applies, for all other authorized Ford dealers combined in the DEALER'S LOCALITY.

3

## 2. RESPONSIBILITIES WITH RESPECT TO VEHICLES (Continued)

(4) In evaluating any comparisons provided for in subparagraph 2(a)(3) above, the Company shall give consideration to the availability of CARS to the Dealer and other authorized Ford dealers and any special local marketing conditions that might affect the Dealer's sales performance differently from the sales performance of COMPETITIVE or INDUSTRY CAR dealers or other authorized Ford dealers.

(5) The sales and registration data referred to in this subparagraph 2(a) shall include sales to and registrations in the name of leasing and daily rental operations and shall be those utilized in the Company's records or in reports furnished to the Company by independent sources selected by it and generally available for such purpose in the automotive industry. In the event such reports of the registrations and/or sales of INDUSTRY or COMPETITIVE CARS in the DEALER'S LOCALITY are not generally available, the evaluation of the Dealer's sales performance shall be based on such registrations and/or sales or purchase data as can be reasonably obtained by the Company.

The Dealer's performance of his sales responsibility for TRUCKS shall be determined in the same manner as for CARS.

The Company will provide to the Dealer an evaluation of his performance under this subparagraph (2)(a) from time to time as initiated by the Company, or not more than once a month upon the written request of the Dealer.

### 2. (b) Orders.

(1) To enable the Company to plan for and establish, and its manufacturing sources to carry out, production schedules, the Dealer shall, on the dates and forms provided by the Company, furnish the Company basic orders for types of VEHICLES and specific orders for individual VEHICLES against the applicable basic order as specified in the applicable VEHICLE TERMS OF SALE BULLETIN.

(2) The Company is authorized to have installed on any VEHICLE ordered by the Dealer any equipment or accessory required by any applicable federal, state or local law, rule, or regulation.

(3) Any order for a VEHICLE not shipped during the month for which delivery was scheduled will remain in effect unless cancelled by the Dealer or the Company by written notice to the other. An order for an "off standard" VEHICLE may be cancelled only by or with the consent of the Company. Any VEHICLE which differs from the Company's standard specifications, or which incorporates special equipment, shall be considered an "off standard" VEHICLE.

(4) The Dealer shall not be liable to the Company for any failure to accept shipments of VEHICLES ordered from the Company where such failure is due to any labor difficulty at the DEALERSHIP LOCATION or to any cause beyond the Dealer's control or without the Dealer's fault or negligence.

### 2. (c) Consideration of Orders.

(1) The Company may reject orders not submitted in accordance with subparagraph 2(b)(1) above. The Company shall make reasonable efforts to fill each order of the Dealer that is accepted by the Company. During any period of shortage of any VEHICLE, the Company shall be entitled to give priority to accepted orders for such VEHICLES for resale to users residing within the DEALER'S LOCALITY of the ordering dealer.

4

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 191 of 233

## 2. RESPONSIBILITIES WITH RESPECT TO VEHICLES (Continued)

(2) The Company shall not be liable to the Dealer in any respect for failure to ship or for delay in shipment of accepted orders for VEHICLES where such failure or delay is due wholly or in part to (i) shortage or curtailment of material, labor, transportation, or utility services, (ii) any labor or production difficulty in any of its own or any of its suppliers' locations, (iii) any governmental action, or (iv) any cause beyond the Company's control or without its fault or negligence.

**2. (d) Stocks.** The Dealer shall maintain stocks of current models of such lines or series of VEHICLES, of an assortment and in quantities as are in accordance with Company GUIDES therefor, or adequate to meet the Dealer's share of current and anticipated demand for VEHICLES in the DEALER'S LOCALITY. The Dealer's maintenance of VEHICLE stocks shall be subject to the Company's filling the Dealer's orders therefor.

**2. (e) Demonstrators.** The Dealer shall maintain at all times in good condition and running order for demonstration and loan to prospective purchasers, such numbers of the latest model of such lines or series of VEHICLES as are in accordance with Company GUIDES therefor.

**2. (f) Factory Suggested Price Labels.** If any CAR is delivered by the Company to the Dealer with an incorrect label, or without a completed label, affixed thereto pursuant to the Federal Automobile Information Disclosure Act, the Dealer shall promptly complete and affix to such CAR a correct label on the form and in accordance with the directions furnished by the Company.

**2. (g) Owner Literature.** The Dealer shall, in accordance with the Company's instructions, complete, execute and deliver to each retail purchaser of a VEHICLE from him the Company's then current publications for owners with respect to the operation, maintenance and warranty of that VEHICLE (hereinafter called "Owner's Literature"). The Dealer shall fulfill promptly all dealer responsibilities under each piece of the Owner's Literature delivered by him. The Company may specify in the Owner's Literature that the Dealer will perform certain inspections of the VEHICLE. The Dealer authorizes the Company to charge his account for work done by another Company authorized CAR or TRUCK dealer under the Owner's Literature delivered by the Dealer, and to credit his account for work done by him under Owner's Literature delivered by another Company authorized CAR or TRUCK dealer. The charge or credit shall be in the amount specified by the Company from time to time.

**2. (h) Rebates and Allowances.** The Dealer shall be entitled to such rebates and allowances from the Company on VEHICLES and factory-installed options, subject to such conditions and procedures, as may be specified in the applicable VEHICLE TERMS OF SALE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company, provided that any change in the model close-out allowance shall be announced to the Dealer prior to the Company's solicitation of the build-out order.

**2. (i) Warranty.** The Company shall from time to time establish, by notice to the Dealer, the warranty to the owner applicable to each VEHICLE. There shall be NO OTHER WARRANTY, express or implied, including any warranty of MERCHANTABILITY OR FITNESS, or any other obligation of the Company to the Dealer or the owner with respect to the VEHICLE or any part thereof except the warranty established pursuant to this subparagraph. The Dealer shall expressly incorporate such warranty as a part of each buyer's order form or other contract for the sale of a VEHICLE and shall deliver a copy of the warranty, in the form furnished by the Company, to the owner at the time the VEHICLE is delivered to the owner, all in accordance with instructions set forth in the Company's then current Warranty and Policy Manual and supplements thereto (hereinafter called "Warranty Manual").

5

## RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS

**3. (a)** *Sales.* The Dealer shall promote vigorously and aggressively the sale of GENUINE PARTS to service, wholesale and other customers within the DEALER'S LOCALITY, and shall develop energetically and satisfactorily the potentials for such sale and obtain a reasonable share thereof; but the Dealer shall not be limited to the DEALER'S LOCALITY in making sales. To this end, the Dealer shall develop, maintain and direct a trained quality parts sales organization and shall conduct aggressive advertising and sales promotion activities, making use to the greatest feasible extent of the Company's advertising and sales promotion programs relating to GENUINE PARTS. The Dealer shall not sell or offer for sale or use in the repair of any COMPANY PRODUCT, as a GENUINE PART, any part or accessory that is not in fact a GENUINE PART.

The Dealer's performance of his sales responsibility for GENUINE PARTS shall be measured by such reasonable criteria as the Company may develop from time to time including:

(1) His sales as a percentage of the sales objectives established for him by the Company from time to time, and his sales per UIO, and

(2) A comparison of such percentage and sales per UIO with the percentage similarly obtained and sales per UIO of all other authorized Ford dealers combined in one or more of the following: (i) the DEALER'S LOCALITY, (ii) the Company's sales or service zone, and (iii) the district in which the Dealer is located, as the Company may determine.

**3. (b)** *Orders.*

(1) Stock orders for the Dealer's requirements of GENUINE PARTS shall be furnished to the Company by the Dealer in accordance with the applicable PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

(2) Any order for a GENUINE PART not shipped in accordance with normal shipping schedules will remain in effect unless cancelled by the Dealer or the Company by written notice to the other.

(3) The Dealer shall not be liable to the Company for any failure to accept shipment of GENUINE PARTS ordered from the Company where such failure is due to any labor difficulty in the Dealer's place of business or to any cause beyond the Dealer's control or without the Dealer's fault or negligence.

**3. (c)** *Consideration of Orders.*

(1) The Company shall make reasonable efforts to fill each order of the Dealer that is accepted by the Company.

(2) The Company shall not be liable to the Dealer in any respect for failure to ship or for delay in shipment of accepted orders for GENUINE PARTS where such failure or delay is due wholly or in part to (i) shortage or curtailment of material, labor, transportation or utility services, (ii) any labor or production difficulty in any of its own or any of its suppliers' locations, (iii) any governmental action or (iv) any cause beyond the Company's control or without its fault or negligence.

**3. (d)** *Stocks.* The Dealer shall maintain a stock of parts, including GENUINE PARTS, in accordance with Company GUIDES therefor, and of an assortment in quantities adequate to meet the current and anticipated demand therefor. The Dealer's maintenance of stocks of GENUINE PARTS shall be subject to the Company's filling the Dealer's orders therefor.

**3. (e)** *Returns and Allowances.* The Dealer shall be entitled to such allowances, discounts, incentives and return privileges from the Company on GENUINE PARTS subject to such conditions and procedures as may be specified in the applicable PARTS AND ACCESSORIES

6

**3. RESPONSIBILITIES WITH RESPECT TO GENUINE PARTS (Cont.)**

TERMS OF SALE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company.

**3. (f) Warranty.** The Company shall from time to time establish, by notice to the Dealer, the warranty applicable to each GENUINE PART. There shall be NO OTHER WARRANTY, express or implied, including any warranty of MERCHANTABILITY OR FITNESS, or any other obligation of the Company to the Dealer or the customer with respect to any GENUINE PART or any part thereof except the warranty established pursuant to this subparagraph. The Dealer shall expressly incorporate such warranty as a part of each sale of a GENUINE PART, in accordance with instructions set forth in the Warranty Manual.

## RESPONSIBILITIES WITH RESPECT TO SERVICE

**4.** The Dealer shall develop, maintain and direct a trained, quality service organization and render at the DEALERSHIP FACILITIES prompt, workmanlike, courteous and willing service to owners and users of COMPANY PRODUCTS, in accordance with the standards and procedures set forth in the applicable CUSTOMER SERVICE BULLETIN, including without limitation all service to which a purchaser of a COMPANY PRODUCT from any authorized Ford dealer may be entitled.

**4. (a) Predelivery Service.** The Dealer shall perform or be responsible for the performance of such inspection, conditioning and repair of each VEHICLE before delivery as may be prescribed for such VEHICLE in the Company's applicable predelivery inspection and conditioning schedules furnished by the Company to the Dealer. The Dealer shall maintain or be responsible for the maintenance of adequate records of all predelivery inspection, conditioning and repair work performed by or for the Dealer.

**4. (b) Warranty and Policy and Campaign Service.**

(1) The Dealer shall perform all warranty and policy service on each COMPANY PRODUCT it is certified to sell and service, presented by owners, in accordance with the warranty and policy applicable thereto and the applicable provisions of the Warranty Manual and CUSTOMER SERVICE BULLETIN.

(2) The Dealer shall perform campaign inspections and/or corrections for owners and users of all VEHICLES, subject to the campaign instructions issued by the Company from time to time and the applicable provisions of the Warranty Manual. The Company may ship parts in quantity to the Dealer to effect such campaign work and if such parts are in excess of the Dealer's requirements, the Dealer may return unused parts to the Company for credit after completion of the campaign.

(3) The Dealer shall use only GENUINE PARTS in performing warranty, policy and campaign work, except as otherwise provided in the Warranty Manual, CUSTOMER SERVICE BULLETIN or campaign instructions, and shall give precedence to all such work over other service work if the use of the vehicle is impaired. The Dealer shall promptly report to the Company, and seek the Company's assistance with respect to, any warranty or policy or campaign work which cannot be performed to the owner's or the Dealer's satisfaction. The Company shall give precedence to such requests over other service assistance. The Dealer shall provide the owner with a copy of the repair order for such work itemizing the work performed. The Dealer shall have such repair

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 194 of 233

## 4. RESPONSIBILITIES WITH RESPECT TO SERVICE (Continued)

order signed by the owner except in unusual circumstances where it is not feasible to obtain such signature.

(4) The Dealer shall submit claims to the Company for reimbursement for the parts and labor used in performing warranty, policy and campaign work and the Company shall reimburse the Dealer therefor, in accordance with the provisions of the Warranty Manual or campaign instructions and the Dealer's approved warranty labor rate. The Dealer shall maintain adequate records and documents supporting such claims in accordance with the provisions of the Warranty Manual.

**4. (c) *Maintenance and Repair Service*.** The Dealer shall perform all other maintenance and repair services, including, where feasible, body repair services, reasonably required by owners and users of VEHICLES and shall provide each customer a copy of the repair order itemizing the work performed and the charges therefor. The Dealer shall have the customer sign such repair order except in unusual circumstances where it is not feasible to obtain such signature.

**4. (d) *Service Tools and Equipment*.** The Dealer shall acquire and maintain for use in DEALERSHIP OPERATIONS such diagnostic equipment and other tools, equipment and machinery, comparable to the type and quality recommended by the Company from time to time, as are necessary to meet the Dealer's service responsibilities hereunder and substantially in accordance with Company GUIDES therefor and the applicable CUSTOMER SERVICE BULLETIN.

## RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES

**5. (a) *Locations and Facilities*.** The Dealer shall establish and maintain at the DEALERSHIP LOCATION approved by the Company DEALERSHIP FACILITIES of satisfactory appearance and condition and adequate to meet the Dealer's responsibilities under this agreement. The DEALERSHIP FACILITIES shall be substantially in accordance with the GUIDES therefor established by the Company from time to time.

**5. (b) *Dealership Facilities Supplement*.** The Dealer and the Company have executed, as a part of and simultaneously with this agreement, a Dealership Facilities Supplement which includes a description of all of the DEALERSHIP LOCATION and FACILITIES, the GUIDES therefor as of the date of this agreement and the purpose for which each shall be used.

**5. (c) *Changes and Additions*.** The Dealer shall not move or substantially modify or change the usage of any of the DEALERSHIP LOCATION or FACILITIES for COMPANY PRODUCTS, nor shall the Dealer or any person named in subparagraphs F(i) or F(ii) hereof directly or indirectly establish or operate in whole or in part any other locations or facilities for the sale or service of COMPANY PRODUCTS or the sale of used vehicles without the prior written consent of the Company. Any such change shall be evidenced by a new Dealership Facilities Supplement executed by the Dealer and the Company. To ensure that all data included on the Dealership Facilities Supplement are reasonably accurate, the Company and the Dealer shall execute a new Dealership Facilities Supplement at least once every five (5) years.

**5. (d) *Company Assistance*.** To assist the Dealer in planning, establishing and maintaining DEALERSHIP LOCATION and FACILITIES in accordance with his responsibilities under this agreement, the Company will make available, at the request of the Dealer, and at a mutually convenient time and place, personnel to provide counsel and advice regarding location and facility planning, including layout and design.

## 5. RESPONSIBILITIES WITH RESPECT TO DEALERSHIP FACILITIES (Continued)

**5. (e) Fulfillment of Responsibility.** The Dealer shall be deemed to be fulfilling his responsibilities under this paragraph 5 when and as long as the DEALERSHIP LOCATION is approved by the Company and the DEALERSHIP FACILITIES are substantially in accordance with the current GUIDES therefor. The execution of this agreement or of any Dealership Facilities Supplement shall not of itself be construed as evidence of the fulfillment by the Dealer of his responsibilities to provide adequate DEALERSHIP LOCATION and FACILITIES.

## OTHER DEALER AND COMPANY RESPONSIBILITIES

**6. (a) Signs.** The Dealer shall install and maintain at the DEALERSHIP LOCATION signs of good appearance and adequate to identify such locations as (1) authorized sales and service establishments for VEHICLES and other COMPANY PRODUCTS identifying such products as products of the Company, (2) authorized sales locations for used vehicles and (3) authorized locations for the leasing or rental of vehicles, as the case may be. Each sign shall be compatible with the design standards established by the Company from time to time and shall be subject to the Company's approval with respect to any display of any trademark or trade name used or claimed by the Company or any of its subsidiaries. Fulfillment of any separate Dealership Identification Agreement between the Dealer and the Company shall be deemed fulfillment of this subparagraph 6(a). The Company will make available, at the request of the Dealer, and at a mutually convenient time and place, personnel to provide counsel and advice regarding dealership signs and identification.

**6. (b) Personnel.** The Dealer shall employ and train such numbers and classifications of competent personnel of good character, including, without limitation, sales, parts, service, owner relations and other department managers, salesmen and service technicians, as will enable the Dealer to fulfill all his responsibilities under this agreement. The Company shall provide assistance to the Dealer in determining personnel requirements. In response to the training needs of the Dealer's personnel, the Dealer at his expense shall cause his personnel to attend training schools or courses conducted by the Company from time to time.

**6. (c) Dealer Residence.** Effective operation of the Dealer's business is dependent in large part on the Dealer's management becoming a part of and accepted within his local community. Accordingly, each person named in subparagraph F(ii) hereof shall (unless otherwise approved in writing by the Company because of individual circumstances) reside within the DEALER'S LOCALITY.

**6. (d) Capital.** The Dealer shall at all times maintain and employ in connection with his DEALERSHIP OPERATIONS separately from any other business of the Dealer, such total investment, net working capital, adequate lines of wholesale credit and competitive retail financing plans for VEHICLES as are in accordance with Company GUIDES therefor and will enable the Dealer to fulfill all his responsibilities under this agreement.

**6. (e) Accounting System.** It is in the mutual interests of the Dealer and the Company that uniform accounting systems and practices be maintained by the Company's authorized dealers in order that the Company may develop and disseminate helpful information, evaluate the relative

**9**

## 6. OTHER DEALER AND COMPANY RESPONSIBILITIES (Continued)

operating performance of each dealer and develop criteria that will enable the Company to formulate plans and policies in the interests of its dealers and the Company and that will assist each dealer to obtain satisfactory results from his dealership operations. Accordingly, the Dealer shall install and use in his DEALERSHIP OPERATIONS, whether conducted as one or several business entities, an accounting system, not exclusive of any other system the Dealer may wish to use, in accordance with the Company's Manual of Dealer Accounting Procedures as amended from time to time.

6. (f) *Financial Reports.* In furtherance of the mutual interests set forth in paragraph 6(e) hereof, the Dealer shall furnish to the Company each month, at the time and on the forms prescribed by the Company, a complete statement reflecting the true financial condition and the month and year-to-date operating results of his DEALERSHIP OPERATIONS as of the end of the preceding month. The Dealer also shall promptly furnish to the Company a copy of any adjusted annual statement that may be prepared by or for the Dealer. All such statements, reports and data shall be based whenever applicable upon the accounting system installed and used by the Dealer in accordance with subparagraph 6(e). Financial information furnished by the Dealer shall be handled on a confidential basis by the Company and, unless authorized by the Dealer or required by law, or offered in evidence in judicial or arbitration proceedings, shall not be furnished, except as an unidentified part of a composite or coded report, to any party outside of the Company.

6. (g) *Delivery and Sales Reports.* To assist the Company in evaluating current sales and market trends, in advising its manufacturing sources of adjustments desired in production and distribution schedules, and in providing the type of information necessary to provide assistance and counsel to the Dealer, the Dealer shall (1) accurately complete the information prescribed on the vehicle delivery card and forward such card to the Company at or as soon as reasonably possible after the end of the day on which the new VEHICLE is delivered or sold, whichever shall occur first, to the private or fleet customer or to rental or leasing operations, if any, conducted or controlled by the Dealer, and (2) furnish the Company with accurate and complete delivery or sales reports and data relating to the Dealer and his DEALERSHIP OPERATIONS at the times and on such forms as the Company may specify from time to time.

6. (h) *Customer Handling.* The Dealer shall cooperate with Company programs, and develop and maintain his own programs, designed to develop good relationships between the Dealer and the public. The Dealer shall promptly investigate and handle all matters brought to his attention by the Company or the public relating to the sale or servicing of COMPANY PRODUCTS in the DEALER'S LOCALITY, in accordance with procedures set forth in the applicable CUSTOMER SERVICE BULLETIN, so as to develop public confidence in the Dealer, the Company and COMPANY PRODUCTS. The Dealer shall report promptly to the Company the details of each inquiry or complaint received by the Dealer relating to any COMPANY PRODUCT which the Dealer cannot handle satisfactorily. The Dealer shall not make, directly or indirectly, any false or misleading statement or representation to any customer as to any VEHICLE, GENUINE PART or other COMPANY PRODUCT as to the source, condition or capabilities thereof, or the Dealer's or the Company's prices or charges therefor or for distribution, delivery, taxes or other items.

6. (i) *Business Practices, Advertising and Programs.* The Dealer shall conduct DEALERSHIP OPERATIONS in a manner that will reflect favorably at all times on the reputation of the Dealer, other Company authorized dealers, the Company, COMPANY PRODUCTS and

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 197 of 233

## 6. *OTHER DEALER AND COMPANY RESPONSIBILITIES (Continued)*

trademarks and trade names used or claimed by the Company or any of its subsidiaries. The Dealer shall avoid in every way any "bait", deceptive, misleading, confusing or illegal advertising or business practice. The Company shall not publish or employ any such advertising or practice or encourage any dealer or group of dealers to do so.

**6. (j) *Compliance with Laws, Rules and Regulations.*** The Dealer shall comply with all applicable federal, state, and local laws, rules and regulations in the ordering, sale and service of COMPANY PRODUCTS and the sale and service of used vehicles, including without limitation those related to motor vehicle safety, emissions control and customer service. The Company shall provide the Dealer, and the Dealer shall provide the Company, such information and assistance as may be reasonably requested by the other in connection with the performance of obligations under such laws, rules and regulations.

**6. (k) *Indemnification by the Company.*** The Company shall defend, indemnify, hold harmless and protect the Dealer from any losses, damages or expense, including costs and attorney's fees, resulting from or related to lawsuits, complaints or claims commenced against the Dealer by third parties concerning:

(1) Property damage to a COMPANY PRODUCT or bodily injury or property damage arising out of an occurrence caused solely by a "production defect" in that product (i.e., due to defective materials or workmanship utilized or performed at the factory, except for any "production defect" in tires and diesel engines made by others, provided, however, that the "production defect" could not have been discovered by the Dealer in the reasonable pre-delivery inspection of the VEHICLE, as recommended by the Company.

(2) Property damage to a COMPANY PRODUCT or bodily injury or property damage arising out of an occurrence caused solely by a defect in the design of that product, except for a defect in the design of tires or diesel engines made by others.

(3) Any damage occurring to a new VEHICLE, and repaired by the Company (excluding removal and replacement of an entire component with a like component where no welding, riveting or painting is involved), from the time the VEHICLE leaves the Company's assembly plant or warehouse to the time it is delivered to the Dealer's designated location, provided the Company failed to notify the Dealer in writing of such damage and repair in transit prior to delivery of the VEHICLE to the first retail customer.

    In the event that any legal action arising out of any of these causes is brought against the Dealer, the Company shall undertake, at its sole expense, to defend said action on behalf of the Dealer when requested to do so by the Dealer, provided that the Dealer promptly notifies the Company in writing of the commencement of the action against the Dealer and cooperates fully in the defense of the action in such manner and to such extent as the Company may reasonably require (provided, however, that the Company shall have the right to continue the suit in the name of the Dealer, if the Company deems such action to be necessary). Should the Company refuse to undertake the defense on behalf of the Dealer, or fail to undertake an adequate defense, the Dealer may conduct its own defense and the Company shall be liable for the cost of such defense, including reasonable attorney's fees, together with any verdict, judgment or settlement paid by the Dealer (provided, however, that the Dealer shall notify the Company within a reasonable period of any such settlement).

(4) Personal injury or property damage arising solely out of a negligent or improper act of an employe of the Company.

**11**

## DEALER'S RESPONSIBILITIES WITH RESPECT TO HOURS OF BUSINESS

**7.** To the end that the needs of customers and owners served by the Dealer are fulfilled properly, the Dealer shall maintain DEALERSHIP OPERATIONS open for business during all hours and days which are customary in the trade and lawful for such operations in the DEALER'S LOCALITY.

## PURCHASES FROM OTHERS AND SALES TO OTHERS

**8.** The Dealer reserves the right to make purchases from others without obligation or liability of any kind to the Company, provided that the Dealer shall not be relieved of any responsibility assumed by the Dealer under this agreement; and, except as otherwise expressly provided herein, the Company reserves the right to make sales to others (including without limitation to other dealers) without obligation or liability of any kind to the Dealer.

## DETERMINATION OF DEALER REPRESENTATION

**9. (a)** *Representation Planning.* The Company reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for COMPANY PRODUCTS within and without the DEALER'S LOCALITY. In making such determinations, the Company from time to time conducts, to the extent deemed adequate by the Company and subject to the ready availability of information, studies of the locality, including such factors as its geographic characteristics, consumer shopping habits, competitive representation patterns, sales and service requirements, convenience of customers or potential customers and past and future growth and other trends in marketing conditions, population, income, UIO, VEHICLE sales and registrations and COMPETITIVE and INDUSTRY CAR and TRUCK registrations.

**9. (b)** *Information to Dealer.* The Company will inform the Dealer of any proposed change in the Company's market representation plans for the DEALER'S LOCALITY, provided that if the Company's market representation plans do not provide for the continuation of representation of COMPANY PRODUCTS from the Dealer's DEALERSHIP FACILITIES (except for a relocation thereof), the Company shall not be obligated to inform other dealers thereof, but shall give the Dealer written notice thereof. If, in the Company's opinion, such changes should be disclosed to other dealers in connection with the Company's market representation plans for their respective DEALERSHIP OPERATIONS, the Company may inform such other dealers thereof, without liability to the Dealer, no earlier than thirty (30) days after such notice to the Dealer and shall inform such other dealers that the Dealer may maintain his DEALERSHIP OPERATIONS for so long as the Dealer desires and fulfills his responsibilities under this agreement.

12

## DETERMINATION OF DEALER REPRESENTATION (Continued)

**9. (c) *Additional Dealers.*** The Company shall have the right to appoint additional dealers in VEHICLES within or without the DEALER'S LOCALITY except that, if an additional dealer will be within the DEALER'S LOCALITY and within ten (10) miles driving distance of the Dealer's principal place of business, the Company shall not appoint the additional dealer unless a study made pursuant to subparagraph 9(a) reasonably demonstrates, in the Company's opinion, that such appointment is necessary to provide VEHICLES with proper sales and service representation in such locality with due regard to the factors referred to above in subparagraph 9(a). The Company by written notice to the Dealer will give the Dealer thirty (30) days in which to review the applicable study (excluding information regarding other dealers considered confidential by the Company), to discuss such additional dealer with representatives of the Company and to give the Company written notice of objection to the proposed addition. If the Dealer fails to give such written notice by such time, he shall be deemed to have consented to the proposed addition. The Company will give consideration to any such written objection and advise the Dealer in writing of its decision before any commitment is made or negotiations conducted with any dealer prospect. If the Dealer appeals to the Dealer Policy Board within fifteen (15) days of such decision, no action will be taken by the Company until the Dealer Policy Board has rendered a decision on the matter.

**9. (d) *Established Dealer Points.***
Nothing in this paragraph 9 shall restrict the right of the Company to appoint a dealer in VEHICLES as a replacement for a dealer in VEHICLES, or to fill an established open point for a dealer in VEHICLES, at or near a location previously approved by the Company.

## PRICES AND CHARGES

**10.** Sales of COMPANY PRODUCTS by the Company to the Dealer hereunder will be made in accordance with the prices, charges, discounts and other terms of sale set forth in price schedules or other notices published by the Company to the Dealer from time to time in accordance with the applicable VEHICLE TERMS OF SALE BULLETIN or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN. Except as otherwise specified in writing by the Company, such prices, charges, discounts and terms of sale shall be those in effect, and delivery to the Dealer shall be deemed to have been made and the order deemed to have been filled on the date of delivery to the carrier or the Dealer, whichever occurs first. The Company has the right at any time and from time to time to change or eliminate prices, charges, discounts, allowances, rebates, refunds or other terms of sale affecting COMPANY PRODUCTS by issuing a new VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN, new price schedules or other notices. In the event the Company shall increase the DEALER PRICE for any COMPANY PRODUCT, the Dealer shall have the right to cancel, by notice to the Company within ten (10) days after receipt by the Dealer of notice of such increase, any orders for such product placed by the Dealer with the Company prior to receipt by the Dealer of notice of such increase and unfilled at the time of receipt by the Company of such notice of cancellation.

## TERMS AND TITLE

**11. (a) *Payment.*** Payment by the Dealer for each COMPANY PRODUCT shall be in accordance with the terms and conditions set forth in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN.

**11. (b) *Title.*** Title to each COMPANY PRODUCT purchased by the Dealer shall (unless otherwise provided in the applicable VEHICLE or PARTS AND ACCESSORIES TERMS OF SALE BULLETIN) pass to the Dealer, or to such financing institution or other party as may have been designated to the Company by the Dealer, upon delivery thereof to the carrier or to the

13

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 200 of 233

## 11. TERMS AND TITLE (Continued)

Dealer, whichever occurs first, but the Company shall retain a security interest in and right to repossess any product until paid therefor.

**11. (c) *Risk of Loss and Claims*.** The Company shall assume all risk of loss or damage to any VEHICLE purchased by the Dealer from the Company which is not borne by the carrier while the VEHICLE is in the possession of the carrier provided the Dealer properly inspects and records any loss or damage of the VEHICLE upon receipt thereof. The Dealer shall cooperate with the Company in processing all claims for loss or damage of the VEHICLE in accordance with the Company's then current procedures.

**11. (d) *Demurrage and Diversion Liability*.** The Dealer shall be responsible for and pay any and all demurrage, storage and other charges accruing after arrival of any shipment at its destination. In the event the Dealer shall fail or refuse for any reason (other than labor difficulty in the Dealer's place of business or any cause beyond the Dealer's control or without the Dealer's fault or negligence) to accept delivery of any COMPANY PRODUCT ordered by the Dealer, the Dealer shall also pay the Company the amount of all expenses incurred by the Company in shipping such product to the Dealer and in returning such product to the original shipping point or diverting it to another destination; but in no event shall the Dealer pay the Company more for any such diversion than the expense of returning the product to its original shipping point.

**11. (e) *State and Local Taxes*.** The Dealer hereby represents and warrants that all COMPANY PRODUCTS purchased from the Company are purchased for resale in the ordinary course of the Dealer's business. The Dealer further represents and warrants that the Dealer has complied with all requirements for his collection and/or payment of applicable sales, use and like taxes, and has furnished or will furnish evidence thereof to the Company. These representations and warranties shall be deemed a part of each order given by the Dealer to the Company.

The Dealer agrees that, as to any COMPANY PRODUCT put to a taxable use by the Dealer, or in fact purchased by the Dealer other than for resale, the Dealer shall make timely and proper return and payment of all applicable sales, use and like taxes, and shall hold the Company harmless from all claims and demands therefor.

### RECORDS, INSPECTIONS AND TESTS

**12. (a) *Record Retention*.** The Dealer shall retain for at least two (2) years all records and documents, including journals and ledgers, which relate in any way, in whole or in part, to DEALERSHIP OPERATIONS, except for records used as a basis for submission of warranty and policy claims, which shall be retained for at least one (1) year.

**12. (b) *Inspections and Tests*.** The Dealer shall allow persons designated by the Company, at reasonable times and intervals and during normal business hours, to examine the DEALERSHIP FACILITIES and OPERATIONS, the Dealer's stocks of COMPANY PRODUCTS and used vehicles and vehicles at the DEALERSHIP FACILITIES for service or repair, to test the Dealer's equipment, to check and instruct the Dealer and his employees in the proper handling of warranty and other repairs and claims based thereon, and to examine, copy and audit any and all of the Dealer's records and documents. The Company may charge back to the Dealer all payments or credits made by the Company to the Dealer pursuant to such claims or otherwise which were improperly claimed or paid.

### CHANGES IN COMPANY PRODUCTS

**13.** The Company may change the design of any COMPANY PRODUCT, or add any new or different COMPANY PRODUCT or line, series or body style of VEHICLES, at any time and from

14

## CHANGES IN COMPANY PRODUCTS (Continued)

time to time, without notice or obligation to the Dealer, including any obligation with respect to any COMPANY PRODUCT theretofore ordered or purchased by or delivered to the Dealer. Such changes shall not be considered model year changes as contemplated by the provisions of any VEHICLE TERMS OF SALE BULLETIN. The Company may discontinue any VEHICLE or other COMPANY PRODUCT at any time without liability to the Dealer.

## DEALER NOT AGENT OF THE COMPANY

**14.** This agreement does not in any way create the relationship of principal and agent between the Company and the Dealer and under no circumstances shall the Dealer be considered to be an agent of the Company. The Dealer shall not act or attempt to act, or represent himself, directly or by implication, as agent of the Company or in any manner assume or create any obligation on behalf of or in the name of the Company.

## TRADEMARKS AND TRADE NAMES

**15. (a)** *Use in Firm Name.* The Dealer may not use any trademark or trade name used or claimed by the Company or any of its subsidiaries in the Dealer's firm name or trade name except with the Company's prior written approval. If, after such approval, the Company should at any time so request, the Dealer shall promptly discontinue such use and take all steps necessary or appropriate in the opinion of the Company to eliminate such trademark or trade name from the Dealer's firm name or trade name.

**15. (b)** *Limitations on Use.* The Dealer shall not use any trademark or trade name used or claimed by the Company or any of its subsidiaries, or coined words or combinations containing the same or parts thereof, in connection with any business conducted by the Dealer other than in dealing in COMPANY PRODUCTS to which such trademark or trade name refers, and then only in the manner and form approved by the Company; provided that the word "Ford" may be used in connection with a business operated by or affiliated with the Dealer as the Dealer's used vehicle outlet if the Dealer obtains the Company's prior written approval, which may be revoked at any time, and if the Dealer retains the right to require any such affiliated business to discontinue such use at any time the Dealer may direct. The Dealer shall direct such discontinuance on request of the Company at any time.

The Dealer shall not contest the right of the Company to exclusive use of any trademark or trade name used or claimed by the Company or any of its subsidiaries.

## REPORTS TO FORD MOTOR COMPANY'S DEALER POLICY BOARD

**16.** In the interest of maintaining harmonious relationships between the parties to this agreement, the Dealer shall report promptly in writing to the Company's Dealer Policy Board (hereafter called "Policy Board") any act or failure to act on the part of the Company or any of its representatives which the Dealer believes was not in accordance with this agreement or was not reasonable, fair, for good cause or provocation or in good faith as to the Dealer. For the purposes of this agreement, the term "good faith" shall mean the Company and its representatives acting in a fair and equitable manner toward the Dealer so as to guarantee the Dealer freedom from coercion or intimidation from the Company. It is the purpose of the Policy Board to receive, carefully evaluate and, to the extent possible, resolve any such claim to the mutual satisfaction of the parties. Any decision of the Policy Board shall be binding on the Company but shall not be binding on the Dealer.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 202 of 233

## TERMINATION OR NONRENEWAL OF AGREEMENT

**17. (a) *By Dealer*.** The Dealer may terminate or not renew this agreement at any time at will by giving the Company at least thirty (30) days prior written notice thereof.

**17. (b) *By Company Due to Events Controlled by Dealer*.** The following represent events which are substantially within the control of the Dealer and over which the Company has no control, and which are so contrary to the intent and purpose of this agreement as to warrant its termination or nonrenewal:

**(1)** Any transfer or attempted transfer by the Dealer of any interest in, or right, privilege or obligation under this agreement; or transfer by operation of law or otherwise, of the principal assets of the Dealer that are required for the conduct of DEALERSHIP OPERATIONS; or any change, however accomplished, without the Company's prior written consent, which consent shall not be unreasonably withheld, in the direct or indirect ownership or operating management of the Dealer as set forth in paragraph F.

**(2)** Any misrepresentation in applying for this agreement by the Dealer or any person named in paragraph F; or submission by the Dealer to the Company of any false or fraudulent application or claim, or statement in support thereof, for warranty, policy or campaign adjustments, for wholesale parts or VEHICLE sales incentives or for any other refund, credit, rebate, incentive, allowance, discount, reimbursement or payment under any Company program; or acceptance by the Dealer of any payment for any work not performed by the Dealer in accordance with the provisions of this agreement, the Warranty Manual or any applicable CUSTOMER SERVICE BULLETIN.

**(3)** Insolvency of the Dealer, inability of the Dealer to meet debts as they mature, filing by the Dealer of a voluntary petition under any bankruptcy or receivership law, adjudication of the Dealer as a bankrupt or insolvent pursuant to an involuntary petition under any such law, appointment by a court of a temporary or permanent receiver, trustee or custodian for the Dealer or the Dealer's assets, or execution of an assignment by the Dealer for the benefit of creditors; dissolution of the Dealer; or failure of the Dealer for any reason to function in the ordinary course of business, or to maintain the DEALERSHIP OPERATIONS open for business during and for not less than the hours customary in the trade and lawful in the DEALER'S LOCALITY as set forth in paragraph 7.

**(4)** Conviction in a court of original jurisdiction of the Dealer or any person named in paragraph F for any violation of law, or any conduct by any such person unbecoming a reputable businessman, or disagreement between or among any persons named in paragraph F, which in the Company's opinion tends to affect adversely the operation or business of the Dealer or the good name, goodwill or reputation of the Dealer, other authorized dealers of the Company, the Company, or COMPANY PRODUCTS.

**(5)** The Dealer shall have engaged, after written warning by the Company, in any advertising or business practice contrary to the provisions of subparagraph 6(i) of this agreement.

**(6)** Failure of the Dealer to fulfill any provision of paragraph 10 (as to prices or charges), or paragraph 11 (as to terms and title, including payment for COMPANY PRODUCTS), or paragraph 15 (as to trademarks or trade names), or to pay the Company any sum due pursuant to any agreement, including any purchase or lease agreement, between the Company and the Dealer.

Upon occurrence of any of the foregoing events, the Company may terminate this agreement by giving the Dealer at least fifteen (15) days prior written notice thereof.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 203 of 233

**17. (c)** *By Company for Nonperformance by Dealer of Sales, Service, Facilities or Other Responsibilities.* If the Dealer shall fail to fulfill any of his responsibilities with respect to:

    **(1)** CARS or TRUCKS under the provisions of paragraph 2 of this agreement,

    **(2)** GENUINE PARTS under the provisions of paragraph 3 of this agreement,

    **(3)** Service under the provisions of paragraph 4 of this agreement,

    **(4)** DEALERSHIP LOCATION or FACILITIES under the provisions of paragraph 5 of this agreement, or

    **(5)** Other responsibilities under the provisions of subparagraphs 6(a) through 6(h) (as to signs, personnel, residence, capital, accounting system, financial reports, delivery or sales reports or customer handling), subparagraph 6(j) (as to laws, rules or regulations), paragraph 12 (as to records, inspections and tests) or paragraph 14 (as to the Dealer not being an agent of the Company) of this agreement,

the Company shall notify the Dealer in writing of such failure or failures, will offer to review promptly with the Dealer the reasons which, in the Company's or Dealer's opinion, account for such failure or failures and will provide the Dealer with a reasonable opportunity to cure the same. If the Dealer fails or refuses to cure the same within a reasonable time after such notice, the Company may terminate or not renew this agreement by giving the Dealer at least ninety (90) days prior written notice thereof.

**17. (d)** *By Company or Dealer Because of Death or Physical or Mental Incapacity of any Principal Owner.* Since this agreement has been entered into by the Company in reliance upon the continued participation in the ownership of the Dealer by the persons named in subparagraph F(i) hereof, the Company or the Dealer may (subject to the provisions of paragraph 20 hereof) terminate or not renew this agreement, by giving the other at least fifteen (15) days prior written notice thereof, in the event of the death or physical or mental incapacity of any owner of the Dealer named in subparagraph F(i); provided, however, that in order to facilitate orderly termination and liquidation of the dealership, the Company shall defer for a period of three (3) months to one (1) year, as the Company may determine, the exercise of its right to terminate in such event if the executor or representative of such deceased or incapacitated owner shall so request and shall demonstrate the ability to carry out the terms and conditions of this agreement.

**17. (e)** *By Company or Dealer for Failure of Dealer or Company to be Licensed.* If the Company or the Dealer requires a license for the performance of any responsibility under this agreement in any jurisdiction where this agreement is to be performed and if either party shall fail to secure and maintain such license, or if such license is suspended or revoked, irrespective of the cause or reason, either party may terminate or not renew this agreement by giving the other at least fifteen (15) days prior written notice thereof.

**17. (f)** *By Company at Will.* If this agreement is not for a stated term specified in paragraph G of this agreement, the Company may terminate this agreement at will at any time by giving the Dealer at least one hundred and twenty (120) days prior written notice thereof.

**17. (g)** *By Company Upon the Offer of a New Agreement.* The Company may terminate this agreement at any time by giving the Dealer at least thirty (30) days prior written

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 204 of 233

## 17. TERMINATION OR NONRENEWAL OF AGREEMENT (Continued)

notice thereof in the event the Company offers a new or amended form of agreement to its authorized dealers in COMPANY PRODUCTS.

### 17. (h) *Acts in Good Faith.*

(1) The Dealer acknowledges that each of his responsibilities under this agreement is reasonable, proper and fundamental to the purpose of this agreement and that (i) his failure to fulfill any of them would constitute a material breach of this agreement, (ii) the occurrence of any of the events set forth in subparagraph 17(b), 17(c), or 17(e) would seriously impair fundamental considerations upon which this agreement is based, and (iii) the rights of termination or nonrenewal reserved in the events specified in subparagraph 17(g) are necessary to permit the Company to remain competitive at all times. The Dealer acknowledges that any such failure, occurrence or event constitutes a reasonable, fair, good, due and just cause and provocation for termination or nonrenewal of this agreement by the Company.

(2) The Dealer agrees that if the Company or any of its representatives (i) requests the Dealer to fulfill any of such responsibilities, (ii) believes that any such failure, occurrence or event is occurring or has occurred and advises the Dealer that, unless remedied, such failure, occurrence or event may result in Company termination or nonrenewal of this agreement, (iii) gives the Dealer notice of termination or nonrenewal, or terminates or fails to renew this agreement, because of any such failure, occurrence or event, then such request, advice, notice, termination or nonrenewal shall not be considered to constitute or be evidence of coercion or intimidation, or threat thereof, or to be unreasonable, unfair, undue or unjust, or to be not in good faith.

## REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN

### 18. (a) *Arbitration Plan.*
The Company has adopted the Ford Motor Company Plan and Rules of Arbitration ("Arbitration Plan") effective June 1, 1972, a copy of which was delivered to the Dealer with this agreement. The Company reserves the right to terminate, change or modify the Arbitration Plan at any time upon notice to the Dealer. Any arbitration pursuant to the Arbitration Plan shall be governed by the terms of the Arbitration Plan in effect on the date such arbitration is commenced.

### 18. (b) *Appeal to Policy Board.*
Any protest, controversy or claim by the Dealer (whether for damages, stay of action or otherwise) with respect to any termination or nonrenewal of this agreement by the Company or the settlement of the accounts of the Dealer with the Company after any termination or nonrenewal of this agreement by the Company or the Dealer has become effective, shall be appealed by the Dealer to the Policy Board within fifteen (15) days after the Dealer's receipt of notice of termination or nonrenewal, or, as to settlement of accounts after termination or nonrenewal, within one year after the termination or nonrenewal has become effective. Appeal to the Policy Board shall be a condition precedent to the Dealer's right to pursue any other remedy available under this agreement or otherwise available under law. The Company, but not the Dealer, shall be bound by the decision of the Policy Board.

### 18. (c) *Optional Arbitration.*
If the Dealer is dissatisfied with the decision of the Policy Board in a case referred to in subparagraph 18(b), the Dealer may, at his option, elect to arbitrate

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 205 of 233

### 18. REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN (Continued)

in accordance with the Arbitration Plan or elect not to arbitrate and retain the right to pursue whatever other remedies may be available, provided that:

(1) The Dealer's election to arbitrate shall be made by filing an Arbitration Demand with the Secretary appointed under the Arbitration Plan within thirty (30) days after receipt by the Dealer of a decision by the Policy Board. The Arbitration Demand shall set forth a clear and complete statement of the nature of the Dealer's claim and the basis thereof, the amount involved, if any, and the remedy sought. The Arbitration Demand shall be in writing and shall be given by personal delivery or sent by registered or certified mail, postage prepaid, to the Secretary, Arbitration Panel, Ford Motor Company, at the address shown in the Plan and Rules of Arbitration.

(2) If the Dealer, by filing a timely Arbitration Demand, elects to arbitrate, arbitration shall be the sole and exclusive remedy of the Dealer in such cases, and the decision and award of the Arbitration Panel provided for in the Arbitration Plan shall be final and binding on both parties.

(3) If the Dealer elects to arbitrate, either party may enjoin the other from pursuing any other remedy in such cases, except that either party may sue to enforce any order or award of the Arbitration Panel and judgment upon such order or award may be entered by any court having jurisdiction.

18. (d) *Limitation of Actions.* If the Dealer elects not to arbitrate by failing to file a timely Arbitration Demand, all causes of action at law or in equity and all rights and remedies before federal, state, or local administrative agencies, departments or boards shall be forever barred unless commenced or instituted within one year after the date of the decision of the Policy Board.

18. (e) *Expenses of Arbitration.* During the first quarter of each calendar year, the Company and the Chairmen of the Ford and Lincoln-Mercury National Dealer Councils ("Dealer Council Chairmen") shall jointly establish a budget for that calendar year for the retainer fees, daily fees, clerical costs, travel expenses and living allowances ("Compensation") of the Arbitrator selected by the Dealer Council Chairmen, for one-half of the Compensation of the Arbitrator selected as Chairman of the Arbitration Panel, and for one-half of the cost of outside services employed by the Arbitration Panel, pursuant to the Arbitration Plan.

(1) The amount of such budget shall be advanced by the Company to a Trustee selected by the Company and the Dealer Council Chairmen. The Trustee shall pay the Compensation of the Arbitrator selected by the Dealer Council Chairmen, one-half of the Compensation of the Chairman of the Arbitration Panel, and one-half of the cost of outside services employed by the Arbitration Panel, as statements are rendered therefor, from and to the extent of such advance. All other costs of the Arbitration Panel for that calendar year shall be borne by the Company except as hereinafter provided. Any unexpended portion of such budget shall be carried forward to the next calendar year.

(2) The amount of such budget shall be spread in equal amounts among all dealerships then having valid and outstanding Ford, Mercury or Lincoln Sales and Service Agreements with the Company ("Authorized Dealers"). Such equal amount shall be charged to each Authorized Dealer. The Dealer shall promptly pay the amount so charged.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 206 of 233

## 18. REQUIRED APPEAL TO POLICY BOARD—TERMINATIONS OR NONRENEWALS—OPTIONAL ARBITRATION PLAN (Continued)

(3) Each party shall pay and bear all costs of any witness called or other evidence adduced by that party, of any attorney, accountant or other person retained by that party and of any transcript ordered by that party in connection with any arbitration under the Arbitration Plan.

(4) The Arbitration Panel, as a part of any award, may assess, against any party or parties to an arbitration under the Arbitration Plan, all or any part of the costs of any witness called, any other evidence adduced, or any outside service employed, at the direct request of any Arbitrator.

## OBLIGATIONS UPON TERMINATION OR NONRENEWAL

19. Upon termination or nonrenewal of this agreement by either party, the Dealer shall cease to be an authorized Ford dealer; and:

19. (a) *Sums Owing the Company*. The Dealer shall pay to the Company all sums owing to the Company by the Dealer.

19. (b) *Discontinuance of Use of Trademarks and Trade Names*. The Dealer shall at his own expense (1) remove all signs erected or used by the Dealer, or by any business associated or affiliated with the Dealer, and bearing the name "Ford" or any other trademark or trade name used or claimed by the Company or any of its subsidiaries (except signs owned by the Company and except as such use may be permitted under other agreements relating to products of the Company other than COMPANY PRODUCTS) or any word indicating that the Dealer is an authorized dealer with respect to any COMPANY PRODUCT, (2) erase or obliterate all such trademarks, trade names and words from stationery, forms and other papers used by the Dealer, or any business affiliated with the Dealer, (3) discontinue all advertising of the Dealer as an authorized dealer in COMPANY PRODUCTS, (4) discontinue any use of any such trademark, trade name or word in the Dealer's firm or trade name and take all steps necessary or appropriate in the opinion of the Company to change such firm or trade name to eliminate any such trademark, trade name or word therefrom, and (5) refrain from doing anything whether or not specified above that would indicate that the Dealer is or was an authorized Dealer in COMPANY PRODUCTS.

If the Dealer fails to comply with any of the requirements of this subparagraph 19(b), the Dealer shall reimburse the Company for all costs and expenses, including reasonable attorney's fees, incurred by the Company in effecting or enforcing compliance.

19. (c) *Warranty Work*. The Dealer shall cease to be eligible to receive reimbursement from the Company with respect to any work thereafter performed or part thereafter supplied under any warranty or policy applicable to any COMPANY PRODUCT, unless specifically authorized by the Company in writing to perform such work and then only in the manner and for the period of time set forth in such authorization.

19. (d) *Service Records*. The Dealer shall deliver to the Company or its nominee all of the Dealer's records with respect to predelivery, warranty, policy, campaign and other service work of the Dealer.

19. (e) *Orders and Customer Deposits*. The Dealer shall assign to the Company or its nominee all customer orders for COMPANY PRODUCTS which the Dealer has not filled and

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 207 of 233

which the Company is not obligated by subparagraph 19(f) to supply to the Dealer, and all customer deposits made thereon; and deliver to the Company or its nominee the names and addresses of the Dealer's existing and prospective customers for COMPANY PRODUCTS.

**19. (f) *Deliveries After Termination or Nonrenewal*.** If this agreement shall be terminated or not renewed by the Company (1) because of the death or physical or mental incapacity of any principal owner of Dealer pursuant to subparagraph 17(d) hereof, or (2) at will pursuant to subparagraph 17(f) hereof, the Company shall use its best efforts to fill the Dealer's bona fide orders for COMPANY PRODUCTS outstanding on the effective date of termination or nonrenewal. The Company's fulfillment of such orders for VEHICLES, however, may be limited to the number and type of VEHICLES delivered to the Dealer by the COMPANY during the ninety (90) days immediately preceding such date, or the number and type of bona fide retail orders for VEHICLES accepted by the Dealer and unfilled on such date, whichever is smaller. Deliveries under this subparagraph shall be made in substantial accord with the Company's normal delivery schedules for the area, unless the Company elects to make all such deliveries within thirty (30) days after the effective date of termination. The Dealer shall inspect, condition and repair such VEHICLES in the manner specified in this agreement and in accordance with procedures outlined by the Company from time to time.

Except for deliveries required by this subparagraph 19(f), each order for a COMPANY PRODUCT received by the Company from the Dealer and unfilled on the effective date of termination or expiration of this agreement shall be deemed cancelled.

## SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY

**20.** In the event of termination or nonrenewal of this agreement by the Company pursuant to subparagraph 17(d) because of the death or physical or mental incapacity of a principal owner of the Dealer named in subparagraph F(i) hereof:

**20. (a) *Interim Agreement*.** The Company, subject to the other provisions of this paragraph, shall offer an Interim Ford Sales and Service Agreement for COMPANY PRODUCTS:

**(1)** To a successor dealership composed of the last person nominated by such principal owner as his successor, together with any other principal and remaining owners named in subparagraphs F(i) and F(iii) (hereafter called "Other Owners") hereof, provided that:

   **(i)** The nomination had been submitted to the Company in writing on the form supplied by the Company with the consent of the Other Owners prior to such death or the occurrence of such incapacity, and

   **(ii)** The Company, upon receipt of the nomination had accepted the nominee as then being qualified (or as capable of becoming qualified in five (5) years), and at the time the notice of termination or nonrenewal is given approves the nominee as then being qualified, to assume full managerial authority for the DEALER-SHIP OPERATIONS, which acceptance or approval shall not be unreasonably withheld, and

   **(iii)** The nominee has been named as a manager of, and has been actively participating in the general management of, the Dealer or a satisfactorily performing automotive or comparable retail business for a reasonable period of time prior to the time of the notice of termination or nonrenewal, and

## 20. SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY (Continued)

(iv) The successor dealership, at the time the Interim Agreement is to be offered, has capital and facilities substantially in accordance with Company GUIDES therefor, and

(v) In the event more than one nominee fulfills the above conditions, the Company, in its discretion, shall determine which nominee or nominees, together with the Other Owners, shall compose the successor dealership to which such Interim Agreement shall be offered;

(2) To a successor dealership, in the event that such principal owner has notified the Company in writing that the spouse or another relative or heir of such principal owner shall retain or acquire a financial interest in the successor dealership and the Company has approved such spouse, relative or heir for such financial interest which approval shall not be unreasonably withheld. Such successor dealership shall be composed of such spouse, relative or heir, together with the Other Owners and any nominee or nominees approved and qualified pursuant to subparagraph 20(a) (1) hereof, provided that:

(i) The Other Owners and any nominees and such spouse, relative or heir agree in writing how each of them shall participate in the ownership and management of the successor dealership, and

(ii) Managerial authority and responsibility of the successor dealership shall be vested in a nominee approved and qualified pursuant to subparagraph 20(a) (1) hereof, or in a person or persons who have been named in subparagraph F (ii) of this agreement and have been actually participating in the general management of the Dealer for a reasonable period of time prior to the notice of termination or nonrenewal or in another person or persons qualified to assume managerial authority and responsibility and approved by the Company to be so named, which approval shall not be unreasonably withheld, and

(iii) The successor dealership, at the time the Interim Agreement is to be offered, has capital and facilities substantially in accordance with Company GUIDES therefor;

(3) To a successor dealership, in the event that the deceased or incapacitated principal owner has neither nominated a successor pursuant to subparagraph 20(a) (1) hereof, nor notified the Company of a retained or acquired financial interest pursuant to subparagraph 20(a) (2) hereof, which successor dealership shall be composed of the Other Owners; provided that the Other Owners agree in writing how each of them shall participate in the ownership and management of the successor dealership and the successor dealership fulfills the conditions set forth in subparagraphs 20(a) (2)(ii) and (iii) of this agreement.

20. (b) *Buy-Out*. The successor dealership named in such Interim Agreement shall arrange in writing, subject to the approval of the Company which shall not be unreasonably withheld, for one or more persons named in subparagraph F(ii) of the Interim Agreement to have the right to acquire during its term at least a 20% ownership interest in the successor dealership and, if the successor dealership is offered a standard Sales and Service Agreement for

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 209 of 233

### 20. SUCCESSOR TO THE DEALER IN THE EVENT OF DEATH OR INCAPACITY (Continued)

COMPANY PRODUCTS at the expiration of the Interim Agreement, to have the right to acquire additional ownership interests therein during the first five (5) years of such standard agreement and, at the end of such five (5) years, to acquire the entire ownership interest therein.

20. (c) *Term/Continuation.* Any Interim Agreement offered pursuant to this paragraph 20 shall be in the form in effect between the Company and its authorized dealers in COMPANY PRODUCTS at the time of such offer, and the term of such Interim Agreement shall be for twenty-four (24) months, or such longer term as the Company shall determine to be reasonable to permit the person or persons named in subparagraph F(ii) thereof to acquire a 20% ownership interest in the successor dealership pursuant to subparagraph 20(b) of this agreement, subject to termination during such term as provided in such Interim Agreement. At least ninety (90) days prior to the end of the term of such Interim Agreement, the Company shall determine whether or not the person or persons composing the successor dealership with which such Interim Agreement shall have been executed possess the qualifications with respect to management, capital and facilities necessary to fulfill the responsibilities of an authorized dealer in COMPANY PRODUCTS and, if the Company shall determine that they do possess the same, which determination shall not be unreasonably made, the Company shall offer to such successor dealership, upon the expiration of the term of the Interim Agreement, a standard Sales and Service Agreement for COMPANY PRODUCTS in the form then in effect.

20. (d) *Limitation of Offer.* Notwithstanding anything stated or implied to the contrary in this paragraph 20, the Company shall not be obligated to offer an Interim Agreement to any successor dealership if the Company has notified the Dealer in writing prior to such death or physical or mental incapacity that the Company's market representation plans do not provide for continuation of representation from the DEALERSHIP FACILITIES as determined by the Company under paragraph 9 of this agreement. If such market representation plans provide for the relocation of the Dealer to another location, however, the Company shall offer an Interim Agreement subject to the condition that the successor dealership relocate within a reasonable time to such other location in facilities approved by the Company.

20. (e) *Limitation for Acceptance.* In the event that the person or persons composing a proposed successor dealership to which any offer of an Interim Agreement or Standard Sales and Service Agreement for COMPANY PRODUCTS shall have been made pursuant to this paragraph 20 shall not accept the same within thirty (30) days after notification to them of such offer, such offer shall automatically expire.

### REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS

21. Upon termination or nonrenewal of this agreement by the Company, the Dealer may elect as provided in paragraph 23 or, upon termination or nonrenewal of this agreement by the Dealer, the Dealer may demand in his notice of termination or nonrenewal, to have the Company purchase or accept upon return from the Dealer, in return for his general release specified in paragraph 23:

21. (a) *Vehicles.* Each unused, undamaged and unsold VEHICLE (together with all factory-installed options thereon) in the Dealer's stock on the effective date of such termination or

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 210 of 233

## 21. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS (Continued)

nonrenewal, provided such VEHICLE is in first-class salable condition, is of a then current model has not been altered outside the Company's factory, and was purchased by the Dealer from the Company or another authorized dealer in VEHICLES prior to giving or receiving notice of such termination or nonrenewal. The price for such VEHICLE shall be its DEALER PRICE, plus the Company's charges for distribution, delivery and taxes, at the time it was purchased from the Company, less all allowances paid or applicable allowances offered thereon by the Company.

**21. (b)** *Genuine Parts.* Each unused, undamaged and unsold GENUINE PART, and each unopened item of appearance and maintenance materials and paints (hereinafter called "maintenance items") in the Dealer's stock on the effective date of such termination or nonrenewal, provided such GENUINE PART or maintenance item is offered for sale by the Company to authorized dealers in VEHICLES in the Company's then current Parts and Accessories Price Schedules, is in first-class salable condition including reasonably legible and usable packaging and was purchased by the Dealer from the Company or another Company authorized dealer in normal volume prior to giving or receiving notice of such termination or nonrenewal. Notwithstanding the foregoing, the repurchase of such GENUINE PARTS identified by the Company as accessories shall be limited to those so purchased by the Dealer within twelve (12) months preceding such date, or those sold to the Dealer by the Company for use in a VEHICLE that is a current model on such effective date. The price for each such GENUINE PART or maintenance item shall be its DEALER PRICE in effect on the effective date of termination or nonrenewal, less all allowances paid or applicable allowances offered thereon by the Company. The Dealer, at his own expense, shall carefully pack and box such of the eligible GENUINE PARTS and maintenance items as the Company may direct, and the Company shall pay the Dealer an additional five percent (5%) of the DEALER PRICE of the eligible GENUINE PARTS and maintenance items so packaged and boxed.

**21. (c)** *Dealer's Signs.* Each sign at DEALERSHIP LOCATION which bears a trademark or trade name used or claimed by the Company or any of its subsidiaries, is owned by the Dealer on the effective date of termination or nonrenewal, was approved by the Company pursuant to subparagraph 6(a) and, if requested by the Company, is removed by the Dealer at his expense. The price for each such sign shall be its fair market value on such effective date as agreed by the Company and the Dealer, or, if they cannot agree, as determined by a qualified independent appraiser selected by the Company and the Dealer.

**21. (d)** *Special Tools and Equipment.* All special tools and automotive service equipment owned by the Dealer on the effective date of termination or nonrenewal which were designed especially for servicing VEHICLES, which are of the type recommended in writing by the Company and designated as "special" tools and equipment in the applicable CUSTOMER SERVICE BULLETIN or other notice pertaining thereto sent to the Dealer by the Company, which are in usable and good condition except for reasonable wear and tear, and which were purchased by the Dealer within the three (3) year period preceding the effective date of termination or nonrenewal. The price for each special tool and item of automotive service equipment shall be its fair market value on such effective date as agreed by the Company and the Dealer, or, if they cannot agree, as determined by a qualified independent appraiser selected by the Company and the Dealer.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 211 of 233

## 21. REACQUISITION OF COMPANY PRODUCTS AND ACQUISITION OF THE DEALER'S SIGNS, SPECIAL TOOLS AND EQUIPMENT, AND MAINTENANCE ITEMS (Continued)

**21. (e) *Procedures, Delivery and Title.*** The Dealer shall return all property to be purchased or acquired by the Company pursuant to this paragraph 21 in accordance with the procedures and timetables then established by the Company, shall deliver such property at the DEALERSHIP FACILITIES unless the Company directs otherwise (in which event the Company shall pay transportation costs to the place of delivery), shall and hereby does warrant good clear title to all such property, and shall furnish to the Company evidence satisfactory to the Company that the Dealer has complied with all applicable bulk sales laws and that such property is free and clear of all claims, liens and encumbrances.

**21. (f) *Payment.*** The Company shall pay the Dealer for the property purchased or acquired by it pursuant to this paragraph 21 within a reasonable time following the Dealer's fulfillment of all of the Dealer's obligations under paragraph 19 and this paragraph 21 subject to the Dealer's tender of a general release as specified in paragraph 23, and further subject to offset of any obligations owing by the Dealer to the Company. If the Company has not paid the Dealer the net amount due the Dealer for such property within a period of two (2) months after the Dealer has fulfilled his obligations under this paragraph 21 and provided the Dealer has fully complied with paragraphs 19 and 23, the Company will, at the Dealer's request, advance the Dealer seventy-five percent (75%) of the estimated amount due the Dealer net of any monies owed to the Company by the Dealer. The Company will pay the balance of such amount as soon as practical thereafter.

**21. (g) *Assignment of Benefits.*** As an assist to the Dealer in effecting an orderly transfer of his assets to a replacement dealer and to minimize possible interruptions in customer convenience and service, in the event of termination or nonrenewal by either party, any rights or benefits with respect to subparagraphs 21(a), 21(b), 21(c) and 21(d), herein may be assigned by the Dealer to anyone to whom the Dealer has agreed to sell the respective property and whom the Company has approved as a replacement for the Dealer. Such assignments will be subject to Dealer's fulfillment of his obligations under paragraph 19 and this paragraph 21 and subject to the Dealer's tender of a general release as specified in paragraph 23.

## DEALERSHIP FACILITIES ASSISTANCE UPON NONRENEWAL OR CERTAIN TERMINATIONS BY THE COMPANY

**22. (a) *Dealer Eligibility.*** The Dealer may elect, as provided in paragraph 23, to have the Company assist the Dealer with respect to the Dealer's Eligible Facilities (as herein defined), in return for the Dealer's general release as specified in paragraph 23, upon nonrenewal of this agreement by the Company, or upon termination of this agreement by the Company, for the following reasons:

    **(1)** Because of disagreement among persons named in paragraph F pursuant to subparagraph 17(b) (4) or because of the Dealer's failure with respect to prices or charges, terms or title or trademarks or trade names, or other sums due the Company pursuant to subparagraph 17(b) (6);

    **(2)** Because of the Dealer's nonperformance of his responsibilities set forth in paragraphs 2, 3, 4 or 6 pursuant to subparagraph 17(c);

(3) Because of the death or physical or mental incapacity of a principal owner named in subparagraph F(i) pursuant to subparagraph 17(d) providing that a successor dealership is not appointed as provided under paragraph 20;

(4) Because of failure of the Dealer or the Company to be licensed pursuant to subparagraph 17(e); or

(5) At will pursuant to subparagraph 17(f) if this agreement is not for a stated term specified in paragraph G of this agreement.

22. (b) *Eligible Facilities.* "Eligible Facilities" are hereby defined as only those DEALERSHIP FACILITIES which are listed in the Dealership Facilities Supplement in effect at the time of such nonrenewal or termination, are approved by the Company pursuant to paragraph 5, are owned or leased by the Dealer and are being used by the Dealer solely for fulfilling his responsibilities under this agreement (or under this agreement and one or more other vehicle sales agreements with the Company which are not renewed or are terminated by the Company at the same time as this agreement) at the time the Dealer received notice of such nonrenewal or termination.

22. (c) *Company's Obligation.* Subject to the provisions of subparagraph 22(d) hereof, if neither the Dealer nor the Company can arrange with a third party within ninety (90) days after the effective date of such termination or nonrenewal:

(1) In the case of Eligible Facilities which are owned by the Dealer, either a lease for one year commencing within such ninety (90) days at fair rental value or a sale within such ninety (90) days at fair market value; or

(2) In the case of Eligible Facilities which are leased by the Dealer, either an assignment of lease, or a sublease for one year (or for the balance of the term of the Dealer's lease if that is shorter) commencing within such ninety (90) days at the Dealer's rental rate (or, if the facilities are owned by an affiliate of the Dealer at fair rental value, if that is different);

the Company shall offer either to make monthly payments to the Dealer, commencing with the ninety-first day, pursuant to subparagraph 22(e) hereof, or to make a lump sum payment to the Dealer pursuant to said subparagraph 22(e), or to accept for itself on the ninety-first day such a lease or sale from the Dealer-owner or such an assignment or sublease from the Dealer-lessee.

For the purpose of this subparagraph 22(c), fair market or fair rental value shall mean value based on the use of the facilities in the conduct of DEALERSHIP OPERATIONS. In the event the Dealer and the Company are unable to agree on the fair market or rental value of any Eligible Facilities, such value shall be determined by an independent real estate appraiser selected by the Dealer and the Company.

22. (d) *Limitations on Company's Obligation.* The Company's obligation with respect to any Eligible Facilities shall be limited to those expressly set forth in this paragraph 22. The Company shall be released from all obligations with respect to any Eligible Facilities if (1) the Dealer fails to give the Company, within thirty (30) days after the Company shall have sent him a tender of benefits as provided in paragraph 23, a written request for assistance pursuant to this paragraph 22, accompanied by a written representation by the Dealer that the Dealer

and each owner named in subparagraph F(i) is, for a period of at least one (1) year, retiring from the business of selling new and used passenger cars and trucks in the general area of the DEALER'S LOCALITY, (2) the Dealer fails to make diligent efforts to obtain from third parties an offer to purchase, lease, sublease or take an assignment of lease described in subparagraph 22(c), or refuses, or within a reasonable time fails to accept, such an offer from a third party; (3) the Dealer does not accept any offer with respect to Eligible Facilities made by the Company in accordance with subparagraph 22(c) within thirty (30) days after receiving it, (4) the Dealer or anyone else occupies such facilities for any purpose for a period of more than ninety (90) days following the effective date of such termination or nonrenewal, or (5) the Company arranges a cancellation of the lease of any leased facilities without cost to the Dealer or the Dealer fails or refuses to execute an agreement covering such cancellation.

22. (e) *Satisfaction of Company's Obligation.* The Company may satisfy all of its obligations under this paragraph 22 with respect to any Eligible Facilities by paying to the Dealer (1) if the facilities are owned by the Dealer, the difference, each month for twelve months (or until facilities are sold if that is earlier), between any lesser rentals received by the Dealer for such facilities for such month and the fair rental value of such facilities for such month, or (2) if the facilities are leased by the Dealer, the difference, each month for twelve months (or until the expiration of the lease if that is earlier) between any lesser rentals received by the Dealer for such facilities for such month and the rental paid by the Dealer (or, if the facilities are owned by an affiliate of the Dealer, the fair rental value if that is different) for such facilities for such month, or (3) at the election of the Company, a lump sum equal to the total payments contemplated in items (1) or (2) of this subparagraph 22(e), or such lesser sum as may be agreed upon between the Dealer and the Company, or by paying any lease cancellation cost negotiated by the Dealer or the Company not to exceed the total of the Company's obligations under subparagraphs 22(c) and 22(e).

### TERMINATION BENEFITS FULL COMPENSATION; GENERAL RELEASE

23. In the event of termination or nonrenewal of this agreement by the Company, the Company, within thirty (30) days after the effective date thereof, shall submit to the Dealer (1) a written tender of the benefits provided for in paragraph 21 (and in paragraph 22 where applicable) and (2) a form for the Dealer to use to elect either to reject all of such benefits or to accept one or more of them as full and complete compensation for such nonrenewal or termination. The Dealer shall have thirty (30) days after receipt of such form to return the same to the Company evidencing his election. If the Dealer fails to return the form stating such election within such thirty (30) days, the Dealer shall be deemed to have elected to accept such benefits. Upon the Dealer's election to accept any of such benefits, or upon the Dealer's demand of any such benefits upon any termination or nonrenewal by the Dealer, the Company shall be released from any and all other liability to the Dealer with respect to all relationships and actions between the Dealer and the Company, however claimed to arise, except any liability that the Company may have under subparagraph 19(f) and said paragraphs 21 and 22, and except for such amounts as the Company may have agreed in writing to pay to the Dealer. Simultaneously with the receipt of any benefits so elected or demanded, the Dealer shall execute and deliver to the Company a general release with exceptions, as above described, satisfactory to the Company.

Case 5:23-cv-00167-D-BM   Document 1-1   Filed 03/31/23   Page 214 of 233

## DISPOSITION OF THE DEALER'S ASSETS

**24. (a) *Company Right to Approve Change in Ownership*.**

(1) In view of the nature, purposes and objectives of the Company's Dealer Sales and Service Agreements, and the differences in operating requirements among dealerships of differing sizes and types of markets, the Company expressly reserves the right to select the dealers with whom it will enter into such agreements so as to maintain as high quality a dealer organization as possible.

(2) In the event this agreement is terminated or not renewed by either party or if the Dealer plans to terminate or not renew this agreement, the Company acknowledges that the Dealer has the right to negotiate for the sale of the assets of the Dealer as such price as may be agreed upon by the Dealer and the prospective purchaser. In turn, the Dealer acknowledges that the Company has the right to approve or decline to approve any prospective purchaser as to his character, automotive experience, management, capital and other qualifications for appointment as an authorized dealer in COMPANY PRODUCTS for the DEALERSHIP OPERATIONS involved. Approval by the Company of the prospective purchaser shall not, however, be unreasonably withheld. If, in the opinion of the Company, the price to be paid for such assets appears, on the basis of the average operating results of other dealers, to result in an unsatisfactory return on investment so that such prospective purchaser (1) may not remain as a dealer, or (2) may be impelled to sell COMPANY PRODUCTS at high noncompetitive prices with a probable reduction in sales volume, the Company may, without liability to the Dealer, counsel with such prospective purchaser regarding such opinions.

**24. (b) *Company Right of First Refusal to Purchase*.**

(1) In the event the Dealer proposes a change in the ownership of 51 percent or more of the stock or transfer by sale or otherwise of the dealership business or its principal assets to any person or entity conditioned upon the Company entering into a Sales and Service Agreement with that person or entity, the Company shall have a Right of First Refusal to Purchase the stock or assets on the same terms and conditions offered or agreed to with such person, regardless of whether the proposed buyer is qualified to be a dealer.

(2) To exercise its Right of First Refusal, the Company must notify the Dealer in writing within thirty days of its receipt of the completed proposal for the proposed sale or transfer.

(3) Upon the Company's request the Dealer shall provide all documents relating to the transfer. The Company shall have the right to inspect the assets, including real estate, before exercising its Right of First Refusal.

(4) The Company's Right of First Refusal under this subparagraph 24(b) may be assigned to any third party ("Assignee"). If there is an assignment, Company will guarantee full payment of the purchase price by the Assignee. The Company shall have the opportunity to discuss the terms of the buy/sell agreement with any potential Assignee, as long as such information is treated confidentially.

**DISPOSITION OF THE DEALER'S ASSETS (Continued)**

(5) The Company's rights hereunder are binding on and enforceable against any successor in interest of the Dealer or purchaser of the Dealer's assets. When the proposed change of ownership involves a transfer by the Dealer solely to a member or members of his or her immediate family, or to a qualifying member of Dealer management, the Company's Right of First Refusal will not apply. An "immediate family member" shall be the spouse, child, grandchild, spouse of a child or grandchild, brother, sister or parent of the Dealer owner or his or her spouse. A "qualifying member of the Dealer's management" shall be an individual who has been employed by the Dealer in the dealership for at least four years and is otherwise qualified as a dealer operator.

(6) The Company agrees to pay the reasonable expenses, including attorney's fees which do not exceed the usual, customary, and reasonable fees charged for similar work done for other clients, incurred by the proposed new owners and transferee prior to the Company's exercise of its Right of First Refusal in negotiating and implementing the contract for the proposed sale or transfer of the Dealer or Dealer's assets.

(7) Notwithstanding the foregoing, no payment of such expenses and attorney's fees shall be required if the Dealer has not submitted or caused to be submitted an accounting of those expenses within thirty days of the Dealer's receipt of the Company's written request for such an accounting. Such accounting may be requested before the exercise by the Company of its Right of First Refusal.

## NEW AGREEMENT

**25.** The termination or nonrenewal of this agreement by the Company in connection with the offer by the Company of a new sales and service agreement for one or more COMPANY PRODUCTS to the Dealer or the Dealer's successor in interest shall not give rise to the rights and obligations provided in paragraphs 19, 21 and 22 with respect to the COMPANY PRODUCTS included in such new agreement, unless otherwise specified by the Company in writing.

## ACKNOWLEDGEMENTS

**26.** This agreement terminates and supersedes all other agreements concerning the DEALERSHIP OPERATIONS and constitutes the entire agreement between the parties with respect to the subject matter hereof. Each party acknowledges that, except as expressly set forth herein, no representation, understanding or presumption of law or fact has been made or relied upon (1) which has induced the execution of this agreement or would in any way modify any of its provisions, or (2) with respect to the effectiveness or duration of this agreement or the sales or profit expectancy of the DEALERSHIP OPERATIONS. The Dealer further acknowledges that he has voluntarily entered into this agreement without coercion or intimidation or threats thereof from the Company, and that each of its provisions is reasonable, fair and equitable.

## NO IMPLIED WAIVERS

**27.** Except as expressly provided in this agreement, the waiver by either party, or the failure by either party to claim a breach, of any provision of this agreement shall not constitute a waiver of any subsequent breach, or affect in any way the effectiveness, of such provision.

29

## RELATIONS AFTER TERMINATION NOT A RENEWAL

**28.** In the event that, after termination or nonrenewal of this agreement, either party has any business relations with the other party with respect to any COMPANY PRODUCT, such relations shall not constitute either a renewal of this agreement or a waiver of such termination or nonrenewal, but all such relations shall be governed by terms identical with the provisions of this agreement unless the parties execute a new and different agreement.

## LIMITATION OF THE COMPANY'S LIABILITY

**29.** This agreement contemplates that all investments by or in the Dealer shall be made, and the Dealer shall purchase and resell COMPANY PRODUCTS, in conformity with the provisions hereof, but otherwise in the discretion of the Dealer and the Dealer's owners. Except as herein specified, nothing herein contained shall impose any liability on the Company in connection with the DEALERSHIP OPERATIONS or otherwise or for any expenditure made or incurred by the Dealer in preparation for performance or in performance of the Dealer's responsibilities under this agreement.

## NOTICES

**30.** Any notice required or permitted by this agreement, or given in connection herewith, shall be in writing and shall be given by personal delivery or by first-class or certified or registered mail, postage prepaid. Notices to the Company shall be delivered to or addressed to the District Sales Manager of the area in which the Dealer is located except notices given by the Dealer either to the Policy Board or pursuant to the Arbitration Plan. Notices to the Dealer shall be delivered to any person designated in paragraph F(ii) of this agreement or directed to the Dealer at the Dealer's principal place of business as decribed herein.

## AMENDMENT

**31.** Notwithstanding anything in this agreement to the contrary, the Company shall have the right to amend, modify or change this agreement in case of legislation, government regulation or changes in circumstances beyond the control of the Company that might affect materially the relationship between the Company and the Dealer.

## MICHIGAN AGREEMENT

**32.** This agreement has been signed by the Dealer and sent to the Company in Michigan for final approval and execution and has there been signed and delivered on behalf of the Company. The parties intend this agreement to be executed as a Michigan Agreement and to be construed in accordance with the laws of the State of Michigan.

## CONFLICT WITH STATUTE

**33.** If performance under this agreement is illegal under a valid law of any jurisdiction where such performance is to take place, the performance will be modified to the minimum extent necessary to comply with any such law as was effective on the date of execution of this agreement.





**North Carolina Automobile Dealers Association**

October 26, 2022
*Via Overnight Delivery*

Mr. James Farley
President & CEO
Ford Motor Company
One American Road
Dearborn, MI 48126

Re: Ford Electric Vehicle Program, Certified and Certified - Elite

Dear Mr. Farley:

On behalf of the North Carolina Automobile Dealers Association ("NCADA"), the purpose of this correspondence is to follow up on my prior letter of March 4, 2022, in which I expressed our surprise, concern and disappointment over Ford Motor Company's ("Ford") decision to remove or limit some Ford dealers' future access to Ford's electric vehicles ("EV").

As discussed below, the Ford Model e Electric Vehicle (EV) Program ("Program"), as currently presented, harms North Carolina consumers, slows the growth of EV sales, and violates multiple North Carolina dealer franchise statutes. NCADA and its members stand ready to take whatever action is required to protect our state's consumers and dealers.

## ALL FORD DEALERS ARE ENTITLED TO RECEIVE FORD EV INVENTORY

The fundamental problem with the Program is that by establishing expensive, onerous prerequisites for dealers to be allowed to sell EVs, that are far in excess of what are reasonably required for dealers to effectively sell and service EVs, Ford is excluding many small and rural dealers from receiving EVs and is imposing an unnecessary financial burden on all dealers that sign up to participate in the Program.

Consistent with your comments noted in Automotive News last month, *"The main message to the dealers, which I've never said before because I never believed it was true, is that you could be the most valuable franchise in the industry"* Ford should design its Program to enable and encourage ALL Ford dealers to participate and more rapidly advance public acceptance of EV vehicles.

Ford's basic precept should have been, 'how do we create an EV program that minimizes costs to dealers while ensuring that dealers receive necessary training and install sufficient charging capacity and other infrastructure to sell EVs?' Instead, by requiring that all dealers spend between $600,000 and $1.4 million per rooftop to be allowed to receive any EV, smaller dealers will be priced out of EV sales and consumers will have fewer options from where to purchase and service EVs.

In North Carolina, it is unlawful for a dealer to be required to pay extra fees, purchase unreasonable quantities of materials or alter their facilities in order to receive any particular model or series of vehicles for which the dealer has a franchise. Specifically, pursuant to N.C. Gen. Stat. §20-305(32), it is unlawful for a motor vehicle manufacturer:

> (32)   To require that any of its franchised new motor vehicle dealers located in this State pay any extra fee, purchase unreasonable or unnecessary quantities of advertising displays or other materials, or remodel, renovate, or recondition the dealers' existing facilities in order to receive any particular model or series of vehicles manufactured or distributed by the manufacturer for which the dealers have a valid franchise. Notwithstanding the foregoing, nothing contained in this subdivision shall be deemed to prohibit or prevent a manufacturer from requiring that its franchised dealers located in this State purchase special tools or equipment, stock reasonable quantities of certain parts, or participate in training programs which are reasonably necessary for those dealers to sell or service any model or series of vehicles.

Ford is unwilling to guarantee dealers that it will manufacture and distribute enough EVs to enable dealers to recoup all or any portion of the huge financial outlays Ford is asking dealers to make in order for dealers to be eligible to sell any EVs at all.

Certainly, dealership employees will require some training related to selling and servicing EVs and some facility enhancements and materials may also be reasonably necessary to sell and service EVs. But the amount of such training, materials and facility enhancements reasonably required will vary greatly from market to market and, within each market, from dealer to dealer. Most dealers can obtain the necessary EV training and make the necessary EV facility modifications for significantly less than what is currently required by Ford. Higher volume dealers in metropolitan markets may require more training and may need higher cost facility enhancements to support a larger number of sales and service customers. Because Ford undoubtedly understands the necessity of scaling EV training and facility requirements to fit the size of markets and the needs of individual dealers, we believe that Ford has knowingly priced it levels of EV participation to discourage smaller dealers from participating and to encourage them to sell or to ultimately give up their Ford franchises.

With that said, we note the provisions of N.C. Gen. Stat. §20-305(14) that in part provide:

> "The willful or malicious maintenance, creation, or alteration of a vehicle allocation process or formula by a manufacturer, factory branch, distributor, or distributor branch that is in any part designed or intended to force or coerce a dealer in this State to close or sell the dealer's franchise, cause the dealer financial distress, or to relocate, update, or renovate the dealer's existing dealership facility shall constitute an unfair and deceptive trade practice under G.S. 75-1.1."

## THE PROPOSED PROGRAM VIOLATES THE NORTH CAROLINA DEALER ALLOCATION STATUTE

The North Carolina dealer franchise laws impose a number of legal requirements relating to vehicle allocation on motor vehicle manufacturers that have dealers in this state. Specifically, N.C. Gen. Stat. §20-305(14) provides that a manufacturer must allocate its products within this State in a manner that, among other requirements, does all of the following:

- Provides each of its franchised dealers in this State an adequate supply of vehicles by series, product line, and model in a fair, reasonable, and equitable manner based on each dealer's historical selling pattern and reasonable sales standards as compared to other same line-make dealers in the State.
- Allocates an adequate supply of vehicles to each of its dealers by series, product line, and model so as to allow the dealer to achieve any performance standards established by the manufacturer and distributor.
- Is fair and equitable to all of its franchised dealers in this State.
- Makes available to each of its franchised dealers in this State a minimum of one of each vehicle series, model, or product line that the manufacturer makes available to any dealer in this State and advertises in the State as being available for purchase.
- Does not unfairly discriminate among its franchised dealers in its allocation process.

The Program fails to comply with any of the above North Carolina statutory vehicle allocation requirements.

North Carolina Ford dealers are already selling Ford EV models. Ford notes in its Program materials to dealers that dealers who have not enrolled in the Program by the established enrollment date "will cease to be eligible to sell or service EVs." Taking away a North Carolina dealer's ability to sell Ford EV models, including models that dealers are already selling, for refusing to sign up for the Program due to the Program's onerous and unjustified financial requirements and dealers' inability to afford or financially justify the required financial commitment, amounts to a constructive termination of these dealers' franchise agreements with Ford. Furthermore, under N.C. Gen. Stat. §20-305(3), it is unlawful for a manufacturer to "Unfairly without due regard to the equities of the dealer, and without just provocation, to cancel the franchise of such dealer."

## THE ONEROUS TRAINING AND FACILITY REQUIREMENTS IMPOSED ON FORD DEALERS THAT ARE CONTAINED IN THE PROGRAM WILL SLOW THE GROWTH OF EV SALES

North Carolina Ford dealers are "All in On EVs", as are all new automobile and truck dealers throughout North Carolina. Dealers across the state are already investing in extensive preparations for the anticipated growth of the EV market driven by the increasing consumer interest in EVs. Franchised dealers will play a critical role in the overall efforts to promote and advance EV adoption in North Carolina and throughout the nation. Truly, a key competitive edge for Ford and

other legacy OEMs is their network of franchised dealers that will support and drive the adoption of EV product offerings.

Unfortunately, the proposed Program and the huge financial requirements the Program imposes on Ford dealers, though being touted as a "voluntary", threatens the viability of many Ford dealers and undermines the potential for Ford's success in its EV model endeavors.

Recognizing the important public policy in ensuring that consumers throughout North Carolina have the ability to purchase EVs from local dealers and the danger to the consuming public of factory policies and programs that would threaten a dealer's viability in the marketplace, the North Carolina General Assembly enacted provisions just last year to ensure that dealers are not discouraged from selling EVs by unduly onerous and unnecessary factory capital requirements.

Specifically, as part of the recent statutory changes noted above, N.C. Gen. Stat. §20-305(9) provides that a manufacturer "may not require, coerce, or attempt to coerce any new motor vehicle dealer to purchase unnecessary or unreasonable quantities of...charging stations...." Further, this statute prohibits a manufacturer or distributor from requiring, coercing, or attempting to coerce any of its franchised dealers to:

- Purchase or lease any electric vehicle charging stations at the dealer's expense more than the number of electric vehicle charging stations for use by service technicians and customer education than would reasonably be necessary for the dealer to perform these functions based on the dealer's estimated sales and service volume during the following three-year period.
- Make electric vehicle charging stations located at the dealership available for use by the general public.
- Purchase or lease any diagnostic equipment or tool for the maintenance, servicing, or repair of electric vehicles if the dealer has other diagnostic equipment or tools available for servicing another brand or line make of vehicle manufactured or distributed by that manufacturer or distributor that can perform the work to the standards required by and which have been approved by the applicable manufacturer or distributor; provided that approval by the manufacturer or distributor shall not be unreasonably withheld.

Again, the financial requirements of the Program far exceed what would be deemed to be reasonable under the above-noted statutes.

## THE PROGRAM MANDATES SALES AND MARKETING PROCESSES THAT ARE MORE EFFICIENTLY MANAGED BY LOCAL DEALERS AND CONSUMERS

Finally, the Program also contains factory required sales and marketing processes that are better managed by the local dealer and its customers. As I noted to the Ford representatives at the recent Chicago ATAE meeting, dealers clearly recall the efforts of Ford in 1999 to implement the Ford Retail Network in Salt Lake City, Rochester and Indianapolis, and they further recall the colossal failure experienced by Ford in its efforts to directly market and sell vehicles and services to local customers.

Mr. James Farley
October 26, 2022
Page 4

other legacy OEMs is their network of franchised dealers that will support and drive the adoption of EV product offerings.

Unfortunately, the proposed Program and the huge financial requirements the Program imposes on Ford dealers, though being touted as a "voluntary", threatens the viability of many Ford dealers and undermines the potential for Ford's success in its EV model endeavors.

Recognizing the important public policy in ensuring that consumers throughout North Carolina have the ability to purchase EVs from local dealers and the danger to the consuming public of factory policies and programs that would threaten a dealer's viability in the marketplace, the North Carolina General Assembly enacted provisions just last year to ensure that dealers are not discouraged from selling EVs by unduly onerous and unnecessary factory capital requirements.

Specifically, as part of the recent statutory changes noted above, N.C. Gen. Stat. §20-305(9) provides that a manufacturer "may not require, coerce, or attempt to coerce any new motor vehicle dealer to purchase unnecessary or unreasonable quantities of ...charging stations...." Further, this statute prohibits a manufacturer or distributor from requiring, coercing, or attempting to coerce any of its franchised dealers to

- Purchase or lease any electric vehicle charging stations at the dealer's expense more than the number of electric vehicle charging stations for use by service technicians and customer consumers that would reasonably be necessary for the dealer to perform these functions based on the dealer's estimated sales and service volume during the following three-year period.
- Make electric vehicle charging stations located at the dealership available for use by the general public.
- Purchase or lease any diagnostic equipment or tool for the maintenance, servicing, or repair of electric vehicles if the dealer has other diagnostic equipment or tools available for servicing another brand or line make of vehicle manufactured or distributed by that manufacturer or distributor that can perform the work to the standards required by and which have been approved by the applicable manufacturer or distributor, provided that approval by the manufacturer or distributor shall not be unreasonably withheld.

Again, the financial requirements of the Program far exceed what would be deemed to be reasonable under the above-noted statutes.

**THE PROGRAM MANDATES SALES AND MARKETING PROCESSES THAT ARE MORE EFFICIENTLY MANAGED BY LOCAL DEALERS AND CONSUMERS**

Finally, the Program also contains factory required sales and marketing processes that are better managed by the local dealer and its customers. As I noted to the Ford representative at the recent Chicago ATAE meeting, dealers clearly recall the efforts of Ford in 1999 to implement the Ford Retail Network in Salt Lake City, Rochester and Indianapolis, and they further recall the colossal failure experienced by Ford in its efforts to directly market and sell vehicles and services to local customers.

Again, as stated in our March 4th letter, despite Ford's repeated assurances throughout the years that their dealers are their 'partners,' Ford's announcement of its Program produced instant dismay and disappointment among all Ford dealers. The Program further dampens the pride that Ford dealers have for their partner and possibly limits or reduces the value of their dealership.

In summary, NCADA hopes to continue to work with our Ford dealer members and Ford to produce a win-win-win relationship for the Ford customer, the dealer, and the factory. Additionally, NCADA will work with NADA and local state regulators as well as several other state dealer associations to best understand the legal ramifications and best course of action to protect the interests of the consumer and the Ford dealer.

Given Ford's poor experience with the Ford Retail Network between 1999 and 2001, we recommend that Ford voluntarily overhaul the Program and affirm its decades-old commitment to all of its North Carolina dealer partners. Such a commitment would lead to the development of an EV program that is consumer-driven, rooted in market-based projections, and centered on economies of scale that directly tie the possible reward a dealer may realize with the required investment that a dealer is making. Sadly, the Program as presented today completely misses the mark on each of these measures.

As I stated at the beginning of this letter, NCADA intends to take whatever action is required to protect our state's consumers and dealers. As such, in the coming days, we intend to make the North Carolina Commissioner of Motor Vehicles aware of the serious violations of state law presented by the Program. Additionally, I understand that dealers are prepared to take legal action to protect their investments and the interests of consumers should Ford refuse to modify the Program to comply with state law.

On behalf of the dealers, we certainly welcome the opportunity to meet with you and your leadership team, together with North Carolina Ford dealers in the very near future, either in Raleigh or in Dearborn, to discuss the critical issues referenced above.

Sincerely,

Robert J. Glaser
NCADA President

cc:     NCADA Board of Directors
        North Carolina Ford, Lincoln dealers
        NADA President Mike Stanton
        Marin Gjaja, Chief Customer Officer, Ford Model e
        Michael O'Brien, Director, North American Market Representative



EXHIBIT

C



**North Carolina Automobile Dealers Association**

December 6, 2022
*Via Overnight Delivery*

Mr. James Farley
President & CEO
Ford Motor Company
One American Road
Dearborn, MI 48126

Re:     Ford Electric Vehicle Program, Certified and Certified - Elite

Dear Mr. Farley:

We are in receipt of Michael O'Brien's November 22, 2022 response to our October 26, 2022 letter to you regarding North Carolina Ford dealer concerns about the Ford Model e Electric Vehicle Program ("Program").

We remain firmly committed to the position we stated previously -- that the Program, even with the minor modifications Ford has made to the Program subsequent to our earlier correspondence, will continue to harm North Carolina consumers, slow the growth of EV sales, and violate multiple North Carolina dealer franchise statutes.

In meetings held in both October and November, Ford dealers overwhelmingly expressed their anxiety about the legality of the Program in North Carolina, the onerous and unnecessary financial obligations associated with the Program, and the lack of any genuine assurance that sufficient EV inventory will be available for them to sell, or that sufficient consumer demand will exist to purchase these products. In the end, we know of a significant number of dealers who are expressly seeking to clarify that in signing up to participate in the Program, they nevertheless have done so with a full reservation of their rights to require Ford to modify the Program so that it is fully compliant with applicable law.

Although most of our Association's Ford dealer members are very excited about Ford's commitment to design and produce EVs, those dealers remain very upset about the unscaled financial commitment Ford is expecting dealers to make, and about the Program's interference with dealer autonomy, dealer decision-making, and the customer - dealer relationship.

Unfortunately, at this point in time, based upon what we are hearing from North Carolina Ford dealers, we see litigation by dealers against Ford as being unavoidable, unless Ford promptly makes material changes to the Program. What is even more unfortunate is that it doesn't have to be this way!

It is clear that the Program violates the North Carolina franchise laws in a number or respects, including, but not limited to:

- The Program cannot in any respect be viewed as being "voluntary" in nature. Requiring dealers to enroll in order to continue to be allowed to sell vehicles that they are currently selling is not "voluntary" and thus amounts to coercion.

- The Program requires investments in training and software that is not reasonably necessary for dealers to sell and service EVs. North Carolina law expressly prohibits Ford from charging dealers extra fees in order to receive any models or series of vehicles, or requiring that dealers purchase unnecessary or unreasonable quantities of materials in order to receive any models or series of vehicles.

- The Program fails to allow for the allocation to each North Carolina Ford dealer of at least one of each model or series of vehicle that Ford makes available for sale to the public. State law further requires Ford to allocate product among its dealers in a fair and equitable manner.

- The Program violates the provisions of N.C. Gen. Stat. §20-305(53) by interfering with the rights of customers and dealers to negotiate the ultimate price of a vehicle, as well as the terms of any vehicle trade. .

- The Program requires that dealers purchase and install public facing charging stations. N.C.Gen.Stat. §20-305(9) express prohibits a manufacturer from requiring that a dealer purchase charging stations "for use by the general public."

- The Program requires that dealers purchase and install a significant number of charging stations, notwithstanding dealers' respective anticipated volumes of EV sales and service. N.C.Gen.Stat. §20-305(9) specifically makes it unlawful for Fordy to require that its dealers install a greater number of charging stations than the dealer would reasonably be expected to need within the following three-year period based upon anticipated volume of sales and service business.

**NCADA has been working with a group of Ford dealers to garner a solid understanding of dealer concerns about the Program. They sincerely hope that litigation can be avoided. We have tentatively selected a small working group of its staff, dealer members and outside counsel to meet in person in the very near future with a similar small working group that we request you appoint from Ford, in a last-ditch effort to avoid litigation in North Carolina. To that end, we invite Ford to schedule a meeting with NCADA's dealer working group prior to December 25 in either Dearborn or Raleigh for the purpose of exploring modifications to the Program that may prove mutually beneficial and that will ensure compliance with the law.**

Mr. James Farley
December 6, 2022
Page 2

It is clear that the Program violates the North Carolina franchise laws in a number of respects, including but not limited to:

- The Program cannot in any respect be viewed as being "voluntary" in nature. Requiring dealers to enroll in order to continue to be allowed to sell vehicles that they are currently selling is not "voluntary" and this amounts to coercion.
- The Program requires investment in training and software that is not reasonably necessary for dealers to sell and service EVs. North Carolina law expressly prohibits Ford from charging dealers extra fees in order to receive any models or series of vehicles, or requiring that dealers purchase unnecessary or unreasonable quantities of materials in order to receive any models or series of vehicles.
- The Program fails to allow for the allocation to each North Carolina Ford dealer of at least one of each model or series of vehicle that Ford makes available for sale to the public. State law further requires Ford to allocate product among its dealers in a fair and equitable manner.
- The Program violates the provisions of N.C. Gen. Stat. §20-305(53) by interfering with the rights of customers and dealers to negotiate the ultimate price of a vehicle, as well as the terms of any vehicle trade.
- The Program requires that dealers purchase and install public facing charging stations. N.C.Gen.Stat. §20-305(9) expressly prohibits a manufacturer from requiring that a dealer purchase charging stations "for use by the general public."
- The Program requires that dealers purchase and install a significant number of charging stations, notwithstanding dealers' respective anticipated volumes of EV sales and service. N.C.Gen.Stat. §20-305(9) specifically makes it unlawful for Ford to require that its dealers install a greater number of charging stations than the dealer would reasonably be expected to need within the following three-year period based upon anticipated volume of sales and service business.

<u>NCADA has been working with a group of Ford dealers to garner a solid understanding of dealer concerns about the Program. They sincerely hope that litigation can be avoided. We have tentatively selected a small working group of its staff, dealer members, and outside counsel to meet in person in the very near future with a similar small working group that we request you appoint from Ford, in a last-ditch effort to avoid litigation in North Carolina. To that end, we invite Ford to schedule a meeting with NCADA's dealer working group prior to December 25 in either Dearborn or Raleigh for the purpose of exploring modifications to the Program that may prove mutually beneficial and that will ensure compliance with the law.</u>

We sincerely believe that by cooperating together, we will be able to work through all of the issues articulated above and that the end result will be a better and more competitive EV market for consumers, greater Ford dealer participation in the Program, greater volume and penetration for Ford EV products in North Carolina, and overall, a stronger and more successful EV Program for Ford.

We look forward to hearing from you about possible meeting dates.

Sincerely,

Robert J. Glaser
NCADA President

cc:     NCADA Board of Directors
        North Carolina Ford, Lincoln dealers
        NADA President Mike Stanton
        Marin Gjaja, Chief Customer Officer, Ford Model e
        Michael O'Brien, Director, North American Market Representative





North Carolina Automobile Dealers Association

January 4, 2023
*Via Overnight Delivery*

Mr. Michael O'Brien
Director, North American Market Representation
Ford Motor Company
One American Road
Dearborn, MI  48126

Re:  Meeting with North Carolina Ford dealers

Dear Mr. O'Brien:

As a follow up to your correspondence dated December 16, 2022, I hope that this letter will serve to continue the dialog that we had prior to the holidays regarding Ford's Model e EV Program ("Program").  This is the third letter that we have sent to the leadership team at Ford Motor Company regarding North Carolina Ford dealers' serious concerns with the Program.

NCADA takes issue with your suggestion that NCADA and its member Ford dealers provide their input relating to the Model e EV Program solely through a dealer who serves on the Model e Subcommittee of the Ford Dealer Council.  Although we clearly understand the role that the Ford Dealer Council plays in communicating with Ford Motor Company, we hope to work directly with Ford's leadership to produce a win-win-win relationship for the Ford customer, the dealer, and the factory.

At our most recent meeting of Ford dealers held in North Carolina in mid-December, more than 50% of the state's Ford dealerships were represented at the meeting.  The overarching sentiment at that meeting was very concise and very clear:

- First, North Carolina dealers are exceptionally proud of the partnership that they have had with Ford Motor Company.  Many of these partnerships span multiple generations - through World Wars and Global pandemics - working together to sell and service Ford vehicles.

- Second, dealers are very, very supportive and hopeful of working together with Ford Motor Company to collectively build a program that is good for the consumer, good for the dealer and good for Ford Motor Company.  We agree with Mr. Farley that Ford Motor Company's dealer network provides Ford with a key strategic advantage in the Company's efforts to make Ford a leader in the EV marketplace.

- Lastly, dealers are firmly unified in their belief that, for the benefit of both consumers and dealers, <u>ALL</u> aspects of the Model e EV Program must comply with state franchise laws. In our previous correspondence, we have described in detail certain aspects of the Program that are clearly inconsistent with North Carolina law. It is certainly reasonable to expect that Ford Motor Company would discuss with us, in good faith, steps needed to alleviate these obvious legal inconsistencies. Any other course of action is viewed by the dealers as disingenuous and representative of Ford's intention to act "above the law". As one dealer commented to us about Ford, "They've got to follow the law!"

Also, as noted in our previous communications, NCADA will work with local state regulators and NADA to best understand the legal ramifications and best course of action to protect the interests of the consumer and the Ford dealer.

On behalf of North Carolina's Ford dealers, I firmly believe that failure to pro-actively address the dealers' articulated concern, and legal inconsistencies with the Program, in the very near future, as outlined in our correspondence of October 26 and December 6, will most certainly lead to litigation in North Carolina.

Further, should it be necessary, we are prepared to pursue legislation during the upcoming Session of the North Carolina General Assembly that opens in Raleigh next month that will provide even greater strength to the dealer's position on the issues addressed in prior correspondence. We remain hopeful that neither litigation nor legislation will be required.

I look forward to hearing from you that we can meet in person, in early 2023, to move forward in a positive, mutually beneficial manner. We are tentatively holding two dates in January –January 18th or January 23rd – on which we could bring dealers together to meet with you and your team.

We continue to welcome the opportunity to meet with you and your leadership team to address the critical issues referenced above.

Sincerely,

*Robert Glaser*

Robert J. Glaser
NCADA President

cc:     NCADA Board of Directors
        North Carolina Ford, Lincoln dealers
        Jim Farley, Ford Motor Company CEO
        Marin Gjaja, Chief Customer Officer, Ford Model e
        Eddie Stivers, Ford Dealer Council
        Will Krill, Ford Regional Manager

DocuSign Envelope ID: 9585CBAC-D264-44E3-B26B-33DB60F83204





<u>*Via Federal Express*</u>

November 22, 2022

Mr. Robert J. Glaser
President
North Carolina Automobile Dealers Association
1029 Wade Avenue
Raleigh, North Carolina 27605

Re: <u>NCADA Letter of October 26, 2022</u>

Dear Mr. Glaser:

On behalf of Ford Motor Company ("Ford"), I am writing in response to your October 26, 2022 letter, on behalf of the North Carolina Automobile Dealers Association ("NCADA"), to James D. Farley, Jr., concerning Ford's 2022 Model e Electric Vehicle (EV) Program (the "Program"). Ford appreciates the opportunity to respond and to continue the dialogue.

Let me begin by noting that we agree with you that a key competitive edge for Ford in the electric vehicle ("EV") space is our network of franchised dealers. We also appreciate your statement that North Carolina Ford dealers are "All in On EVs." We respectfully disagree, however, that the Program "violates multiple North Carolina dealer franchise statutes" or is harmful to consumers. Although this letter will not respond to each and every allegation in your letter, in general, we do not believe that the Program standards are in excess of what are reasonably necessary for dealers to effectively sell and service EVs. Further, Ford has not "knowingly priced its levels of EV participation to discourage smaller dealers from participating and to encourage them to sell or ultimately give up their Ford franchises." Nor is Ford constructively terminating or canceling any franchise agreement. We believe that the Program standards are necessary and reasonable to promote a competitive image for our brand in the EV space. Moreover, Ford also has the right under its dealer agreement to develop programs, and dealers have a corresponding obligation to cooperate with such programs, which are designed, as the Program is, to develop good relationships between Ford dealers and the public. Fundamentally, the Program is intended to enhance competition and to strengthen the existing franchise system that already requires sales and service measures to promote our brand and satisfy consumer needs, not to lessen or undermine either.



DocuSign Envelope ID: 0885C3AC-0284-44E3-B2CB-33DB80F8320A

the opportunity to participate fully in the EV revolution, and all dealers will enjoy the advantages of whatever level of participation they choose to embrace. And, in order to accommodate as many dealers as possible, we are staggering the deadlines for the charging-related investments over a period of years. With respect to the concerns expressed about Ford's ability to supply adequate inventory to support Program investments, we simply disagree, and believe there will be an adequate supply of EVs.

It is not only a question of giving customers what they need and have a right to expect, as vitally important as that is. It is also a question of fairness to all dealers. Dealers who decide to make the commitment to EVs, and who make the necessary investments and embrace a new way of doing business for a fundamentally new kind of product, have a right to a level playing field. They should not be required to compete with dealers who fail or refuse to make the necessary investments in EV chargers and training required to sell EVs.

In closing, the Program is reasonable and provides our dealers with the choice of determining the best path forward for each of them. Indeed, several North Carolina dealers have elected to participate in the Program. We hope that the NCADA comes to share our vision and joins us in making the Ford EV dealer network a leader in the exciting new world of EVs. We look forward to continuing the discussion with you.

Very truly yours,

Michael O'Brien
Director, NA Market Representation, Ford Model e

EXHIBIT

F

| **Publish Date:** | February 14, 2023 | Due Date (If Applicable): | N/A |

**Information:** *Launch Announcement/Update: EFC12371 Model e Electric Vehicle ("EV") Certification Program – Certified; Modification of Key Term and Definition of "Certified Dealers"*

**Target Dealer Group:** All Ford Dealers

**Target Audience:** Dealer Principals, Sales Managers, Sales Consultants, F&I Managers, Service Managers, Parts Managers

**Target Dept(s):** ☒ New Sales ☐ Used Sales ☐ Fleet ☐ Finance ☐ Parts ☐ Service
☐ Model e ☐ Warranty ☐ Training

## ACTION REQUESTED
Please review the modifications to the Key Terms and Definitions of "Certified Dealers" as set forth in the Model e EV Certification Program – Certified (the "Program"). An updated copy of the Program may be found on the Model e homepage on FMCDealer. Please note that an announcement related to the modification of the 24/7 public charging and availability of a pre-construction charging review was released January 30 to Model e enrolled dealers. That communication can be reviewed here.

## SUMMARY
Model e is announcing two changes to the Key Terms and Definitions of "Certified Dealers" as set forth in the Program:
- Modification to the Model e Certified sales level
- Modification to Model e Certified dealer visibility on ford.com

## MODEL e CERTIFIED SALES
Model e previously communicated that new vehicle sales of Model e products were designed so that Certified dealers could sell EVs to their long-term, loyal customers and employees. In our effort to continuously evaluate the Program, and to modify, supplement, or amend the standards as appropriate, Model e is making the following changes to the Key Terms and Definitions section of the Program for "Certified Dealers" as follows:

- The 25-unit cap for Certified dealer sales to employees and loyal customers has been removed. The number of sales for a particular Certified dealer will depend upon the number of employees and loyal customers that meet the definitions provided below.
  - All other elements of the program remain unchanged at this time, including Certified dealers using built-to-order vehicles exclusively, no Model e inventory, and all other Standards
- **Sales to Employees:** Certified Dealers may sell built-to-order (BTO) Model e products to their employees pursuant to the D-Plan program and its eligibility criteria, standards and rules
  - Information about the D-Plan sales may be found using this link
  - Dealers are responsible for ensuring their dealerships comply with all D-Plan rules
- **Sales to Loyal Customers:** Certified Dealers may sell built-to-order (BTO) Model e products to their loyal customers, where a loyal customer is defined as a household that has purchased or leased at retail at least two new Ford vehicles from the Model e Certified dealer within the previous 7 years
  - Small businesses that buy or lease vehicles at retail (often known as "fleetail" sales) are eligible provided they meet the criteria set forth herein
  - Used vehicles and new vehicles from a brand other than Ford (including Lincoln) do not count towards the two-vehicle threshold

- o  Ford will audit compliance with the customer eligibility standards
- o  In order to avoid mistakes, misuse or abuse of the Program, customers will be required to sign a document that includes a statement that the vehicle is not being acquired for resale
- o  The dealer may sell up to 3 Model e products per calendar year to each customer household who meet the definition of "loyal customers" as defined herein
- o  The Company will strictly enforce any violations of our brokering as detailed in <u>EFC 10790</u>
- o  Because of the unique circumstances surrounding newly-acquired dealerships, the Model e team will discuss the "loyal customers" provision with newly-appointed dealerships.

**CERTIFIED DEALER VISIBILITY ON FORD.COM**
- All Ford dealers continue to have visibility on Ford.com. Certified dealers will now have more visibility during the shopping process in e-commerce on ford.com than previously announced.
- Employees and loyal customers will need to contact their Certified dealer to place a BTO order.
- Please note that the full e-commerce experience is still in development and we expect more details to follow at a later date.

**ENROLLMENT DECISION**
If the above modifications result in your Dealership revisiting its decision whether to participate in the Model e EV Certification Program (Certified, Certified Elite or by not participating), please send an email to <u>ModelE4@ford.com</u> by February 28, 2023. Include your dealership name, sales code and P&A Code, and advise us of whether your participation decision has changed. For example, if you wish to enroll or unenroll or change your level of participation, please provide that information. The Model e team will reach out to you to discuss next steps.

**QUESTIONS**
For more information, please visit the <u>Model e landing page</u> through FMC Dealer. Or contact your Regional Network Development Manager or email the Model e Team at <u>ModelE4@ford.com</u>.